542-07/ROSS

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Defendant TRANS
PACIFIC CARRIERS CO. LTD.
80 Pine Street
New York, New York 10005
(212) 425-1900

James L. Ross (JR6411)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
NAIAS MARINE S.A.,                          07 CV 10640 (PKL)

                          Plaintiff,

     - against -

TRANS PACIFIC CARRIERS CO. LTD.,            **DECLARATION OF MAX CROSS
                                            PURSUANT TO 28 U.S.C. § 1748**

                          Defendant
-----------------------------------------------------------

I, MAX CROSS, pursuant to the laws of the United States, declare under penalty
of perjury, that the following is true and correct:

1.    I am 37 years old and a solicitor admitted to practice in Hong Kong and in
England and Wales and a partner of the firm Ince & Co. of Room 3801-06, ICBC Tower,
Citibank Plaza, No. 3 Garden Road, Central, Hong Kong solicitors for the Defendant
TRANS PACIFIC CARRIERS CO.LTD. ("TRANS PACIFIC").

2.    Save where expressly stated to the contrary, the facts and matters deposed
to herein are within my own knowledge and are true. Where the facts and matters
deposed to herein are not within my own knowledge they are based on the stated sources
and are true to the best of my knowledge, information and belief.

2

3.      In terms of my background, I joined Ince & Co's London office in 1993 as a trainee solicitor. I remained with Ince & Co. after becoming admitted as a solicitor in 1995 until I moved to Ince & Co.'s Hong Kong office in 1998. In 2002, I became a partner of Ince & Co. Since 2002, I worked for 3 years at our London office and since the summer of 2005 I have been a resident partner of my firm's Hong Kong office. For the last 14 years, I have worked exclusively as a shipping litigation lawyer, advising clients on a wide range of matters connected with the shipping industry. I have personally handled over 150 shipping arbitrations whose seat is in London and I am familiar with and can comment with some authority on the process involved. In this year's edition of Chambers Asia 2008 (a leading legal reference book), I was named as one of Hong Kong's leading shipping lawyers.

4.      I make this affidavit in support of the Motion to Show Cause filed on behalf of the TRANS PACIFIC.

5.      TRANS PACIFIC was the time-charterer of the vessel STENTOR pursuant to a Charter Party ("C/P") dated August 14, 2007. Attached is a copy of the C/P (Exhibit A).

6.      Plaintiff NAIAS MARINE S.A. ("NAIAS") was the owner of the STENTOR, who entered into the aforementioned C/P agreement with the TRANS PACIFIC.

7.      Pursuant to the C/P, the parties expressly agreed that any disputes between them would be resolved by arbitration in London and according to English law. (See, Clause 31 of C/P, Exhibit A). As the parties agreed that any disputes between them would be resolved by arbitration in London and according to English law, the substantive

3

law governing the dispute is English law. As the substantive law of the arbitration is English law, as a matter of English law the dispute is governed by the provisions of the English Arbitration Act (1996) ("The 1996 Act"). The C/P further provides that the arbitration is to be conducted under procedural terms drafted by the London Maritime Arbitrator's Association ("The LMAA").

8. TRANS PACIFIC initiated a London arbitration against NAIAS claiming that NAIAS had wrongfully withdrawn the vessel STENTOR from their services in breach of the C/P. My firm was instructed to represent TRANS PACIFIC with respect to this dispute and I have personally handled this matter to the present time.

9. Our client TRANS PACIFIC had appointed Mr. Michael Baker-Harber as their arbitrator and served notice on the Plaintiff NAIAS. The Plaintiff, as they are required to do, served notice of the appointment of their arbitrator Mr. David Aikman and the Tribunal was duly constituted.

10. On November 14, 2007, TRANS PACIFIC served its Claim Submissions on NAIAS. Under the automatic direction set down in The LMAA rules, NAIAS is now due to serve its Defense Submissions within twenty-eight (28) days of service of the Claim Submissions. As such, the Defense Submissions of NAIAS are due to be served on or before December 12, 2007.

11. In the London arbitration proceeding, NAIAS has not asserted any counter-claim against TRANS PACIFIC seeking damages for an alleged breach of the C/P.

12. On the issue of security for costs, the arbitration Tribunal has the power to order that a Claimant (i.e. TRANS PACIFIC) put up security for the legal costs of the

4

Respondent (NAIAS). This power is expressly given to the Tribunal under §38(3) of The 1996 Act.

13.    Conversely, there is no power under English law for a Tribunal to order that a Respondent (i.e. NAIAS) post security for the legal fees and costs of the Claimant (i.e. TRANS PACIFIC). In essence, this is a one way deal in favor of the Respondent to a claim.

14.    The LMAA rules provide that an application for costs can be made by a Respondent after Defense Submissions have been served.    As such, the Respondent/Plaintiff NAIAS will have an opportunity to seek security for its costs, including attorney fees, relating to the London arbitration, after they have submitted their Defense Submissions on or before December 12, 2007.

15.    While the Plaintiff NAIAS has a procedure in the London arbitration proceedings for seeking security for its costs, it has instead initiated a Rule B attachment proceeding in the United States seeking security solely relating to its potential defense costs in the London arbitration.

16.    I have been asked by Freehill Hogan & Mahar to comment on whether those defense costs would be treated under English law as an admiralty or maritime claim. There are certain categories of claims under which English law entitle a Claimant to bring an action IN REM against a vessel. These can be described as "admiralty claims". Under English law, defense legal costs awarded in an arbitration do not fall within the English law definition of an "admiralty claim".

5

17.    Under English law the costs, including attorney fees, awarded to a successful party following the completion of an arbitration relating to a C/P are not damages awarded for claims under the C/P. Accordingly, they are not admiralty claims.

18.    The English legal system draws a clear distinction between the damages in the substantive sense, for example a claim for damages under a C/P, and the legal costs/attorney fees awarded after the claim has been decided. The costs are determined after the Court has ruled on the substantive merits.

19.    The leading authority on this issue is *The Bumbesti [1999] 2 Lloyds Rep 481.* A copy of the judgment of Aikens J in this case is attached herewith (Exhibit B). In *The Bumbesti* the Court was considering the enforcement of an arbitration award arising out of a dispute under a C/P. In attempting to enforce the arbitration award the successful Claimants arrested the vessel *Bumbesti* in Liverpool, England. The Claimants relied upon Section 20(2)(h) of the Supreme Court Act 1981 asserting that the damages awarded were admiralty claims arising out of an "agreement in relation to the use or hire of a ship." The Court held that the enforcement of this claim following an arbitration award is not an admiralty claim within the meaning of Section 20(2)(h) of the Supreme Court Act 1981.

In giving his judgment Aikens J stated that he was bound by the earlier Court of Appeal decision in *The Beldis [1936] P .51 (C.A.)* and then gave the following reasons (See paragraph 21(1), (2) and (3) of the judgment, Exhibit B):

> *"(1) The 'claim' in this case is the action on the award. The claim clearly arises out of the agreement to refer disputes that had arisen under the bareboat charterparty.*

6

*(2) However, that agreement to refer disputes is not, itself, an "agreement in relation to the use or hire of a ship". This is because the arbitration agreement, whether it is the individual reference or the general agreement to refer, is a contract that is distinct from the principal contract, i.e. the bareboat charterparty in this case.*

*(3) In The Antonis P Lemos, at p. 289, col. 2; p. 730 F-G, the House of Lords accepted that the authorities on par. (h) of the 1981 Act and its statutory predecessors made it clear that a narrow meaning must be given to the expression "in relation to" in that paragraph. The agreement to refer to arbitration individual disputes that have arisen out of a charter-party, or the agreement to refer future disputes in general that arise out of a charter-party, must be agreements that are indirectly "in relation to the use or hire of a ship". But, in my view, they are not agreements that are sufficiently directly "in relation to the use or hire of a ship". The arbitration agreement is, at least, one step removed from the "use or hire" of a ship. The breach of contract relied upon to found the present claim has nothing to do with the use or hire of the ship; it concerns the implied term to fulfil any award made pursuant to the agreement to refer disputes. In my view the breach of the contract relied on when suing on an award does not have the "reasonably direct connection with" the use or hire of the ship that Lord Keithheld in the Gatoil case was necessary to found jurisdiction under this paragraph: see p. 188, col. 1; p. 271A-B.*

*(4) Therefore, upon the proper construction of pat. (h), an action on an award is not one on an agreement which is "in relation to the use or hire of a ship".*

20.    The legal principle created by the **The Bumbesti** case applies here. If NAIAS was awarded legal costs following the conclusion of the London arbitration, and these costs were not paid, then NAIAS would have a claim against TRANS PACIFIC for

7

those costs. However, this would not be an admiralty claim under the charter. It would be a claim under the arbitration award. *The Bumbesti* makes it clear that the award is given pursuant to a separate agreement, being the agreement to refer disputes to arbitration, and which is distinct from the charterparty and which is not *"agreement in relation to the use or hire of a ship"*. Awards as to costs cannot therefore be considered to be admiralty claims. Accordingly, the English Courts have no jurisdiction to allow the arrest of a vessel solely to allow a party without a claim or counterclaim to obtain security for costs.

Executed at: Hong Kong
          December 11, 2007

_____
MAX CROSS

EXHIBIT A

# Time Charter

GOVERNMENT FORM

Approved by the New York Produce Exchange
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

## This Charter Party, made and concluded in Melbourne .......... 14th . day of August .......... 19. 2007

1  Between *Naias Marine S.A.* .......... Owners/disponent Owners *"Nestor"*

2  Owners of the good *Bahamas* .......... Steamship/Motorship *"Nestor"*

3  of 16,960 .......... tons gross register, and 16,498 .......... tons net register, having engines of .......... of Built 2006 .......... indicated horse power

4  and with hull, machinery and equipment in a thoroughly efficient state, and classed

5  at ..........

6  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one-and-one-half percent of ships' deadweight capacity, of about 57,523.017 / 35,762.65 cubic feet bale capacity, and about .......... 38,445 metric .......... tons of 2240 lbs.

7  allowing a minimum of fifty tons) on a draft of 9.78 meters feet ..........

8  dead weight capacity (cargo and bunkers, including fresh water and stores not exceeding one-and-one-half percent of ships' deadweight capacity,

9  which are of the capacity of about ..........

10  condition about .......... Summer loaded, inclusive of permanent bunkers,

11  now trading .......... inches on a consumption of about .......... tons of .......... , under good weather

12  .......... inches on a consumption of about .......... tons of fuel, and capable of steaming, fully laden, under good weather

13  and *Trans Pacific Carriers Co. Ltd.,* .......... Charterers of the City of Seoul, Korea

## Witnesseth,

14  That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

15  *about 2/3 laden legs, minimum 60 to maximum 100 days via safe port(s), safe berth(s), safe anchorage(s), always afloat, always*

16  accessible and always within IWL with lawful, harmless cargoes. (Intention first legs Cement Clinker) .......... within below mentioned trading

17  limits.

18  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

19  the fulfillment of this Charter Party.

20  Vessel to be placed at the disposal of the Charterers, at *dropping last outward sea pilot Kaohsiung, Thailand, any time day or night, Sundays*

21  *and holidays included.* in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6) as

22  Charterers may direct. If such dock, wharf or place be not available the Vessel to be ready to receive cargo with steam-swept holds and tight, staunch, strong and in every way fitted for the service *(See Clause 47),* having water ballast,

23  winches and

24  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and for the same

25  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchandise, including petroleum or its products, in proper containers, excluding *See Clause 77,* .......... *(vessel is not to be employed in the carriage of live stock but Charterers to have the privilege of shipping a small number on deck at their risk,*

26  all animals including equipment, fittings and foodstuff to be for Charterers' account and risk and the vessel to be properly fitted out.) in such lawful trades, between safe port and/or ports in British North

27  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

28  Mexico, and/or South America, .......... and/or Africa, and/or Europe, and/or Asia, and/or Australia, and/or New Zealand, excluding Magdalena River, River St. Lawrence between

29  October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic

30  ..........



35    as the Charterers or their Agents shall direct, on the following conditions:

36  1.    That the Owners shall provide and pay for all provisions, fresh water, wages and consular shipping and discharging fees of the Crew; shall pay
37  for the
38  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
        the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service with *all certificates necessary to comply with*
        *current requirements at all ports of call.*

39  2.    That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies, Commissions,
40  Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew and cargo prior to delivery to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is
        employed under this
43  charter to be for Charterers account including but not limited to crew transportation and accommodation. All other fumigations to be for
        Charterers account after vessel has been on hire for a continuous period
        of six months or more. *Fumigations of Charterers risk/expense/responsibility and always as per IMO and local regulations.*
44  Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
45  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
        for dunnage they making good any damage thereto.

48  3.    That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
        board the vessel at the current prices at the respective ports, the vessel to be delivered with not less than.... tons and re-delivered with not less than.... tons and not more than
        .... tons.

51  4.    That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$14,500 daily including overtime
52  payable every 15 days in advance
53  ..... United States Currency, per ton on vessel's total... per Calendar Month, commencing on and from the day (o'clock a.m.) of her delivery, as aforesaid, and at
        and after the same rate for any part of a day; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
        wear and tear excepted, to the Owners (unless lost) at.... on dropping last outward sea pilot one safe port Passing/Japan Range, port in
        Charterer's option, any time day or night, Sundays and holidays included unless otherwise mutually agreed. Charterers are to give Owners not
        less than 20/15/10/7/5 days approximate and 3/2/1 day(s) definite notice of vessel's expected date of re-delivery and probable port.

57  5.    Payment of said hire to be made in cash in United States Currency, semi-monthly in advance, and for the last 15 days or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
        due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
        hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
        terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
        following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
        to have the privilege of using vessel at once, such time used to count as hire.
        *every 15 days semi-monthly in advance and for the last 15 days or* *See Clause 51 in New York* *in cash in United States Currency,*
        *payable every 15 days in advance* *definite*

64  Cash for vessel's ordinary disbursements at any port may be advanced as required by the
        Captain, by the Charterers or their Agents, subject
65  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
        of such advances.

66  6.    That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf/anchorage or place that Charterers or their Agents
67  may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
68  lie aground.

72  7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
73  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
        tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers



paying Owners.

~~losses. In the consequences of any passage for accommodation and meals. However, ~~ for speed that in no way frees or ~~otherwise expenses on~~ boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, ~~lash, trim~~ and *trim/lash/unlash/secure and discharge* and trim the cargo at their *risk* and expense under the supervision of the Captain, who *if required by Charterers* is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

9. That, if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointment.

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *in port but not between ports or during sea passage* and see the voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of $10.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers *and /or Charterers will sign a Letter of Indemnity prior to this boarding in the usual manner*, or their Agents, to victual Tally Clerks, Stevedore's Foreman, etc., Charterers paying ~~for such~~ *the current rate per meal for all such victualling. See Clause 74.*

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel.

12. That the Captain shall use diligence in caring for the ventilation of the cargo.

~~13. That the Charterers shall have the option of continuing this charter for a further period of~~

~~carrying~~ ~~within collier abroad to the Owners or their Agents~~ ~~days previous to the expiration of the first named term~~ or any declared option, their Agents to have the option of tendering to the vessel on or before the *22nd August, 2007.* ~~and should vessel~~ *Redelivery: 22-23 August 2007)*

14. That if required by Charterers, time not to commence before the *22nd August, 2007,* ~~but not later than 4 p.m. Charterers or~~ not have given written notice of readiness on or before the *27th of August, 2007,* ......... ~~and should vessel~~

15. That in the event of the loss of time *arising from any cause of Master/Officers/Crew or slackness/incidents of crew, deficiency or defect* ~~of any of the~~ or by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause *for* ~~loss of time by~~ ~~sea, breakdown~~ or damages to hull, machinery or equipment, ~~grounding, detention by~~ *which Owners are responsible under the terms of this Charter Party.* ~~stranding, fire, breakdown~~ or preventing the full working of the vessel *the terms of this Charter Party,* Itinerary: 16-18th August - ~~payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by~~ defect in or breakdown of any part of the hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra expenses shall be deducted from the hire.

16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

17. ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. See Clause 31.~~

18. That the Owners shall have a lien upon all cargoes, and all sub-freights, ~~freights, demurrages,~~ Hires, sub-hires, for any amounts due under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the owners in the vessel.



19. That all derricks and slings shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and ...

York-Antwerp Rules 1974 or any amendment in London ...

20. ...

Provisions as to General Average. *Hire not to contribute to General Average.*

21. ...

22. Owners shall maintain the gear of the ship as fitted, providing gear for all cranes derrick(s) capable of handling lifts up to three tons, also providing ropes, falls, slings and blocks. ...

*No drydocking except in case of emergency or when required by vessel's Underwriters or class.*

23. Vessel to work night and day, if required by Charterers, and all cranes winches to be at Charterers' disposal during loading and discharging. ... *electric light as on board* ... Charterers to have the use of any gear on board the vessel.

24. ...

U.S.A. Clause Paramount


CLARKSON MELBOURNE PTY LTD

~~Both-to-Blame Collision Clause~~

160 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
161 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods~~
162 ~~carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such~~
163 ~~loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
164 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
165 ~~owners as part of their claim against the carrying ship or Carrier.~~
166 ~~The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in~~
167 ~~addition to, the colliding ships or objects are at fault in respect of a collision or contact.~~
168 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
269 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
port or to get out after having completed loading or discharging. *Vessel not to trade ice [See Clause 73].*
26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.
172
173 27. A commission of 1.25% 3½ per cent is payable by the Vessel and Owners to Clarkson Melbourne Pty. Ltd, Melbourne,
174 *and 1.25% to Doric Shipbrokers S.A. Greece*
175 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
28. An address commission of 2 1/2 per cent payable to Charterers.

*Clause 25 to 166 see General Average, General Clause Paramount, New Both to Blame Collision Clause, Arbitration Clause, P & I Bunker Deviation Clause and Conwartime 1993 War Clause and Arbitration I-Clause are deemed to be a part of and incorporated in the Charter Party and all Bill(s) of Lading issued hereunder to incorporate all terms, conditions, liberties and exceptions of the time Charter Party and in particular the lien and Arbitration Clause to be fully incorporated in this Charter Party.*

CHARTERERS:                    OWNERS:

...on the hire earned and paid under this Charter,

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of a colour or use of a larger font and marked as having been made by this licensee or end user as appropriate and not by the author.







## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 29.**
Charterers are entitled to deduct from last sufficient hire payments estimated Owners disbursements as well as value of estimated bunkers on redelivery, in case of any vessel's delay due to Owners matter vessel to be fully off hire.

Payment is not sufficient to cover value of estimated bunkers on redelivery (See Clause 49 and 72) and estimated amount disbursed for Owners account from penultimate hire payment. Charterers to produce supporting evidence from such deduction as soon as same are available.

**Clause 30.**
At or off port, crew to perform if weather permitting first opening and last closing of hatches where and when required if permitted by local regulations/union/authority, however, crew always to assist in opening and/or closing hatches in case of emergency if permitted by local regulations/union/authority.

**Clause 31.**
That should any dispute arise between Owners and Charterers, the matter in dispute shall be referred to Arbitration in London, in accordance with English Law. This Charter Party shall be governed by and construed in accordance with English Law.

In the event one of the parties serves a notice of appointment of its arbitrator and the other party fails to appoint its arbitrator within 14 days the party that has appointed the arbitrator will serve one final notice to the defaulting party and in the event the defaulting party does not appoint an arbitrator within 7 days then the arbitrator appointed will act as sole arbitrator and as one appointed by mutual consent.

Arbitration shall be conducted in accordance with the rules and procedures of the London Maritime Arbitration Association rules and procedures in force at the time arbitration is declared. Should the claim and counter claim (if any) not exceed US$50,000 (United States Dollars Fifty Thousand) excluding legal fees, tribunal costs and interest, then arbitration shall be conducted in accordance with the simplified rules and procedures of the London Maritime Arbitration Association in force when arbitration is declared.

1

08-OCT-2007  16:24    FROM                                    TO  28772833                    P.07

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 32.**

Owners to supply valid certificates, for the agreed trading limits and such certificates to be maintained throughout the period of charter. Any consequences due to vessel lacking necessary certificates, or if same should be out dated, to be for Owner's risk and expense to the extent Charterers operations are hindered. Vessel's cargo gear and all other equipment shall comply with the regulations of the countries to which the vessel may trade, and Owners are to ensure that the vessel at all times in possession of valid and up-to-date certificate of efficiency to comply with such regulations. If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owner's Agents to comply with the aforementioned regulations or because vessel is not in possession of such valid and up to date certificates. The vessel to be off hire for the time actually lost. Vessel has lighting apparatus for night work in all holds simultaneously.

**Clause 33.**

Should any damage be caused to the vessel or her fittings by Stevedores, Master has to try to let the Stevedores repair the damage and will try to settle the matter directly with them at the first stage. If the damage is not repaired by the Stevedores, Master has to endeavour to obtain written acknowledgement of the damage and liability from Stevedores otherwise Charterers shall not be responsible for the damage. Master is to notify Charterers or their Agents of such damage within 48 hours of occurrence or on discovery of same, in case of hidden damage. Charterers have the privilege of redelivering the vessel without repairing the Stevedore damage for which the Charterers are responsible, incurred during the currency of this charter as long as the damage does not affect the seaworthiness/cargo worthiness survey report ascertained by independent Lloyds surveyor or joint survey between Charterers representative and Master/Chief Engineer who is to quantify the extent of damage (such cost of damages to be settled by Charterers upon receipt of such survey) but repair time for Charterer's account if such time exceed the time necessary for Owners to carry out their own other works of repair. Stevedore damage affecting seaworthiness and/or cargo worthiness of the vessel shall be repaired without delay to the vessel after each occurrence in the Charterer's time and shall be paid for by the Charterers.

**Clause 34.**

Master shall supervise stowage of cargo as well as instruct one of his Officers to supervise all loading, handling and discharging of the cargo and he is to furnish Charterers with stowage plan as well as other documents customarily used.





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 35.**
The Charterers shall not be liable for loss nor personal injury nor arrest or seizure or loss or damage to the vessel or other objects arising from perils covered by the usual policies and conditions of Hull and Marine Insurance at Owner's Underwriters unless caused by Charterers or their servants and/or agents negligence.

**Clause 36.**
In the event of vessel deviating (which expression includes putting back or putting into any port other than to which she is bound under the instructions of Charterers) for any cause or for any purpose which would result in payment of hire being suspended under any provisions of this Charter, no hire shall in any case be payable as from the commencement of such deviation until the time when the vessel is again ready and in an efficient state to resume her service from a position not less favourable to Charterers, than that at which the deviation is commenced.

In the event of the vessel for any cause or for any purpose aforesaid putting into any port other than the port for which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners.

**Clause 37.**
Vessel is currently insured for the full hull and machinery value (including I.V.) but Owners have the right to adjust insured value of hull and machinery from time to time with notice to Charterers of the changes. Owners P and I Club is:

Owners agree that the Charterers will enjoy and are being entitled to same coverage by ship's protection and indemnity club as if vessel were operated by Owners themselves provided rules permit.

**Clause 38.**
Owners guarantee vessel is not black listed by trading countries due to vessel's ownership/operators/age and whatsoever.
Vessel to comply with Australian/New Zealand trading.
Vessel has no relation to ex-Yugoslavia in vessel's flag/ownership/crew/etc.

**Clause 39.**
Charterers agree to instruct their agents to undertake normal ship's husbandry on behalf of Owners without agents fee to Owners. However, this shall not include any extra ordinary business such as crew joining/leaving ship, crew

3

08-OCT-2007  16:25  FROM                    TO  28772633              P.09





### ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

repatriations and/or hospitalization in which case Owners shall appoint their own agents, or appoint Charterer's agents as Owner's agents.

In any event, Owners have the option to appoint their own husbandry agents if so desired by them.

**Clause 40.**
Any dues and/or taxes on cargoes and/or freight and/or hire due to Charterers trade and domicile to be for Charterer's account, excluding taxes levied by the country of the flag of vessel and Owners.

**Clause 41.**
Deleted.

**Clause 42.**
Owners to supply on delivery and to maintain during the service, valid deratization exemption certificate.

The cost of any fumigation necessary to obtain extension or renewals of deratization exemption certificates to be for Owner's account and time actually lost to be off hire. Hold fumigation due loaded cargo for Charterer's account.

**Clause 43.**
Charterers to be responsible for fines imposed in the event of smuggling by Charterers employees and/or Charterers Agents but Owners to be responsible for any such acts of their own officers and/or crew. Charterers to remain responsible responsible for detention of the due to smuggling committed by Charterers employees and/or Charterers Agents only.

**Clause 44.**
Should the vessel be arrested during the currency of this Charter Party at the suit of any person having or purporting to have a claim against or any interest in the vessel hire under this Charter Party shall not be payable in respect of any time actually lost by Charterers whilst the vessel remains under arrest and remains unemployed as the result of the arrest. Owners shall reimburse the Charterers for any proven expenditure Charterers may incur under the Charter Party in respect of any period during which she is arrested.

This Clause shall be inoperative should the arrest be caused through any fault or omission of Charterers and/or their Servants and/or Agents.

4

08-OCT-2007  16:25    FROM                                TO  28772633                P.10





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 45.**
If, during the currency of this Charter Party, there is any deviation during the course of the voyage or any loss of time whatsoever caused by sickness of, or accident to crew or any person other than Charterers servants on board the vessel, hire shall not be paid for the time so lost and the cost of extra fuel consumed any extra expenses incurred shall be for the Owners account.

**Clause 46.**
Officers and crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available on board, otherwise any detention and fines resulting from not having these certificates on board to be for Owners account except for the quarantine detention imposed by authorities due to the vessel having traded to country, or port affected by contagious disease/plague under this charter period. Further, the vessel shall be in possession of valid certificate necessary to prepare radio pratique at all port or ports where normal radio pratique is available.

**Clause 47.**
Vessel's holds on delivery to be clean/swept/washed down by fresh water and dried up so as to receive Charterers intended cargoes in all respects, free of salt, loose rust scales and previous cargo residue to the satisfaction of independent surveyor at load port. If vessel fails to pass any hold inspection as above, the vessel should be placed off hire from time of rejection until the vessel passes the same inspection again.

**Clause 48.**
As long as Charterers fulfill their financial obligation to Owners, the Owners undertake to instruct the Master to authorize, in writing, the Charterers or Charterers agents to issue and sign Bills of Lading on Charterers usual form on Owners and Masters behalf for cargo.

Charterers and/or their agents have option to sign Bills of Lading on behalf of Master in accordance with Mate's or Tally's receipts without prejudice to this Charter Party. The entire responsibility for proper delivery of the cargo to the receiver(s) at all discharge ports shall rest at all times with the Charterers.

As long as Charterers have fulfilled their financial obligations, Owners are to allow Charterers to discharge entire cargo without presentation of original Bill(s) of Lading and Charterers provided Letter of Indemnity signed by Charterers only. The L.O.I. to be accompanied with copies of all original Bills of Lading to which it refers.

5





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

Charterers agree to indemnify and hold Owners harmless from any and all claims, cost, expenses and/or liability resulting from or arising out of Charterer's failure to obtain the original Bill(s) of Lading.

It is clearly agreed that no liner Bills of Lading will be issued under this Charter Party unless Owners prior consent is obtained.

Clause 49. Bunker Clause
Vessel to be delivered with about 800/900 metric tons IFO and about 75 metric tons MDO. Bunkers on redelivery to be about same as on delivery.
Same prices at both ends – US$425.00 per metric ton for IFO and US$675.00 per metric ton for MDO.
Bunkers on delivery payable with first hire payment and estimated bunkers on redelivery to be deducted from last sufficient hire payment.

Clause 50. Vessel's Description
MV STENTOR
BC/LOGGER, BUILT JAN 2006 SHIMANAMI SHIPYARD (IMABARI GROUP)
28,445 MT ON 9.78M
BAHAMAS FLAG - NKK CLASS
GT/NT 16960/10498
LOA/BEAM 169,26/27.24M
5 HO/HA
CARGO GEAR: 4 X 30.50T CR
HATCH SIZES: NO.1  13.60 M X 16.00 M NO.2 TO 5  19.20 M X 17.60 M
GRAIN/BALE 37523,01CBM / 35762.45 CBM OR 1325125/1262954CBFT
UNIFORM TANK TOP STRENGTH 15 TNS/SQM
STRENGTHENED FOR OF HEAVY CARGOES, HOLDS NO.2 + NO.4 MAY BE EMPTY
CO2 FITTED/AHL
STEEL PERMANENT AND COLLAPSIBLE STANCHIONS FITTED
SPEED/CONSUMPTION ARE ABOUT, UNDER GOOD WEATHER CONDITION
I.E. THE WIND NOT EXCEEDING B4, THE SEA STATE 3 AND NO ADVERSE CURRENT/SWELL/DECK CARGO
ABOUT 13.5 KNOTS ON 22 TONS IFO 180CST
IN PORT: WORKING 4MT IFO, IDLE 2.5MT IFO.
'RME 25' FOR IFO 180 CST AND 'DMB' FOR MDO BOTH ISO 8217/1996 (E).
VESSEL HAS LIBERTY TO USE MDO FOR MANOUVERING IN NARROW WATERS, CANALS, RIVERS, ON ENTERING/LEAVING PORTS AND IN ADVERSE WEATHER.
ADA/WOG

6

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

**Clause 51.**
Hire to be telegraphically remitted, free of bank charges to Owner's bank:

Eurobank Ergasias SA
Aktl Miaouli Branch
Piraeus, Greece
Swift Code: EFGBGRAA
IBAN: GR380 2600 290000 25 1200 268266
Corresponding Bank in New York: Deutsche Bank Trust America New York
Swift Code: BKTRUS33
In favour of: Naias Marine S.A.
Account Number: 026.029.25.1200268266

Payment of first hire and value of estimated consumable bunkers to be paid within 3 banking days after vessel's delivery and Charterers receipt of faxed invoice in Seoul.

Charterers are entitled to deduct from last sufficient hire payments estimated Owners disbursements as well as value of estimated bunkers on redelivery in case of any vessel's delay due to Owners matter vessel to be fully off hire.

**Clause 52.**
Hull and bunker on-off hire survey to be held.
Time/cost to be shared equally between Owners and Charterers.
Owners option to be represented by Master/Chief Engineer in which case each party to take over the corresponding cost.
Surveys to be arranged and take place in such manner so that vessel not to be off hire.

**Clause 53.**
Deleted.

**Clause 54.**
Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters (as and when received from Underwriters) by reason of the vessel being in port for a minimum period of a calendar month, if on full hire for this period or pro rata for the time actually on hire as far as the rules permit.

7

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 55.**
Basic War Risk Insurance to be for Owner's account. Any additional or extra War Risk Insurance and extra crew war bonus, if any, due to vessel trading in Charterers service to be for Charterer's account.

**Clause 56. Pollution Charter Party Clause**

1. Owners warrant throughout the currency of this Charter they will provide the vessel with the following certificates:
   (A) Certificates issued pursuant to the Civil Liability Convention 1969 ("C.L.C.")
   (B) Certificates issued pursuant to Section 311(P) of the U.S. Federal Water Pollution Act, as amended (Title 33, U.S. Code, Section 1321 (P)).
   (C) Certificates which may be required by U.S. Federal legislation at any time during the currency of this Charter provided always that such legislation incorporates the C.L.C. as amended by the 1984 Protocol thereto or contains provisions equivalent thereto.

2. Notwithstanding anything whether printed or typed herein to the contrary:
   (A) Save as required for compliance with paragraph 1 hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.
   (B) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the cost of any delay incurred by the vessel as a result of any failure by Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of the vessel's inability to perform as aforesaid.
   (C) Owners shall not be liable for any loss, damage, and liability or expense whatsoever and howsoever arising which Charterers and/or the holds of any Bill of Lading issued pursuant to this. Charterers may sustain by reason of the vessel's inability to perform as aforesaid.

3. Charterers warrant that the terms of this Clause will be incorporated effectively into any Bill of Lading issued pursuant to this charter.

8

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14ᵗʰ AUGUST, 2007

**Clause 57.**
Cranemen and stevedores always to be appointed/employed and paid by
Charterers.

It is mutually agreed that the crew of the vessel has to co-operate in rendering
the services as performed and customary on Owner's own vessels according to
the direction of the Charterers respectively their agents. Owners undertake to
instruct ship's command accordingly. Any lashing etc., if and when required will
be done by shore gang or others for Charterer's account. Crew to perform such
work if local regulations/port authorities permit and for such work by Master/Crew
they are servants of the Charterers and work is done at Charterer's time/risk
expense crew remuneration to be agreed with Owners and to be paid to Owners
in the first place.

The vessel's officers and crews to shall perform extra work, if so requested by
the Charterers, such as setting stanchion, lashing, relashing of cargo or
collecting and providing of dunnage and/or lashing materials including catwalks,
cargo marks, painting and etc., provided and subject that shore and labour
union's regulations permit/allow.
Charterers shall pay US$4000 lumpsum per voyage for above extra work directly
to the Owners. Such amount excludes providing necessary material for eventual
catwalk and cargo marks are to be for Charterers account.
Crew to assist in lashing/lashing-always acting as Charterers servants.
When logs loaded on deck, subject to weather conditions, vessel's speed may be
reduced upto half "knot."

   1) The crew shall be considered as servants of the Charterers when
      performing this work.
   2) The work shall be done at Charterer's time and expense.
   3) Trimming is to be performed and completed by Shipper's stevedores to
      the satisfaction of Master, prior to the vessel's Crew commencing lashing
      work.
   4) All lashing work is to be performed while the vessel is alongside or in
      anchorage.

**Clause 58.**
When hire is not received by Owners at the due date on account of delays
beyond the Charterer's control Owners to give Charterers 2 banking days notice
in order to rectify the cause for such delay before exercising their rights under
Clause 5 of the charter.

9





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 59.**
Should the vessel be boycotted at any port or place by shore and/or port labour and/or tugboats and/or pilots, or by government authority, by reason of the vessel's manning or ownership or terms and conditions on which members of the Officers/Crew are employed, or by reason of trading of the vessel (except for trading during currency of this Charter), any extra expenses incurred therefrom shall be for Owner's account and the Charterers are entitled to place the vessel off hire any time lost by such reasons. If the boycott shall be caused by Charterers and/or their servants and/or their agents, then this clause shall be inoperative and the vessel shall remain fully on hire.

**Clause 60.**
In lieu of hold cleaning: US$4,500.00 lumpsum including disposal/removal of dunnage/lashing materials/debris/bark.
Intermediate hold cleaning: US$500.00 per hold.

**Clause 61.**
Charterers or Owners are at liberty to cancel this Charter Party in case of war, whether declared or not, between any of the following powers: U.S.A., Great Britain, Japan, Russia and People's Republic of China, South Korea, New Zealand and Liberia.

**Clause 62.**
Deleted.

**Clause 63.**
All negotiations and eventual fixture to be kept private and confidential.

**Clause 64.**
Owners shall have the liberty of using Diesel Oil whilst entering and leaving port and for manoeuvring in shallow water.

**Clause 65.**
General Average, General Clause Paramount, New Both to Blame Collision Clause, New Jason Clause, Arbitration Clause, P & I Bunker Deviation Clause and Conwartime 1993 War Clause and Arbitration Clause are deemed to be a part of and incorporated in the Charter Party and all Bill(s) of Lading issued hereunder. All Bill(s) of Lading to incorporate all terms, conditions, liberties and exceptions of the time Charter Party and in particular the lien and Arbitration Clause as applicable.

10

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 66.**
Cargo claims to be settled between Owners and Charterers in accordance with Interclub N.Y.P.E. Agreement as amended May 1984 and any subsequent amendments and/or re-enactments of same. Neither party will involve any time limit as a defense between themselves.

**Clause 67.**
Deleted.

**Clause 68.**
Export and/or import permits for cargo to be at Charterer's risk and expense. Charterers to obtain and to be responsible for all necessary permits to enter and/or trade in/out of all ports during the currency of this charter at their own risk and expense.

**Clause 69.**
Owners have the option to supply bunkers prior to redelivery provided not interfering with Charterer's operations.

Charterers also have the option to supply bunkers prior to redelivery provided not interfering with Owner's operations.

**Clause 70. Bimco Bunker Quality Control Clause Fuel Grade (IFO/MDO):**
Charterers guarantee to supply vessel with bunkers of minimum standards of "RME 25 or RMF 25" for IFO 180 CST and "DMB" for MDO. Bunker specifications to be in accordance with international standards at those set by the ISO 8217/2005 (E) and always in compliance with Marpol Annex VI requirements.
Bimco Fuel Sulphur Content Clause for TCP to apply.

**Clause 71.**
Deleted.

**Clause 72.**
First hire, cables/entertainment/victualling plus bunkers on delivery values to be paid within three banking days after vessel's delivery and receipt of faxed invoice in Seoul.

**Clause 73. Trading Exclusions**
Notwithstanding anything else contained in this Charter Party the Charterers agree that vessel will not trade any area which is now or which may be in the future designated by Lloyds and/or vessel's hull underwriters as a war zone

11

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

trading always within Institute Warranty Limits and always excluding the following countries:

Israel, Turkish occupied Cyprus, Denmark, Norway, Finland, Sweden, Cuba, Iraq, North Korea, CIS Pacific, Somalia, Liberia, Yemen, Eritrea, Sierra Leone, Mauritania, Alaska, Oregon State and any other place which vessel is from time to time prohibited to call by the national authorities under which the vessel is registered.
Vessel not to trade directly between China and Taiwan.
Conwartime 1993 War Risk Clause to apply.

Vessel not to be ordered to nor bound to enter:

(a) Any places where epidemics are prevalent or to which the Master/crew by law are not bound to follow vessel and in countries/ports where the vessel may be infested by Asian Gypsy Moth i.e. CIS Pacific or Japanese ports which are included in the AGM alert list as per USDA regulations i.e. Chiba, Hachinohe, Hakodate, Hiroshima, Oita, Sakata, Shimizu, Tomakomai.

(b) Any ice-bound port or place or any port or place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice of vessel's arrival or where there is risk that the vessel will not be able on account of ice to reach the port or place or to depart therefrom after completion loading or discharging. If on account of ice the Master considers it dangerous to remain at the loading or discharging port or place for fear of vessel being frozen in and/or damaged, the Master shall have liberty to sail to a convenient port or place and await Charterer's fresh instructions.

(c) The vessel shall not be obliged to force ice, nor to follow ice breakers. All countries which are not in compliance with International Ship and Port Facility Security (ISPS) Code and therefore lack of effective anti terrorism measures, i.e. following countries are reported by US Coast Guard not in compliance: Albania, Democratic Republic of Congo, Guinea-Bissau, Liberia, Madagascar, Mauritania, Nauru.

(d) No direct call between Taiwan and People's Republic of China is to be permitted.

### Clause 74. Cables, Victualling and Entertainment
Charterers to pay Owners lumpsum US$1,250 (United States Dollars One Thousand, Two Hundred and Fifty) per month or pro rata for all victualling/cable charges/entertainment/etc.

12





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 75.**
Deleted.

**Clause 76.**
Subject to vessel's stability/trim and provided deck strength/space permitting Charterers have the option of loading cargo on deck at Charterer's/Shippers entire risk without any liability to Owners/Vessel for whatsoever cause, and Charterers undertake to procure that Bills of Lading to be so claused (See Clause 78 and 79). Charterers undertake to supply on board at their expense all dunnages (if Master considers necessary) and all lashing/securing materials (except for logs and/or lumber and/or wood products for on deck only) and/or any other extra fitting/equipment/materials requisite for safe stowage/carriage and to have such deck cargo dunnaged/stowed/lashed/secured to the satisfaction of Master. Any extra expenses resulting therefrom/incurred thereby and detention through any of above causes to be for Charterer's account.

**Clause 77. Cargo Exclusions**
The vessel shall be employed in carrying lawful merchandise in accordance with the requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment/discharge and of any intermediate countries or ports through whose waters the vessel must pass.

Charterers warrant that all cargoes to be loaded/stowed/carried and discharged in strict conformity with I.M.O. and local regulations and BC Code. Any extra fittings/equipment/etc. which are required to observe such regulations to be undertaken by Charterers at their time/expense. Charterers will hold Owners harmless against all and any consequences that may arise and will indemnify Owners for all and any damages and/or losses Owners may suffer as a result of any failure in this respect.

None of the cargoes, goods, or substances listed below are to be loaded during the currency of this Charter:
All corrosive, dangerous, explosive and/or combustible, hazardous, inflammable, injurious and toxic substances/cargoes or goods or substances listed in the IMO-IMDG Code 1990 Consolidated Edition and any subsequent new edition thereof or amendments thereto as well as listed on BC Code Appendix B.

Without prejudice to the generality above following cargoes are specifically excluded:

    A. Acids, ammonium nitrate, ammonium nitrate fertilizers except harmless non hazardous type, ammonium nitrates fertilizers Class B, ammonium

13

 

## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

phosphate, ammonium sulphate unless fertilizer grade, alumina, aluminium ashes, aluminum nitrate, aluminium ferrosilicon, aluminium dross, aluminium residues, aluminium silicon powder, aluminium smelting by-products, ammonia, ammunition, andalusite, animals, arms, asbestos, ashes, asphalt and/or its products, ammonium chlorine,

B. Bauxite, barium nitrates, bitumen, black powder, blasting caps and detonator caps, brown coal and brown coal briquettes, boycotted cargoes, bones or bone meal, borax, bombs, bullion

C. Calcined pyrites Class B, calcium nitrates Class B, calcium carbide, calcium chloride, calcium fluoride, calcium hypochlorite, calcium hyperchloride, calcium oxide, calcium oxychloride, carbon black, caustic potash, castor beans, chemical wastes, chrome ore and sand, charcoal, charcoal briquettes, chipped bone, Chilean natural nitrates, Chilean natural potassic mixture, clay, coal, cocoa, coffee, concentrates, copra pellets/products, copra, corrosives, cotton and cotton waste, containers, creosote and creosoted goods, carbite, caustic soda, cottonseed expellers

D. Deck cargoes except logs and timber, dynamite, direct reduced iron in any form, iron swarf, iron oxide, direct reduced iron ore pellets, hot briquetted iron, drugs,

E. Esparto grass, essential oil, explosives

F. Ferrous meal, ferro manganese, ferro silicon, fertilizers except non hazardous and non IMO class, fertilizers to Australia, firearms, fire briquettes, fireworks, fishmeal, fishscrap, ferrous metal, fluorspar,

G. Gaseous coal, gasoline, granite blocks and other stone blocks, gypsum

H. Hypochlorite solutions, hides, HBI

I. Jute

J. Kaolin Clay

K. Ilmenite, Indian coal/coke, iron ore fine or pellets metallized, iron carbide/oxide spent, isotopes,

L. Lead calcined or sulphide or nitrate, lime, livestock, limestone, loaded bombs

M. Magnesia, magnetite, magnesium nitrate, manioc, manioc pellets, metal sulphide, milled rice, Mississippi coal, motor spirit, mineral sands, motor blocks

N. Nefiline syenite, naphtha, nitrates, nitro glycerin, nigerseed, nitrate of soda, nuclear substances or fuels or cargo or wastes

O. Oil cakes or seeds or palm kernels, oily pieces, oily expellers, organic peroxides, olivine sand

P. Palm kernels, petroleum derivatives and all petroleum products, pig iron, pitch, pitch prill, poultry, pond coal, potassium chloride, potassium/sodium nitrate, potash, petcoke, pesticides, paper products, pollard pellets, pyrites, prefabricated and mobile buildings

14





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

Q.  Quebracho, quicklime

R.  Radioactive substances or wastes of any kind, products or waste, rags, radio isotopes, rape seed expellers, resins, refrigerated cargo, refuse and garbage of any kind, rock salt, rutile san, rice

S.  Salt, saltpetre, metal in any form including motorblocks, turnings and swarf, silicon and silicon manganese, silica sand, silver sand, sludge ore, solvents, sodium nitrate or sulphate, specie, sponge iron, sulphate in bulk, sulphur, sunflower seeds and expellers/pellets and cakes, soda ash, sawdust, seed cakes Class B, sodium and potassium nitrate

T.  Taconite, tankage, tar, tar and all its products, tea, tobacco, TNT, titanium slag, technical urea, toxic waste, turpentine.

U.  Vanadium ore, vermiculite, vehicles

V.  Waste and old paper, wet hides, woodchips and wood pulp pellets both with less than 15 percent moisture

W.  Yachts, yellow phosphorus

X.  Zircon sand, zinc ashes, zinc dross and residue and all it products.

Notwithstanding the above Charterers are allowed to carry with Owners specific prior consent which is not to be unreasonably withheld the following:

Concentrates excluding lead concentrates always provided that carried in accordance with the terms of the Charter party and to be in full conformity with and to be loaded/carried/stowed/discharged in accordance with IMO and/or local authorities regulations/recommendations and certificate of water contents to be within safety margin for water transport as ascertained by IMO Code. Charterers are fully responsible for all time/cost/expenses pertaining to the carriage of concentrates including but not limited to certification/surveys required for carriage of this cargo.

HMS 1 & 2 or shredded scrap, non oily and allow excluding M.B.T. Charterers to observe soft loading clause whereby first layers of scrap to be gently lowered and loaded on vessels tank top forming a cushion prior balance cargo loaded to Master's satisfaction. When scrap loaded, the first load/layer of scrap in each hold to be lowered as/low/close as possible to bottom of the hold to provide a proper flooring and cushion for loading balance of cargo to Master's satisfaction.

In the event that Charterers load IMO and/or IMDG listed cargoes (always in accordance with the Charter Party) then they are to reimburse Owners for any extra expenses incurred by owners as a result including extra fittings and in case IMO/IMDG and/or local and/or national authorities require special documentation for any cargoes covered by IMO/IMDG Codes Charterers to be responsible for obtaining same at their time and expense.

15

08-OCT-2007  16:30  FROM                    TO  28772633                P.21





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

**Clause 78.**
Owners guarantee that vessel is fully logs fitted with steel stanchions. Owners guarantee that vessel has sufficient lashing materials and other equipment including certificates for loading full cargoes of log on and under deck.

**Clause 79.**
Master and Owners are not responsible for loss and/or damage to deck cargoes howsoever caused.

**Clause 80.**
Deleted.

**Clause 81.**
Owners and Master to undertake best efforts to co-operate with Charterers for best stowage of cargo and cargo fumigation if necessary at Charterer's time and expense.

**Clause 82.**
If vessel is off hire for a consecutive period of 30 days Charterers have the right to cancel this Charter Party without any further obligation under this contract on the part of the Charter, having first discharged cargo.

**Clause 83.**
In the event of breakdown of crane or cranes, or, winch or winches, by reason of disablement or insufficient power, the hire to be reduced pro rata for the period of such inefficiency, if any loss of time in relation to the number of cranes available. Owners to pay in addition the cost of labour either idle or additionally engaged, but limited to one shift only for each breakdown but Charterers not to order labour against already disabled crane(s). Because of the breakdown Owners to hire shore appliances, if available, if required by Charterers, but maximum daily cost not to exceed daily time charter hire however in such case vessel to remain on full hire unless loss of time should occur.

**Clause 84.**
Gangway watchmen to be from vessel's crew and for the cargo to be for Charterer's account, compulsory shore gangway watchmen, patrol watchmen or watchmen for all purposes to be for Charterer's account.

16





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 85.**
In case Charterers require fumigation of the cargo at discharge port, time and expense of same to be for Charterer's account and Officers/crew are to be provided with suitable hotel/accommodation at Charterer's expense.

**Clause 86.**
Compulsory garbage removal to be for Charterer's account.

**Clause 87.**
The vessel is fitted with hold ladders to current Australian WWF regulations and any dispute on this matter at load ports to be for Owner's responsibility and time lost or expenses incurred thereby to be for Owner's account.

**Clause 88.**
Notice on fixing.

**Clause 89.**
For the purpose of computing hire payments, time for delivery/redelivery shall be adjusted to GMT.

**Clause 90.**
Vessel to be left in seaworthy trim to Master's satisfaction at all times between ports and at sea.

**Clause 91. Hamburg Clause**
Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, Way Bill or other document evidencing a contract of carriage ( whether or not signed on behalf of the Owner or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against any liability, loss or damage, which may result from any breach of the foregoing provisions of this clause.

**Clause 92.**
The Bill of Lading to be decided by Charterers; tally and measurement and tally to be arranged and paid for by Charterers at both loading and discharging ports if required. But if Owners require tally to protect their own interest which will be for Owners time/account. Master to promptly notify Charterers or their agents of any damage to and/or cargo of which he became aware during the period of this charter.

17





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 93.**

Bimco Standard ISM Clause to apply.

From the date of coming into force of the International Safety Management (I.S.M.) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by failure on the part of the Owners or "The Company" to comply with the I.S.M. Code shall be for the Owners account.

**Clause 94.**

Bimco Y2K Clause to apply.

**Clause 95. New Both to Blame Collision Clause**

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the Untied States of America, following clause to apply:-

"If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the carrier in the navigation or in the management of the vessel, the Owners of the cargo carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading Issued under this Charter Party shall contain the same clause.

18





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 96. Intermediate Holds Cleaning**
Any intermediate hold cleaning(s) if required by Charterers shall, in Charterers option, be performed by either the vessels crew or by shore labour at Charterers time/expense. If Charterers request services of crew for intermediate cleaning then this cleaning to be performed whilst vessel is en route to next loading port provided the time of ballast leg is sufficient for the work and the weather suitable, or in port provided shore regulations permit. If this option is declared then Charterers are to pay Owners US$500 per hold for each occasion. All intermediate cleaning, even if effected by crew, are carried out at Charterers risk and in Charterer's time, (crew acting as Charterer's servants) and should vessel's holds be subsequently rejected and any further cleaning etc. be required then these expenses and time used always to be for Charterers account. Any special equipment and/or materials/chemicals etc which may be required for hold cleaning are always to be provided and paid for by Charterers.

**Clause 97.**
Owners to allow transit fumigation as per IMO regulations. If required by Charterers the cargo is to be fumigated en route from the load port(s) to the first discharge port. This fumigation procedure involves the use of the product phosphine. But all loss and damage and expenses to be for Charterer's account.

**Clause 98.**
Owners guarantee that vessel's holds are to be clear of any fittings/superstructures such as car deck, curtain plates, container fittings whatsoever.

**Clause 99.**
Owners guarantee that vessels hatch covers are to be watertight all throughout this charter period and if any hatch cover is found to be defective, same to be rectified at Owner's time and expense to class satisfaction. Charterers also have the right to carryout hose test on all hatches at any time during this charter.

**Clause 100. Safe Stowage and Trimming**
Charterers are to leave the vessel in safe and seaworthy trim and with cargo on board safely stowed, dunnaged and secured to the Master's satisfaction for all shifting between berths and all passages between ports under this Charter in their time and at their expenses.

Separations between cargoes, other than natural, to be for Charterers account/risk and expense.

19





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

**Clause 101. BIMCO U.S.A. Security Clause for Time Charter**
If the vessel calls in the United States including any U.S. territory the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in the Charter party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspection, shall be for the Charterer's account, unless such costs or expenses result solely for the Owners negligence.

**Clause 102. Pre Loading Survey for Steels**
In the event Charterers load finished steel products they will tender notice to Owners prior to such loading in order Owners to arrange for a preloading survey on the cargo to be loaded. The cost of such survey will be shared equally between Owners and Charterers and both parties will receive copies of the pre-loading survey of such cargo.

**Clause 103. Bimco Stowaway clause**
i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers.
ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to berate of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever, which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers account and the vessel to remain on hire.
iii) Should the vessel be arrested as a result of the Charterers breach of charter according to sub-clause (A) ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

B)
i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and however incurred, including fines, shall be for the Owners account and the vessel shall be off-hire.

20





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

ii)   Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure the release of the vessel.

**Clause 104**
Charterers option to weld padeyes on deck / hatch cover / in holds at Charterer's time/expense and same to be removed prior to redelivery otherwise Charterers option to redeliver vessel without removal padeyes by paying US$10 per each padeye.
No welding of padeyes at places which will adversely affect vessel's epoxy coat, wing tanks or double bottoms or fuel/diesel tanks. Padeyes to be welded to Master's satisfaction which not to be withheld unreasonably.

**Clause 105, Deck Cargo Clause**
Charterers are permitted to load on the vessel's deck and hatch covers always provided that the permissible loads on the deck/hatch covers are not exceeded, that the stability of the vessel permits and that such cargo does not affect the seaworthiness of safe navigability of the vessel in any manner. Any extra fittings required for deck or hatch cargo are to be provided and paid for by the Charterers who are to load, stow, dunnage, lash and secure, unlash, tally such cargo in their time, risk and expense always to the entire satisfaction of the Master.
The vessel is not to be held responsible for any loss of or damage to the cargo carried on deck and Charterers to keep Owners always harmless for all delays/consequences/losses howsoever caused including cost/delays in placing of security/guarantees.

In the event that cargo is shipped on deck during this charter, Charterers are to ensure that separate Bills of Lading are issued covering such cargo that those Bills of Lading are claused as follows:

"Shipped on deck at Charterers/Shippers and Receivers risk, expenses and responsibility, without liability on the part of the vessel, or her Owner for any loss, damage, expenses or delay howsoever caused" or voyages to and from ports in the U.S.A. – "carried on deck at Shippers risks as to perils inherent in such carriage, but in all other respects subject to the provisions of the United States Carriage of Goods by Sea Act 1936."

21





## ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 106.**

**A - ISPS CLAUSE FOR TIME CHARTER PARTIES**

**(a)(i)** From the date coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of .SOLAS (ISPS Code) relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company." Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

**(ii)** Except as otherwise provided in this Charter Party, loss, damage, expense or delay excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

**(b)(i)** The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO / Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".*

**(ii)** Except as otherwise provided in this Charter Party, loss, damages, expense or delay(excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

**(c)** Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the

22





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

B – Charterers P and I Club: SSM

C – Any shortages established in any other method whatsoever other than draft survey in which the Master participated and agreed/signed will for Charterers account and Charterers place relevant security in order vessel sail without delay.

Charterers undertake to appoint and pay for draft surveys at load and discharge ports. To the extent Charterers fail to do so then the Master will be deemed to have been authorized to perform these surveys on behalf of the Charterers. Such draft surveys will be conclusive evidence of the cargo discharged.

D – Bimco Fuel Sulphur Content Clause for Time Charter Parties
Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.
For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

23





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

### P AND I CLUB OIL BUNKERING CLAUSE

The vessel in addition to all other liberties shall have the liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading and discharge named in this Charter Party and may there take oil bunkers in any quantity at the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be adjusted according to York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the cargo, shippers, consignees, or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.

If a salvage ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the cargo to the carrier before delivery."

### PARAMOUNT CLAUSE

The Hague Rules contained in the International Convention for the unification of certain rules relating to Bills of Lading, dated Brussels the 25ᵗʰ August 1924 as enacted in the country of shipment shall apply to this contract, when no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactment's are compulsorily applicable, the terms of the said Convention shall apply.

24

# EXHIBIT B

*481 The "Bumbesti"

Queen's Bench Division (Admiralty Court)

22 June 1999

[1999] 2 Lloyd's Rep. 481

Before Mr. Justice Aikens

June 16, 17; 22, 1999; June 22, 1999

Admiralty practice - Action in rem - Jurisdiction - Arrest of vessel - Abuse of process of Court - Dispute under charter referred to arbitration in Romania - Action founded on award - Whether Court had jurisdiction in rem in respect of claim made by claimants - Whether arrest an abuse of process because claimants already had security for claim made - Supreme Court Act, 1981, s.20(2)(h).

By a charter-party dated Feb. 27, 1995, the defendant Romanian corporation bareboat chartered their vessel *Dacia* to the claimants for a period of three years expiring on Mar. 27, 1998. The charter was governed by Romanian law and all disputes under the charter were to be referred to arbitration in Romania.

The claimants alleged that the defendants wrongfully terminated the charter early in January, 1998. This resulted in two arbitration references. The Constanza Court of Arbitration made two awards. Award No. 1 dated Mar. 3, 1998 ordered the defendants to return her to the claimants for the balance of the charter period and awarded damages to the claimants of U.S.$186,532. In Award No. 12 dated Nov. 10, 1998 the claimants were awarded a further U.S.$238,072 as damages for the wrongful early determination of the charter.

The arbitration awards were appealed. The appeal from Award No. 1 was dismissed by the Constanza Court of Appeal on Mar. 30, 1999 and by the Supreme Court of Justice on Apr. 14, 1999. The appeal from Award No. 12 was dismissed by the Constanza Court of Appeal in April, 1999 but leave was granted to appeal to the Supreme Court. The defendants obtained an order from the Romanian Supreme Court for the general suspension of any enforcement of Award No. 12 until July 13, 1999.

On Feb. 4, 1999, in attempting to enforce the awards the claimants applied to the Constanza Court for execution of all movables and immovables of the defendants. Subsequently two bulk carriers, Tirgu Lapus and Tirgu Neamt owned by the defendants were arrested in Constanza and remained detained by the order of the Constanza Court.

On June 8, 1999 a claim form in this action was issued stating that the claimants brought their actions founded on Award No. 12. On June 9, 1999 *Bumbesti* was arrested in Liverpool and the sworn evidence to lead to the arrest stated that Award No. 12 remained wholly unsatisfied and that the aid of the Court was sought "to enforce payment of or security for the same". In respect of Award No. 1 two bank letters of guarantee were put up following the arrest of *Bumbesti* in Greece and the Netherlands and were sufficient to meet any liability that the defendants had on that award.

The defendants applied to set aside these proceedings and or to release *Bumbesti* from arrest the issues for decision being: (1) Whether the Admiralty Court had jurisdiction in rem to hear and determine a claim to enforce the arbitration Award No. 12 made by the Constanza Court; (2) assuming that the Court had jurisdiction, whether *Bumbesti* should be released from arrest because the claimants already had adequate security for their claim to enforce Award No. 12 because of the detention of the two vessels in Constanza so that the arrest of *Bumbesti* was an abuse of process of the Court.

The only basis of the Court's in rem jurisdiction relied on by the claimants was s. 20(2)(h) of the Supreme Court Act, 1981 which provided inter alia that the Admiralty Court had jurisdiction to hear and determine -

> . . .any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship . . .

Held, by Q.B. (Adm. Ct.) ( AIKENS, J.), that

(1) in order to succeed on their claim the claimants had to plead and prove the individual submission to the Constantza Court of Arbitration and Award No. 12 that they made on Apr. 12, 1999 pursuant to that submission; but no more than that need be proved; there was no need to plead and prove the underlying dispute under the charter (see p. 484, col. 2; p. 485, col. 1);

(2) the claim in this case was the action on the awards and clearly arose out of the agreement to refer to arbitration the disputes that had arisen under the bareboat charter; but that agreement to refer disputes was not, itself, an agreement in relation to the use or hire of a ship since the arbitration agreement to refer was a contract that was distinct from the principal contract, i.e. the bareboat charter ( see p. 487, col. 2);

(3) the agreement to refer to arbitration disputes that had arisen under a charter-party must be agreements that were indirectly "in relation to the use or hire of a ship", but they were not agreements that were sufficiently directly "in relation to the use or hire of a ship"; the arbitration agreement was, at least, one step removed from the "use or hire" of a ship; the breach of contract relied on to found the present claim had nothing to do with the use or hire of a ship; it concerned the implied term to fulfil any award made pursuant to the agreement to refer disputes; and the breach of contract relied on when suing on the award did not have the reasonably direct connection with the use or hire of the ship that was necessary to found jurisdiction (see p. 487, col. 2; p. 488, col. 1);

(4) on the proper construction of par. (h) an action on an award was not one on an agreement which was "in relation to the use or hire of a ship"; and the Court had no jurisdiction to consider the claim under par. (h) of s. 20(2) of the Supreme Court Act, 1981 ( see p. 488, col. 1);

-, The Beldis(1936) 53 Ll.L.Rep. 255, applied.

(5) the action and the claim form must be struck out and the service of the claim form in rem must be set *482 aside; the arrest of the vessel could not be maintained in respect of the claim (see p. 488, col. 1);

(6) on the evidence it was very unlikely that the two detained vessels in Romania would achieve more than a scrap value price if sold at Constantza; it was inherently more likely that the vessels would be sold for delivery rather than further afield and the sale value of the vessels at Constantza was between U.S.$300,000 and U.S.$340,000, i.e. enough to meet the claimants' claim (see p. 489, col. 1);

(7) the security obtained by the claimants for Award No. 12 in the form of detention of the two vessels by the Constantza Court was adequate security for the enforcement of that claim; and provided that the defendants confirmed that they would undertake not to disturb the enforcement proceedings in Constantza, *Bumbesti* would be released from arrest (see p. 489, col. 2).

The following cases were referred to in the judgment:

- Alina, The (C.A.) (1880) L.R. 5 Ex. 227;
- Antonis P Lemos, The (H.L.) [1985] 1 Lloyd's Rep. 283; [1985] A.C. 711;
- Beldis, The (C.A.) (1936) 53 Ll.L.Rep. 255; [1936] P. 51;
- Black Clawson International Ltd. v. Papierwerk Waldhof-Aschaffenburg A.G., [1981] 2 Lloyd's Rep. 446;
- Bloemen (F.J.) Pty. Ltd. v. Council of the City of Gold Coast, (P.C.) [1973] A.C. 115;
- Bremer Oeltransport G.m.b.H. v. Drewry, (C.A.) (1933) 45 Ll.L.Rep. 133; [1933] 1 K.B. 753;
- Eschersheim, The (H.L.) [1976] 2 Lloyd's Rep. 1; [1976] 1 W.L.R. 430; (Q.B. (Adm. Ct.)) [1974] 2 Lloyd's Rep. 188; [1975] 1 W.L.R. 83;
- Gascoyne v. Edwards, (1826) 1 Y. & J. 19;
- Gatoil International Inc. v. Arkwright-Boston Manufacturers Mutual Insurance Co., (H.L.) [1985] 1 Lloyd's Rep. 181; [1985] A.C. 255;
- Harbour Assurance (U.K.) Ltd. v. Kansa General International Assurance Co. Ltd., (C.A.) [1993] 1 Lloyd's Rep. 455; [1993] Q.B. 701;
- Heyman v. Darwins Ltd., (H.L.) (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356;
- Rena K, The [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377;
- Saint Anna, The [1983] 1 Lloyd's Rep. 637; [1983] 1 W.L.R. 895;
- Zeus, The (1888) 13 P.D. 188.

This was an application by the defendants the owners and/or demise charterers of the vessel *Bumbesti* to release the vessel from arrest and/or to set aside the proceedings brought against the vessel by the claimants S.C. Rolinay Sea Star Srl on the grounds inter alia that the arrest was an abuse of process of

the Court because the claimants already had adequate security in respect of the claims made and that the Admiralty Court had no jurisdiction in rem in respect of the claim made by the claimants.

### Representation

Mr. Christopher Smith (instructed by Messrs. Hill Dickinson, Liverpool) for the claimants; Mr. David Garland (instructed by Messrs. Ince & Co.) for the defendants.

The further facts are stated in the judgment of Mr. Justice Aikens.

Judgment was reserved.

Tuesday June 22, 1999

### JUDGMENT

Mr. Justice AIKENS:

This is an application to set aside these proceedings and/or to release the vessel *Bumbesti* from arrest. The claim form was issued on June 8, 1999 and the vessel was arrested in Liverpool on June 9, 1999. Initially the application notice sought an order to set aside the arrest. The ground stated was that the arrest was an abuse of the process of the Court because the claimants already had adequate security in respect of the claims made. However, Mr. Garland for the defendants/applicants made it clear in opening his application that the defendants had a further ground, which was that the Admiralty Court had no jurisdiction in rem in respect of the claim made by the claimants. During the hearing I gave leave to amend the application notice to include this point. Accordingly the application is now put on two bases, which are: (1) that the action in rem and/or the claim form should be set aside under CPR Part 3, r. 3.4 (2)(b), on the ground that the Court has no jurisdiction in rem in respect of the claim sought to be made by the claimants in these proceedings. If this ground is successful, then the vessel must be released from arrest, subject to any caveats against release. Ground (2) is that the vessel should be released from arrest pursuant to the Admiralty Court's power to do so under par. 6.6(1)(b) of the Admiralty Court Practice Direction which supplements CPR Part 49, on the basis that the arrest is an abuse of the Court process because the claimants *483 already have adequate security for the claim made.

### The facts

The defendants are Compania de Navigatie Mari- timie Petromin S.A., which is a Romanian corporation. They were the owners of the vessel *Dacia*. The vessel was bareboat chartered to the claimants by a charter-party dated Feb. 27, 1995. The charter was for three years and was due to expire on Mar. 27, 1998. The charter provided (by cl. 26) that it was governed by Romanian law. Clause 26 also stipulated that disputes would be "solved" by arbitration which was to be organized by the "Chamber of Commerce, Industry and Navigation of Constantza County in accordance with the Rules of Arbitrational Procedure" of that chamber. Clause 55 of the charter provided that disputes between the parties were to be "solved in accordance with the laws of the Romanian State, such laws governing this Charter (see Clause 26)". It was therefore common ground at the hearing that the proper law of the charter was Romanian law and that the procedural law of the arbitrations which have taken place was Romanian law.

3. Disputes did arise under the charter. The claimants, as charterers, alleged that the defendants wrongfully terminated the charter early in January, 1998. This resulted in two arbitration references. Two awards were made by the Constantza Court of Arbitration. They were called Arbitration Award No. 1 and No. 12. Award No. 1, dated Mar. 3, 1998, ordered the defendants, as owners of the vessel, to return her to the claimants for the balance of the charter period, i.e. 53 days. The claimants were also awarded damages of U.S.$186,532 and further sums in respect of stamp duty and legal fees. The vessel was not returned for the balance of the charter. In Arbitration Award No. 12, dated Nov. 10, 1998, the tribunal awarded the claimants a further U.S.$238,072 as damages for the wrongful early determination of the charter. It also awarded further sums in respect of stamp duty and costs. The total sum awarded to the claimants was therefore U.S.$424,604 plus stamp duty and lawyers' fees.

4. The claimants appealed the arbitration awards. The appeal from Award No. 1 was dismissed by the Constantza Court of Appeal on Mar. 30, 1999 and by the Supreme Court of Justice on Apr. 14, 1999. The appeal from Award No. 12 was dismissed by the Constantza Court of Appeal in April, 1999. However, leave has been granted to appeal to the Supreme Court and the hearing will take place on Dec. 2, 1999. The defendants have obtained an order from the Romanian Supreme Court for the general suspension of any enforcement of Award No. 12 until July 13, 1999.

5. The claimants have attempted to enforce the two awards. On Feb. 4, 1999 the claimants applied to the Constantza Court for execution of all movables and immovables of the defendants in order to meet

the sums due on both awards. In respect of Award No. 1 the claimants have put up two bank letters of guarantee following the arrest of *Bumbesti* in Greece and the Netherlands. Those bank guarantees are, in my judgment, sufficient to meet any liability that the defendants have on that award. The bank guarantee in Greece is the subject of proceedings there, but I am satisfied that, quite apart from the vessels in Constantza, the claimants have adequate security for Award No. 1.

6. On Feb. 4, 1999 the claimants applied to the Constantza Court for execution against the defendants in respect of the two awards. Subsequently, two identical bulk carriers that are owned by the defendants, *Tirgu Lapus* and the *Tirgu Neamt*, were seized in Constantza pursuant to commands of the Court of Constantza made on Feb. 9, 1999. The commands required the defendants to pay the sums due under the two awards within 24 hours, or, if they failed to do so, then the vessels, which were identified in the Commands, would be "prosecuted and auctioned off". The exact legal characterization of the process by which the vessels have been detained is in dispute between the parties. But the present position appears to be that both vessels remain detained by order of the Constantza Court, despite attempts by the defendants to rescind the orders. Further, an order for the sale, by public auction, of the two vessels was made by the Court at some date in April, 1999. The auction was set to take place on Apr. 30, 1999. A buyer was found for the two vessels at a price of U.S.$660,000 for the pair, but the deposit was not lodged in time. So the sale was cancelled. Subsequently, on June 8, 1999, the order permitting enforcement against *Tirgu Lapus* was cancelled by the Constantza Court. However, two stamped certificates (one for each vessel), both dated June 15, 1999 and issued by the Constantza harbour master's office, state, in English, that the vessels are arrested. That state of affairs is accepted by both parties.

7. The claim form in this action was issued on June 8, 1999. It states that the claimants bring their action "founded on" the arbitration award dated Nov. 10, 1998 (i.e. Award No. 12). On the following day, June 9, 1999, *Bumbesti* was arrested in Liverpool. The sworn evidence to lead the arrest states that the Award No.12 remains wholly unsatisfied and that the aid of the Court is sought "to enforce payment of or security for the same". The sworn evidence states that security of U.S.$300,000 is sought.

*484

## The issues

The principal issues are:

(1) whether the Admiralty Court has jurisdiction in rem to hear and determine a claim to enforce the arbitration Award No. 12 made by the Constantza Court. The only basis of the Court's in rem jurisdiction relied on by the claimants is s. 20(2) par. (h) of the Supreme Court Act, 1981. By that paragraph the Admiralty Court has jurisdiction to hear and determine "any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship". (It is common ground that if the claim comes within that paragraph then, pursuant to s. 21(4) of the 1981 Act the in rem jurisdiction of the Court could be invoked. No point was taken by the defendants on s. 21(4)(a) that this claim did not "arise in connection with a ship");

(2) assuming that the Admiralty Court has jurisdiction, then whether *Bumbesti* should be released from arrest because the claimants already have adequate security for their claim to enforce Award No. 12 because of the detention of the two vessels in Constantza, so that the arrest of *Bumbesti* is an abuse of the process of the Court.

### Principal issue one: The nature of the claim to enforce Award No. 12

The proper law governing the arbitration procedure and Award No. 12 was agreed to be Romanian law. However, I received no evidence that Romanian law differs from English law on the nature of an arbitration award and the effect of an award being made. In English law it is clear that if a claim for damages is referred to arbitration and an arbitration award is made awarding the payment of damages, this creates a new right of action for the enforcement of the award that replaces the original cause of action. Strictly speaking the doctrine of "merger" does not apply in the way that it does to an action brought in Court and there could be debate on the precise juridical basis for the rule relating to awards: see Mustill & Boyd on Commercial Arbitration, 2nd. ed., p. 410. But it has been accepted since at least Gascoyne v. Edwards, (1826) 1 Y. & J. 19 that a claimant cannot bring a further claim in personam on the original cause of action (if the original cause of action was for damages) once he has an award. (As noted below, it is possible to bring an action in rem: (see The Rena K, [1978] 1 Lloyd's Rep. 545 [1979] Q.B. 377).)

10. The "brief details of claim" endorsed on the claim form in this case state:

The Claimants bring their action founded on the Arbitration Award dated 10 November 1998, made by The Chamber of Commerce, Industry, Navigation and Agriculture, (CCINA), Constantza, Romania. The said award was in respect of the premature termination of the charterparty dated March 1995, of the *MV "Dacia"*, at that time owned by the Defendant.

It is therefore clear that the claim is one to enforce the award. What is the nature of a claim to enforce an award? It could be a claim for a debt, being the sum awarded. Alternatively it could be a claim for liquidated damages, for a breach, by the party due to pay, of an implied obligation to fulfil the award made. Both solutions have been suggested in the cases. However, the preferred analysis by the Court of Appeal in the leading case of Bremer Oeltransport G.m.b.H. v. Drewry, (1933) 45 Ll.L.Rep. 133. [1933] 1 K.B. 753 was that a claim on an award is a claim for damages for the breach of an implied term in the submission to arbitration that any award made would be fulfilled: see particularly per Lord Justice Slesser at p. 138; p. 764 with whom Lord Justice Romer agreed. That analysis was adopted by Lord Pearson in giving the advice of the Privy Council in F. J. Bloemen Pty. Ltd. v. Council of the City of Gold Coast [1973] A.C. 115 at p. 126. He emphasized that in the case of an arbitration award a new cause of action arises once the award is made, but that the award "cannot be viewed in isolation from the submission under which it was made". Therefore a claimant wishing to enforce an award in English proceedings has to prove not only the award, but also the submission to arbitration which gave the arbitrators power to make their award and which contained the implied term that the parties would fulfil any award made pursuant to the submission.

11. That gives rise to a further question: which "submission" to arbitration is being referred to here? As Mr. Justice Mustill made clear in Black Clawson International Ltd. v. Papierwerk Waldhof-Aschaffenburg A.G., [1981] 2 Lloyd's Rep. 446 at p. 455, there are two "submissions" which govern the arbitration of disputes under a substantive contract. First, there is the contract to submit future disputes to arbitration; this will often be annexed to the substantive contract between the parties, in this case the bareboat charter-party. Secondly, there is the contract that is created when a particular disputes arises and the parties refer that dispute to arbitration. The implied term to fulfil the award made must, in my view, be contained in the contract that is created between the parties when the individual dispute arises and it is referred to arbitration. However, in practice there is bound to be reference to the initial general submission to refer disputes to arbitration, as that is the basis upon which individual references are made.

12. On this analysis, in order to succeed on their claim, the claimants must plead and prove the individual submission to the Constantza Court of arbitration and Award No. 12 that they made on 25 Apr. 12, 1999 pursuant to that submission. But no more than that need be proved. There is no need to plead and prove the underlying dispute arising under the charter-party.

## Is the claim to enforce the award within s. 20(2)(h) of the SCA, 1981

The next question must be: does this claim to enforce the award fall within the terms of s. 20(2) of the Supreme Court Act, 1981? Mr. Smith says that it does and he relies upon the decision of Mr. Justice Sheen in *The Saint Anna*, [1983] 1 Lloyd's Rep. 637; [1983] 1 W.L.R. 895, in which the Judge held that an action to enforce an award made in respect of a contract for the hire of a ship was within par. (h). Mr. Garland has submitted that *The Saint Anna* was wrongly decided and that Mr. Justice Sheen should have followed the decision of the Court of Appeal in The Beldis, (1936) 53 Ll.L.Rep. 255; [1936] P. 51 which, he said, was binding. In view of these submissions, it is necessary to consider briefly the statutory history of par. (h) and some of the decisions that have dealt with it.

## The statutory history of par. (h)

The history has been considered by the House of Lords in a number of recent cases: see The Eschersheim, [1976] 2 Lloyd's Rep. 1; [1976] 1 W.L.R. 430; Gatoil International Inc. v. Arkwright Boston Manufacturers Mutual Insurance Co., [1985] 1 Lloyd's Rep. 181; [1985] A.C. 255; and The Antonis P Lemos, [1985] 1 Lloyd's Rep. 283; [1985] A.C. 711. From these cases the history of par. (h) is established as follows:

(1) Paragraph (h) in the 1981 Act reproduced, in the same words, par. (h) of s. 1(1) of the Administration of Justice Act, 1956. That section had been enacted to give force in England to the International Convention for the Unification of Certain Rules relating to the Arrest of Seagoing Ships made in Brussels on May 10, 1952 ("the Arrest Convention"). In the Arrest Convention a number of "maritime claims" in respect of which a ship could be arrested are set out at art. 1 under the terms of the

Convention. The wording of the Convention is exactly reproduced in the Scottish section of the    Act
( s. 47(2) (d) and (e)). But although two paragraphs have been rolled into one in s. 1(1)(h) of t    956
Act, their effect is not materially different.

(2) The wording of the Arrest Convention list of "maritime claims" was itself based upon the list    e
types of claim set out in s. 22(1)(a)(xii) (1) of the Supreme Court of Judicature (Consolidation)
1925, for which the Admiralty jurisdiction of the High Court could be invoked. This re-enacted s    )(a)
of the Administration of Justice Act, 1920. That was the first Act to confer Admiralty jurisdiction    he
High Court to consider this type of claim. Neither the High Court of Admiralty, nor its successo    n
1875), the Probate Divorce and Admiralty Division of the High Court, had jurisdiction over clain    the
type now covered by par. (h).

(3) However, prior to 1920 the County Court did have a limited Admiralty jurisdiction for that t    f
claim. The jurisdiction was conferred by the County Courts Admiralty Jurisdiction Act, 1868, am    d by
the County Courts Admiralty Jurisdiction Amendment Act, 1869. Section 2(1) of the latter Act p    ed
that County Courts appointed to have Admiralty jurisdiction could try and determine "any claim    ng
out of any agreement made in relation to the use or hire of any ship. . .".

(4) Therefore the wording in the 1981 Act can trace its ancestry back to the 1869 Act. The diffe    : in
the words used are not significant, as Mr. Justice Brandon observed in The Eschersheim: see [1    2
Lloyd's Rep. 188 at p. 195, col. 1; [1975] 1 W.L.R. 83 at p. 93G.

## The early cases on the construction of par. (h)

The three House of Lords' cases I have referred to have also considered the Courts' constructic . . he
predecessors of par. (h) and that paragraph in the 1981 Act. The Courts construed the 1869 Ac
paragraph restrictively. They were reluctant to give the County Court a wider Admiralty jurisdic    han
the High Court, particularly in relation to charter-party disputes, as that would interfere with th    mon
law Courts which had always asserted exclusive jurisdiction in such cases. Thus it was only in Tr    na,
(1880) L.R. 5 Ex. 227 that the Court of Appeal held that claims arising out of charter-parties wc    s
covered by s. 2(1) of the 1869 Act. But in a significant case after The Alina, The Zeus, (1888) 1.    ).
188, the Divisional Court held that a claim arising out of a contract to load a ship with coals was
within s. 2 of the 1869 Act. Mr. Garland relied on that case and the fact that it was approved in
House of Lords in both the Gatoil case (see p. 187, col. 2; p. 270E per Lord Keith of Kinkel) and
Antonis P Lemos (see per Lord Brandon at p. 290, col. 2-p. 291, col. 1; p. 730 G-H). In those ca    the
House of Lords held that The Zeus was authority for a narrow construction of the words "relatin    in s.
2 of the 1869 Act and its statutory successor paragraphs.

## The Beldis, (1936) 53 Ll.L.Rep. 255 [1936] P. 51

The wording of s. 2(1) of the 1869 Act was again considered by the Court of Appeal (The Presic
*486 Sir Boyd Merriman, Lord Justice Scott and Mr. Justice Swift) in The Beldis, (1936 53 Ll.L.f    :55;
[1936] P. 51. A claim had been referred to arbitration to recover overpaid charter hire in respec
charter for a ship called Belfri. An award was made in favour of the plaintiffs in the subsequent a    :,
Anglo Soviet Shipping Co. They started a County Court action in rem against a sister-ship of Bel    illed
Beldis. The claim was to recover the sum awarded by the tribunal. The defendant owners did no    ear
and judgment was entered against them in default. The mortgagees then intervened. The partie    one
agreed issue before the County Court Judge. That was whether an Admiralty action in rem coulc
maintained against Beldis when the original claim arose out of a charter-party for Belfri. He deci    hat
it could be maintained. When the matter came before the Court of Appeal the President raised t    ue
of whether there was jurisdiction in rem to deal with this type of claim at all. It appears from th    ort
of the argument (see p. 58 of [1936] P.) that Mr. Owen Bateson for the appellant mortgagees c    :
take up the jurisdiction point, although he did refer the Court to three cases on the issue, incluc :: he
Zeus.

17. In a reserved judgment the Court held that the claim on the award did not come within s. 2    the
1869 Act. Therefore the County Court could not exercise jurisdiction in rem. The President accep    iat
if the action had been for the claims that were the subject of the reference to the arbitrator, the    y
would have fallen within the section, following The Alina: see p. 264; p. 61. But he held that this
entirely different from a claim on the award. He pointed out that a plaintiff claiming on an awarc    only
to plead and prove "that certain matters in dispute have been submitted to an arbitrator and th    has
made his award in the plaintiff's favour". The President emphasized that it was not necessary, in
positively wrong, to plead the nature of the original dispute. He concluded that he was not prep    o
hold that "a claim upon an award held under the arbitration clause in a charterparty is a claim a    out
of any agreement made in relation to the use or hire of a ship". He held it was a "common law a
upon the award and nothing else". The President went on to hold that, if there had been jurisdic . . it

was not possible to bring the action in rem against a sistership that was unconnected with the      of action. Both Lord Justice Scott and Mr. Justice Swift agreed on the second point of decision.

18. Lord Justice Scott noted that when the 1869 Act was passed, there was a statutory means enforcing arbitration awards by obtaining from one of the three common law Courts a rule abs        or payment of the sum awarded: see p. 274; p. 82. Therefore, he remarked, it was unlikely that       Admiralty jurisdiction would be created to enforce an arbitration award, unless the statutory w        clearly did so. He concluded that the wording of s. 2(1) clearly did *not* confer this jurisdiction.        pointed out that the history of the statutory extension of the Admiralty Court's jurisdiction in t         0 and 1861 Acts was in -

> . . .precise, plain and carefully guarded terms; and, in the case of those founded on contract, the cause of action was one directly based upon the maritime contract descri in the section.

In his view, because of this approach, it would be "entirely wrong to hold that an action on an        arising out of such a maritime contract was included by the words of" the 1840 and 1861 Acts        gave the Admiralty Court jurisdiction over certain types of contractual claim e.g. in relation to and bills of lading. He concluded that the legislature must have adopted a similar approach to       inty Court jurisdiction in Admiralty. He therefore concluded:

> . . .It would in my judgment be plainly wrong to say that under s. 2 sub-s.1 of the 186 Act a County Court has Admiralty jurisdiction to entertain an action on an award upon voluntary submission, merely because the arbitration was held pursuant to an arbitrati clause in a Charter-party for the reference of disputes arising out of that charter-party.

19. The decision in The Beldis stood undisturbed until 1983. In The Eschersheim Mr. Justice Br        commented on it (at p. 196, col. 1; p. 94F-G), saying that the basis of the decision was that th        ant claim did not arise out of the agreement (i.e. the charter-party), although the agreement relat        e use or hire of a ship. He commented that that ground of decision in the The Beldis "does not s      be consistent with Bremer Oeltransport G.m.b.H. v. Drewry, (1933) 45 Ll.L.Rep. 133; [1933] 1 K.        which was apparently not cited". As already noted, the Court of Appeal in that case had held th        action on an award was founded on the breach of an implied term in the agreement to submit t differences of which the award was the result. Therefore the Court held that, for the purposes existing O. XI r. 1(e), the claim on an award was one "to enforce a contract made within the jurisdiction". (This was so, even though the award itself was made in Hamburg.) I am not sure          r. Justice Brandon was correct to suggest that in The Beldis the Court of Appeal was emphasizing was the first part of the sentence of the section (i.e. "claim arising out of any agreement") that       t fulfilled. The President *487 refers to the whole sentence at p. 264, col. 1; p. 63 and Lord Just        t recognized that the action on the award arose "indirectly" out of the maritime contract: see p.        l. 2; p. 83. However, it should be noted that Mr. Justice Brandon did not say that The Beldis was per incuriam although he clearly had doubts about it.

## The Saint Anna, [1983] 1 Lloyd's Rep. 637; [1983] 1 W.L.R. 895

The issue of whether an action on an award could be the subject of an Admiralty action in rem this case, in which the plaintiffs sought judgment in default of defence. The action was on an a        made in favour of charterers and against the owners of *Saint Anna*. That vessel had been arres        sold by the Admiralty Marshal at the suit of numerous claimants. The plaintiffs had issued a wri        against the proceeds of sale of the vessel. Mr. Justice Sheen heard argument only from the pla        ut both The Beldis and Bremer Oeltransport were cited, as were the passages of Mr. Justice Brand        e Eschersheim and relevant text books. Having referred to both cases, Mr. Justice Sheen conclu        that Bremer Oeltransport was clear authority for the proposition that an action based upon an        an action for the enforcement of the contract which contains the submission to arbitration, i.e.        charter-party; (2) an action to enforce an award necessitates pleading and proving the arbitra        submission and the award; (3) a claim to enforce a charter-party is within the Admiralty jurisd        the High Court; (4) because one ground of decision of The Beldis was inconsistent with Bremer Oeltransport -

. . .that leaves me free to decide which authority I should follow. As the decision in
[Bremer] was not brought to the attention of the Court of Appeal during argument in T.
Beldis and as I find myself convinced by the reason in the latter case, I have no hesital
in following it.

21. Mr. Smith drew my attention to the fact that The Saint Anna has been followed in the Hon    and
Singapore Courts. He also submitted that it has been referred to in text books without criticisr    for
a cautionary note in Dicey & Morris on The Conflict of Laws (12th ed.; pp. 605 and 608). So fal
Counsel can discern, there is no reported decision either following it or dissenting from it in En
However, in the Gatoil case in the House of Lords, Lord Keith of Kinkel refers, without commer    he
decision of the Court of Appeal in The Beldis but The Saint Anna was not cited. Nor was it in T    nis
P Lemos.

**Conclusion on principal issue one: Is a claim on an arbitration award within par. (h) of    )(2)
of the Supreme Court Act, 1981?**

I have come to the conclusion that the answer I must give to this question is "no". I think thal          :t
within the paragraph as a matter of construction. I also consider that I am bound by thedecisi         e
Court of Appeal in The Beldis. My reasons are as follows:

(1) The "claim" in this case is the action on the award. That "claim" clearly "arises out of" the i     ent
to refer the disputes that had arisen under the bareboat charter-party. In The Antonis P Lemo:
House of Lords held that the phrase "arises out of" in par. (h) should be given a broad constru     so
as to mean "in connection with": see p. 290, cols. 1 and 2; p. 731F. Upon the analysis of the C         f
Appeal in Bremer Oeltransport a claim on an award "arises out of" or is "in connection with", t
agreement to refer the particular dispute to arbitration, or the agreement to refer future dispu
generally to arbitration.

(2) However, that agreement to refer disputes is not, itself, an "agreement in relation to the usi     re
of a ship". This is because the arbitration agreement, whether it is the individual reference or th         :ral
agreement to refer, is a contract that is distinct from the principal contract, i.e. the bareboat i
party in this case. The distinction between the contracts is, as Mr. Garland submitted, made ci
cases such as Heyman v. Darwins Ltd., (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356; and Harbou        ice
(U.K.) Ltd. v. Kansa General International Assurance Co. Ltd., [1993] 1 Lloyd's Rep. 455; [19
701; and see s. 7 of the Arbitration Act, 1996.

(3) In The Antonis P Lemos, at p. 289, col. 2; p. 730 F-G, the House of Lords accepted that th
authorities on par. (h) of the 1981 Act and its statutory predecessors made it clear that a narr
meaning must be given to the expression "in relation to" in that paragraph. The agreement to         o
arbitration individual disputes that have arisen out of a charter-party, or the agreement to refc        e
disputes in general that arise out of a charter-party, must be agreements that are *indirectly* "in :        on
to the use or hire of a ship". But, in my view, they are not agreements that are *sufficiently direr           t
relation to the use or hire of a ship". The arbitration agreement is, at least, one step removed f        le
"use or hire" of a ship. The breach of contract relied upon to found the present claim has noth        o
with the use or hire of the ship; it concerns the implied term to fulfil any award made pursual
agreement to refer disputes. In my view the breach of the contract relied on when suing on ar
does not have the *488 "reasonably direct connection with" the use or hire of the ship that Lc
Keithheld in the Gatoil case was necessary to found jurisdiction under this paragraph: see p. :        . 1;
p. 271A-B.

(4) Therefore, upon the proper construction of par. (h), an action on an award is not one on ar
agreement which is "in relation to the use or hire of a ship". This was the conclusion of theCou
Appeal in The Beldis. The current paragraph is the statutory successor to the wording that wa
considered in that case. Unless there is some material distinction in the wording, then I believe
must follow the construction given by the Court of Appeal to the wording in that case. There is i
significant distinction, as Mr. Justice Brandon pointed out in The Eschersheim: see p. 195, col :        3G.

(5) With great respect to Mr. Justice Sheen I cannot accept his view that the decision in The f        is
"inconsistent with" the Bremer Oeltransport case. The latter case was not dealing with the pr
construction of this head of Admiralty jurisdiction. and the analysis in both cases of the consti
an action on an arbitration award is remarkably similar. Both make it clear that the submissic
arbitration must be pleaded and proved as well as the award itself.

(6) Even assuming that an action on an award is one "in connection with" the underlying subr        to

refer, there remains the question, critical to the present issue, of whether that submission is  ... tly directly related to the use or hire of a ship to make the matter fall within par. (h). That point  '    at issue in Bremer Oeltransport, but it was in The Beldis, which decided the point against the cl...   I am satisfied that the decision was not "per incuriam" and that I must follow it.

23. Therefore I have concluded that Mr. Garland is correct in his submission that the Admira...  ... has no jurisdiction to consider this claim under par. (h) of s. 20(2) of the Supreme Court Act, 19...  ... Accordingly, the action and the claim form must be struck out and the service of the claim fo...  ... n must be set aside. It must also follow that the arrest of the vessel cannot be maintained in r...  ...his claim.

### The second principal issue: that the arrest is an abuse of the process of the Court a... claimants already have adequate security

This point obviously only arises if I am wrong on the first issue. Both parties accept that the ...  ; the power to release the vessel from arrest under par. 6.6(1) of the Practice Direction formin...  ... Admiralty Court Guide. Mr. Smith for the claimants accepted that there should be a release if...  ...t is satisfied that the claim to enforce Award No. 12 is otherwise adequately secured. The only "...  ... considered was the detention of the two vessels at Constantza. There was some debate as to...  ... "adequate" the security had to be. Mr. Smith contended that the security had to be as good ...  ...rest of Bumbesti both in terms of amount and the "quality" of the protection. But he accepted tha...  ...ure of the protection of the security did not have to equate exactly with an arrest by the English ...  ... / Court. Mr. Garland ultimately accepted these tests. Therefore there are two issues that I hav...  ... with under this heading: (1) is the correct value of the vessels, as detained in Constantza suf...  ...t discharge the claim: and (2) is the protection over the vessels that is provided by the Consta...  ...rt order adequate?

### The amount of the claim on Award No. 12

As already noted, the total claim under Award No. 12 is for damages of U.S.$238,072, plus s...  ...y and lawyers' fees. The parties agreed that the latter two figures probably amount to about U...  , making a total of U.S.$247,072. Under the award there is no entitlement to interest on the p...  ... sum. Even if I assume that interest can be awarded somehow, then the maximum figure for ...  ...e claimants could legitimately seek security is, in my view, U.S.$300,000.

### Value of the vessels as detained in Constantza

The evidence on value was conflicting. Tirgu Neamt is 21 years old, is in class but is laid up. ...  ...us is nearly 21 years old and has been out of class since October, 1998. A Romanian company ...  ... "market value" on Tirgu Neamt of U.S.$750,000. Mr. Garland says that should be accepted a...  ... vessels are identical, it is the market value of Tirgu Lapus also. But if the vessels were sold i...  ... Constantza, whether pursuant to a Court auction or privately, it would be at a "forced sale" v...  ... : valuation report does not say that the figure of U.S.$750,000 represents the sum that would ...  ...ed in a "forced sale" of the vessels in their present condition and I am sure that sum would not ...  ...d.

27. Mr. Garland next relies on the figure that was offered by a Cypriot company that had agr...  ...ly the vessels through the Constantza Court but then failed to pay the deposit. The total price f...  ... vessels was agreed at U.S.$660,000. As this sale did not go ahead I am sceptical about the u...  ...he sum agreed. I am also sceptical about the "offer" apparently made to the defendants by N. G...  ...reas Shipping S.A. on June 9, 1999. The price "offered" for both vessels was U.S.$470,000. There...  ... evidence of how this offer came to be *489 made and, given that the vessels were detained ...  ... Constantza at the time, I must doubt whether it was a genuine offer.

28. Lastly there is evidence of the value of the vessels from the well known ship sale and pu...  ... brokers English White Shipping Ltd. That gives a valuation of U.S.$600,000 for each of the ve...  ... assuming them to be "in seaworthy condition, capable of proceeding under their own power, '...  ...e condition for their age and in Class". I have concluded that these conditions are not satisfied ...  ... case. Tirgu Lapus is out of class and the Romanian company's valuation report on Tirgu Near...  ... that "in order for the vessel to be operated on [sic], high investments are necessary". That r...  ...n that Tirgu Neamt is probably neither seaworthy, nor capable of proceeding under her own po...  ...n average condition for her age, even if she is still, technically, in Class.

29. English White also gives a scrap valuation of the vessels. The net value would depend on ...  ...e vessels were to be delivered, because the cost of towage to any destination far from Constan...  ...d be high. The two scrap markets suggested by English White are the Indian sub-continent and...  ...lf the vessels were sold for delivery to the former, the net sale proceeds would probably be onl...

U.S.$40,000; if for delivery to the latter the net proceeds would be about U.S.$340,000. Th
evidence as to which destination would be more likely.

30. On the evidence I have concluded that it is very unlikely that the two vessels would ach
more than a scrap value price if sold at Constanza. But there is evidence of an available sc
Turkey. It seems to me inherently more likely that the vessels would be sold for delivery th
than further afield. Therefore, although the evidence is not entirely satisfactory, I have conc
the sale value of the vessels at Constanza is between U.S.$300,000 and U.S.$340,000, i.e.
meet the claimants' claim.

## The nature of the protection of the security given by the Constanza Court order

Mr. Smith submits that the vessels are not in the custody of the Constanza Court in the sam
vessels under arrest in an Admiralty action in rem are in the custody of the Admiralty Marsh
the protection given by the Constanza Court order is not as good as that of an arrest in Eng
was some evidence of the nature of the detention of the vessels by the Constanza Court. Th
application for execution was no specifically an "Admiralty" provision, but is a form of execu
against all assets. But the "commandment" made on Feb. 9, 1999 against each vessel was m
arts. 914 and 915 of the Romanian Commercial Code and is an Admiralty provision. That de
seizure and enforcement of existing judgments against vessels. The commandment gives th
priority over subsequent claimants in receiving payment out of the proceeds of sale of the v
accepted by the Romanian lawyers acting for the defendants that the effect of the suspensi
Supreme Court) of the execution of Award No. 12 does not affect the seizure of the two ves
fax of Musat & Associatii dated June 17, 1999: exhibited to PEM 2. Mr. Smith also accepted
effect of the seizure was that the defendants could not attempt to sell the vessels, except wi
approval of the Constanza Court.

32. There was controversy as to whether the defendants could lawfully use the vessels for t
remaining seized by the Romanian Court. I asked Mr. Garland if his clients would be prepar
undertaking not to use the vessels while remaining seized by the Constanza Court. The und
the defendants are prepared to give, assuming that the arrest in the English proceedings wa
is set out in a fax from Ince. & Co. to the Court dated June 18, 1999 (although only sent on
follows:

> Not to disturb the enforcement proceedings against the two vessels detained in
> Constanza pending determination of the appeal to the Romanian Supreme Court, th
> undertaking specifically reserving [the Defendants'] right to apply to the court on 13
> for the suspension of the right of sale to continue throughout that period.

That undertaking would, I think, adequately preserve the rights of the claimants on the two
the existing orders of the Contantza Court over the vessels.

## Conclusions on the second principal issue

I have concluded that the security obtained by the claimants for Award No. 12, in the form c
detention of the two vessels by the Constantza Court, is adequate security for the enforcem
claim. Accordingly, provided that the defendants confirm that they will give the undertaking
Ince's fax of June 18, I propose to release *Bumbesti* from arrest in this action. I should, how
two further points. First, I was informed by Mr. Smith that the claimants would be issuing fu
proceedings in rem against *Bumbesti* and so they had issued a caveat against the release of
The proposed proceedings were in the form of a claim, brought in rem, based on the original
action under the bareboat charter. *490 The right to bring this form of action is said to be b
decision of Mr. Justice Brandon in The Rena K, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377.
Mr. Justice Brandon held that a cause of action in rem does not merge with a judgment mad
personam, but remains available so long as the judgment in personam remains unsatisfied.
accepted that this principle could apply to arbitration awards: see p. 559, col. 2 to p. 560, c
pp. 405B to 406F. I do not know whether the claimants will maintain their caveat in the light
conclusion on principal issue two.

34. Secondly, I note that the claimants were prepared to undertake to release their security
vessels in Constanza if the arrest of *Bumbesti* were to be maintained. As I have held that it
be, this undertaking is irrelevant.

(c) Lloyds of London Press Limited

© 2007 Sweet & Maxwell Ltd

Westlaw UK