CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
NAIAS MARINE S.A.
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
NAIAS MARINE S.A.,

                          Plaintiff,

                                                                07  CV  10640 (PKL)

            v.

TRANS PACIFIC CARRIERS CO. LTD.,

                          Defendant.
----------------------------------------------------------------X


### ATTORNEY'S AFFIDAVIT IN OPPOSITION TO
### MOTION TO VACATE PROCESS OF MARITIME ATTACHMENT

State of New York      :
                       :ss.
County of Nassau       :


Owen F. Duffy, being duly sworn, states under penalty of perjury as follows:

1.      I am a member of the Bar of the State of New York, and I am admitted to practice before this Court.

2.      I am a member of the firm of Chalos, O'Connor & Duffy, LLP, attorneys for the Plaintiff NAIAS MARINE S.A. (hereinafter "NAIAS") in this action.

3.      I am fully familiar with the matters set forth in this affidavit, and my knowledge of the matters set forth in this affidavit is based on information provided to me by Plaintiff NAIAS, its agents and attorneys and my own independent research.

4.      I submit this affidavit for the purpose of setting forth the facts and introducing evidence of the facts in opposition to Defendant's Motion to Vacate the Process of Maritime Attachment and Garnishment that was issued by this Honorable Court on November 28, 2007.


### THE PARTIES

**NAIAS MARINE S.A.**

5.      Plaintiff NAIAS is a foreign business entity duly organized and existing pursuant to the laws of a foreign country operating under foreign law with an address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH 96960.

6.    NAIAS is the owner of the vessel the M/V STENTOR, and the primary business of NAIAS is to charter the M/V STENTOR to others for the carriage of cargo in exchange for payments of hire or freight.

### TRANS PACIFIC CARRIERS CO. LTD.

7.    Defendant TRANS PACIFIC is a foreign business entity duly organized and existing pursuant to the laws of a foreign country by virtue of foreign law with an address at 10th Floor, Donghwa Bldg., 58-7, Seosomun-Dong, Jung-Gu, Seoul, Korea.

8.    TRANS PACIFIC is engaged in the business of transporting cargoes by ocean vessel.


## THE BACKGROUND TO THE INSTANT LITIGATION

### THE UNDERLYING DISPUTE BETWEEN THE PARTIES

9.    By a time charter party on an amended New York Produce Exchange form dated August 14, 2007, Naias agreed to charter its vessel the M/V STENTOR and TRANS PACIFIC agreed to hire the M/V STENTOR form the time of delivery "for 2/3 laden legs, minimum 60 to maximum 100 days via safe port(s), safe berth(s), safe anchorage(s), always afloat, always accessible and always within IWL [Ins titute Warranty Limits] with lawful, harmless cargoes. (Intention first leg: Cement Clinker) within below mentioned trading limits." *See,* Exhibit A.

10.    Clause 4 of the charter party provided that the redelivery range was to be Penang/Japan and "Charterers [TRANS PACIFIC] are to give Owners [NAIAS] not less thatn 20/15/10/7/5 days approximate and 3/2/1 day(s) definite notice of vessel's expected date of re-delivery." *See,* Exhibit A.

3

11.     The M/V STENTOR was delivered in the Charterers' service on August 23 at 1530 hours GMT. *See generally*, Exhibit F.

12.     Because the earliest date of redelivery was 60 days later, the earliest date of redelivery was therefore October 22, 2007. *See generally*, Exhibit F.

13.     The M/V STENTOR performed her first laden leg without problem. *See generally*, Exhibit F.

14.     On September 25, 2007, the M/V STENTOR completed loading at Nelson, New Zealand, under her second laden voyage and Charterers TRANS PACIFIC ordered her to proceed to Shimonoseki, Japan to discharge. *See generally*, Exhibit F.

15.     The Master of the M/V STENTOR advised his approximate time of arrival at Shimonoseki as October 12, 2007. *See generally*, Exhibit F.

16.     On October 1, 2007, agents for TRANS PACIFC as Charterers sent the following message at 1616 hours Korean or Melbourne (Australian) time:

> Following message from from Charterers:-
> QTE
> Pls be advised that subj vsl will be redelivered to ownrs at dlosp
> BUSAN, KOREA o/a 20th – 21st OCT 2007, iagw/wp.
> Pls take this msg as chrts' 20 days of redelivery notice
> UNQUOTE

*See generally*, Exhibit F.

17.     This message was sent to NAIAS' agent brokers (Doric Shipbrokers SA who are based in Greece) as their agents. *See generally*, Exhibit F.

18.     Later that day, TRANS PACIFIC attempted to withdraw the Notice of Redelivery stating that it had been sent in error. *See generally*, Exhibit F.

19.    The Owner, however, accepted the notice of redelivery at face value and went out into the market seeking alternative employment for the M/V STENTOR on the basis that she was available at Busan on October 21, 2007. *See generally*, Exhibit F.

20.    At 1338 Greek time on October 1, 2007, NAIAS' brokers, as the agents for the Owner stated their position in relation to the events of that day.  That message stated, in its entirety:

> Owners refer to Charterers' redelivery notice and the message
> Owners' brokers appear to have received from Charterers' borkers and
> Owners kindly advise Charterers that the vessel is currently being
> negotiated by the Owners firmly for her next employment on the basis
> of Charterers' redelivery notice. As Charterers can appreciate the
> vessel was fixed to their account in order to perform 2/3 ladden [sic]
> legs at their option.
> Charterers are currently performing their second leg and they have
> already declared their option by tendering redelivery notice that they
> will not perform a third laden [sic] leg.  Owners by circulating vessel
> on the market and having commenced firm negations with third
> parties have accepted this redelivery notice and this cannot now
> be retracted by the Charterers.

*See generally*, Exhibit F.

21.    Several days later, on October 4, 2007, the Chareterer responded with the following message to Owner:

> We have consulted with our P & I Defence Club and they have
> advised us that Owners are obliged to perform the 3rd leg and have no
> right to fix the vessel out to a third party based on a 'redelivery' notice
> that was retracted shortly after.
> Giving an intended redelivery notice is not the same as exercising a
> legal option: redelivery notices are intended as general guidance only
> which is very difference from making a clear exercise of an option.
> Charterers having clearly retracted the notice, Owners should have
> conducted themselves accordingly (and should continue to do so) as
> though the vessel will be performing a third laden leg …

*See generally*, Exhibit F.

22.    TRANS PACIFIC, as Charterers, attempted to present voyage instructions for another voyage, i.e. a third laden leg , but NAIAS, as owners, refused those instructions and proceeded to employ the M/V STENTOR under a new charter as it had advised TRANS PACIFIC it would. *See generally*, Exhibit F.

### TRANS PACIFIC INSTITUTED SUIT IN THE SOUTHERN DISTRICT OF NEW YORK AGAINST NAIAS

23.    On October 25, 2007, TRANS PACIFIC filed suit in the Southern District of New York against NAIAS.  *See*, Exhibit B.

24.    Without even mentioning that it had, in fact, sent a Notice of Redelivery to the vessel Owner, TRANS PACIFIC, instead, alleged that it had exercised its option to use the M/V STENTOR for a third voyage and NAIAS had wrongfully withdrawn the M/V STENTOR from the services of TRANS PACIFIC prior to performing a third voyage that TRANS PACIFIC purportedly exercise its option for.  *See*, Exhibit B at ¶¶s 7 & 8.

25.    With the filing of its complaint on October 25th, TRANS PACIFIC also made an *ex parte* application for a Process of Maritime Attachment pursuant to Rule B in the amount of $1,558,735.00 to obtain security for the Plaintiff's claims against vessel Owner, NAIAS, which TRANS PACIFIC conceded were subject to arbitration in London. *See*, Exhibit B at ¶¶s 7 & 8.

26.    TRANS PACIFIC never made any allegation that the Rule B Process of Attachment was necessary to obtain jurisdiction over the vessel Owner, NAIAS. *See generally*, Exhibit B.

6

27.    In the Verified Complaint, as filed on October 25th, TRANS PACIFIC further alleged that its action was: "brought to obtain security for additional sums to cover Plaintiff's anticipated attorneys fees and costs in the London arbitration, as well as interest, all of which are recoverable under English law." *See*, Exhibit B at ¶ 10.

28.    As set forth in its Complaint, TRANS PACIFIC's principal claim for breach of charter party was quantified at $1,030,500.00 and, therefore, 33% (or an amount equal of ½ of the principal claim) of the amount that was going to be attached was for interest and "estimated costs, including legal fees, of London arbitration, which are recoverable." *See*, Exhibit B. In other words, one half of a million dollars was piled on a one million dollar claim.

29.    The Court, Sand, D.J., issued a Process of Maritime Attachment and Garnishment against vessel Owner, NAIAS, on October 25, 2007, for the amount of $1,558,735.00.

30.    TRANS PACIFIC served the Process of Maritime Attachment on several garnishee banks in New York and, on Thursday, November 8, 2007, a payment from the current charterer of the M/V STENTOR to NAIAS in the amount of $711,605.60 was restrained as those funds were being wired through an intermediary bank New York for the account of vessel Owner, NAIAS.

31.    Because the attachment and restraint of its funds was compromising NAIAS' ability to conduct its business and in order to mitigate its losses, NAIAS made immediate arrangements to provide TRANS PACIFIC with substitute security in order to have the funds under attachment in New York released and to prevent TRANS PACIFIC from restraining any further payments to or from NAIAS.

32.    On November 13, 2007, and after negotiating the amount of security to be provided over the weekend, NAIAS provided TRANS PACIFIC with a letter of guarantee from HSBC bank in the amount of $978,238.00. *See*, Exhibit C, Letter of Guarantee No 15401 for USD 978,238.00 from HSBC on Tuesday, November 13, 2007.

## TRANS PACIFIC's CLAIM WAS OVERSTATED

33.    The reduction of the amount to be secured was a reflection of the fact that TRANS PACIFIC's claim was overstated when it claimed damages in the amount of $517,500.00 for overpaid charter hire. *See* Exhibit B at ¶ 9 (a).

34.    The fact of the matter was that the money which was paid by TRANS PACIFIC, but not earned by NAIAS, had been remitted back to TRANS PACIFIC on October 26, 2007, which was one day after the Complaint was filed and before NAIAS even knew that TRANS PACIFIC had filed suit in New York.

35.    As confirmed by TRANS PACIFIC's solicitors, Ince & Co., TRANS PACIFIC's principal claim for the alleged breach of charter party was only in the amount of $590,863.41, and the balance of the substitute security provided by NAIAS was to cover interest in an amount of $137,375.00 and the costs of the arbitration in the amount of $250,000.00. See, Exhibit D.

36.    Even though TRANSPACIFIC knew or should have known, as early as October 26, 2007, that it did not have any claim for overpaid daily hire in the amount of $517,500.00, TRANS PACIFIC never advised Judge Sand of that fact nor did TRANS PACIFIC ever seek to amend its complaint or obtain an amended Process of Attachment to reflect the correct amount of its significantly reduced claim and, from October 26,

2007 through November 8, 2007, Trans Pacific continued to serve the original process in an attempt to restrain NAIAS's funds in the amount of $1,558,735.00.

### NAIAS HAD OFFERED TO PROVIDE SECURITY VOLUNTARILY BEFORE THE TRANS PACIFIC ATTACHMENT, BUT WAS IGNORED

37.    Contrary to the factual argument presented by TRANS PACIFIC in its motion to vacate the present attachment, NAIAS did request TRANS PACIFIC to voluntarily post counter security for the arbitration costs, but TRANS PACIFIC refused.

38.    At the end of October 2007, and before NAIAS was aware that it had been sued in New York, TRANS PACIFIC's solicitors in Hong Kong, i.e. Ince & Co., requested that NAIAS voluntarily post security for TRANS PACIFIC's claim. NAIAS replied to Ince & Co. that NAIAS would provide security on the condition that TRANS PACIFIC provided counter security for the legal costs that NAIAS would incur to defend the claim asserted by TRANS PACIFIC.

39.    Ince & Co. replied that it would take instructions, but it never responded to NAIAS's request for counter security and, more specifically, Ince & Co. ignored NAIAS's later correspondences of Friday, November 2, 2007 and Wednesday, November 7, 2007 apparently with full knowledge that the Process of Attachment seeking to restrain the incorrect sum of $1,558,735.00 was being served on a daily basis in New York.

40.    In any event, in exchange for the letter of guarantee provided on November 14, 2007, TRANS PACIFIC voluntarily withdrew its action in the Southern District of New York on November 14, 2007. *See*, Exhibit E.

41.    The same day that it dismissed its action against NAIAS in New York, TRANS PACIFIC proceeded to serve its Claim Submissions on NAIAS in London arbitration.

## NAIAS RECEIVES ADVICE FROM LONDON SOLICITORS

42.    Once NAIAS became aware of the attachment and that TRANS PACIFIC was intending to present a claim in London arbitration, NAIAS requested a preliminary opinion from a London solicitor regarding the merits of the claim presented by TRANS PACIFIC.

43.    On November 14, 2007, i.e. the same day that the TRANS PACIFIC New York action was dismissed, Timothy Hill, Esq. of the firm of Stone Chambers advised NAIAS that TRANS PACIFIC's claim for losses under the remaining claimed period of charter was without merit. *See*, Exhibit F.

44.    In his advice to NAIAS, Mr. Hill advised that TRANS PACIFIC had exercised its option not to perform a third voyage when it tendered its notice of redelivery for the M/V STENTOR on October 1, 2007. Solicitor Hill, with reference to English law, advised NAIAS that:

- In my view Charterers [TRANS PACIFIC] exercised their contractual option not to employ the vessel [M/V STENTOR] on a third laden leg. They did so by serving a 20 day notice of redelivery on 1 October.

- The exercise of that contractual option was irrevocable.

- Although commercially unattractive, Owners [NAIAS] were entitled to hold Charterers [TRANS PACIFIC] to their exercise of their contractual option notwithstanding an attempt to withdraw it four hours later.

- Owners [NAIAS] do not need to show any detrimental reliance by reason of the giving of the notice and exercise of the option.

- Owners [NAIAS] should defend any claim pursued by Charterers [TRANS PACIFIC].

*See*, Exhibit F, at ¶¶ 46 – 50.

45.    Consistent with the advice from solicitor Hill, NAIAS decided that it would defend the TRANS PACIFIC claim in the London arbitration.

## THE INSTANT LITIGATION

### THE COMPLAINT

46.    Having posted a letter of guarantee in the amount of $978,238.00, but being unsecured for its own costs and attorneys' fees, which as TRANS PACIFIC has noted are regularly awarded to the successful party in London Arbitration, and TRANS PACIFIC having ignored NAIAS request for counter security, NAIAS instituted the instant litigation in the Southern District of New York for the primary purpose of obtaining security for its arbitration costs on November 27, 2007.  *See*, Exhibit G, Verified Complaint.

47.    The Complaint included a request for the issuance of a Process of Maritime Attachment in the amount of $250,000.00 which was the same amount requested by TRANS PACIFIC in its Complaint, *compare*, Exhibit A at ¶ 12c with Exhibit G at ¶ 22, and which was the exact same amount for which NAIAS secured TRANS PACIFIC in the Bank Guarantee. *See,* Exhibit D.

### THE ISSUANCE OF A PROCESS OF MARITIME ATTACHMENT

48.     On November 28, 2007, this Court ordered that a Process of Maritime Attachment be issued by the Clerk of the Court in the amount of $250,000.00. *See*, Exhibit H.

49.     On November 28, 2007, the Clerk of the Court issued a Process of Maritime Attachment. *See*, Exhibit I, Process of Maritime Attachment.

50.     The Process of Maritime Attachment was served on, *inter alia*, the Bank of America.

51.     On November 30, 2007, NAIAS, as Plaintiff, was notified that the Bank of America had restrained $250,000.00 pursuant to the Process of Maritime Attachment.

52.     On November 30, 2007, NAIAS sent Notice of Lawsuit and Attachment to TRANS PACIFIC pursuant to Local Rule B.1. *See*, Exhibit J, Notice of Lawsuit and Maritime Attachment dated November 30, 2007.

### DEFENDANT TRANS PACIFIC CARRIERS CO. LTD. MOVES, BY ORDER TO SHOW CAUSE, TO VACATE THE PROCESS OF MARITIME ATTACHMENT

53.     Without offering to discuss the posting of security for the legal costs that NAIAS would incur to defend the claim asserted by TRANS PACIFIC, Defendant TRANS PACIFIC applied for an Order to Show Cause why the attachment should not be vacated with the argument that NAIAS's claim did not fall within this Court's admiralty and maritime jurisdiction.

54.     December 11, 2007 this Court issued the Order to Show Cause requiring Plaintiff NAIAS to Show Cause why Defendant's assets were attached and this case should not be dismissed.

55.    Plaintiff NAIAS, in response, submits this affidavit and the accompanying Memorandum of Law in opposition to TRANS PACIFIC's motion to vacate and so as to present the full facts which demonstrate that NAIAS is equitably entitled to be secured in the London arbitration for its costs and attorneys' fees in the same amount which TRANS PACIFIC is already secured in that arbitration.

Dated: Port Washington, New York
        December 14, 2007

                    CHALOS, O'CONNOR & DUFFY, LLP
                    Attorneys for Plaintiff,
                    NAIAS MARINE S.A.

            By:     _____
                    Owen F. Duffy (OD-3144)
                    366 Main Street
                    Port Washington, New York 11050
                    Tel:  (516) 767-3600
                    Fax:  (516) 767-3605

Subscribed and sworn to before me this
December 14, 2007

_____
Notary Public, State of New York

        GEORGE E. MURRAY
    Notary Public, State of New York
            No. 02MU6108120
        Qualified in New York County
    Commission Expires April 12, 2008

13

**EXHIBIT A**

08-OCT-2007  16:20  FROM                                TO  28772633                    P.01



# Time Charter

**GOVERNMENT FORM**

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party,** made and concluded in _Melbourne_ .......................... _16th_ , day of August .......................... _19_, _2007_

2  Between _Nalco Marine S.A._ ......................... _Seaonship/Motorship "Mentor"_ ......................... of _Built 2006_,

3  Owners of the good _Reinsmen_

4  of _16,960_ .......................... tons gross register, and _10,498_ .......................... tons net register, having engines of .......................... indicated horse power

5  and with hull, machinery and equipment in a thoroughly efficient state, and classed

6  at .......................... of about _37,523.01 / 35,762.65_ cubic feet bale capacity, and about _28,465 metric_ ......................... tons of _2240 lbs._

7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8  allowing a minimum of fifty tons) on a draft of _9.76 meters feet_ ..........................

9  which are of the capacity of about .......................... inches on ......................... Summer freeboard inclusive of permanent bunkers,

10  conditions about .......................... tons of fuel, and capable of steaming, fully laden, under good weather

11  now trading .......................... knots on a consumption of about .......................... tons of best Welsh coal - best grade fuel oil - best grade Diesel oil.

12

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  above 23 laden legs, minimum 60 to maximum 100 days via safe port(s), safe berth(s), safe anchorage(s), always afloat, always

15  accessible and always within IWL with lawful, harmless cargoes. (Intention first legs Cement Clinker) within below mentioned trading

16  limits.

17  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

18  the fulfillment of this Charter Party.

19  Vessel to be placed at the disposal of the Charterers, at dropping last outward sea pilot Kaohsiung, Thailand, any time day or night, Sundays

20  and holidays included .......................... ~~the Charterers may direct, If such dock, wharf or place (where she may safely, lie always afloat at all times of tide except at Nils except provided in clause No. 6, as~~

21  ~~in such dock~~

22  ~~loading port on her delivery to be~~ Vessel before arrival at first

    ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service (See Clause #7), having water ballast,

    winches and

23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25  dise, including ~~petroleum or its products in proper containers~~, excluding See Clause 77.

26  ~~(vessel to not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27  ~~all necessary fittings and other requirements to be for account of Charterers)~~, in such lawful trades, between safe port and/or ports in British North

28  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29  Mediterranean, and/or Europe, and/or

30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31  October 31st and May 14th, Hudson Bay and all unsafe ports; also excluding when out of season, White Sea, Black Sea and the Baltic,

32

33

34



35  as the Charterers or their Agents shall direct, on the following conditions:
36  for the

37  1.  That the Owners shall provide and pay for all provisions, ~~fresh water,~~ wages and consular shipping and discharging fees of the Crew; shall pay
38  the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service ~~with all certificates necessary to comply with~~
        *current regulations at all ports of call.*

39  2.  That the Charterers shall provide and pay for all of the fuel except ~~as otherwise agreed,~~ Port Charges, Pilotages, Agencies, Commissions,
40  ~~a port or~~ Consular charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41  Illness of the crew and vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  ~~employed under this~~

43  charter to be for Charterers account ~~including but not limited to crew transportation and accommodation. All other fumigations to be for~~
44  ~~Charterers account and has been paid for for at least six months~~
        Fumigations ordered because of cargoes carried or ports visited while vessel is

45  ~~of the consular mess. Fumigations of Charterers at continuous period~~

46  Charterers are to provide necessary ~~dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but~~
47  Owners to allow them the use of any dunnage ~~and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but~~
48  ~~for dunnage they making good any damage thereto.~~
        Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

49  3.  ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
        board the vessel at the current prices at the respective ports. ~~the vessel to be delivered with not less than~~

50  4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$34,500 daily including overtime
52  *payable every 15 days in advance.*   United States Currency per Calendar Month, ~~total, including overtime—working—hours—and~~
        and after the same rate for any part of a day, commencing on and from the day and date of her delivery, as aforesaid, until her

54  ~~stone.~~   United States Currency per Calendar Month ~~commencing on and from the day and date of her delivery, as aforesaid, and if~~
55  wear and tear excepted, to the Owners (unless lost) at ~~or dropping last outward pilot once safe port Pasung/Japan Range, port in~~
56  *Charterer's option,* any time day or night, Saturdays and holidays included unless otherwise mutually agreed. Charterers are to give Owners not
57  less than 20/15/10/5 days approximate and 3/2/1 day(s) definite
58  notice of vessels expected date of re-delivery and probable port.

59  5.  Payment of said hire to be made in the Owner's nominated bank account *See Clause 51 in New-York* in cash in United States Currency,
60  *every 15 days semi-monthly* in advance, and for the last 15 days or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
61  due, if so required by Owner, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
62  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
63  *following that such withdrawal of vessel of confinement has been given to* terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from ~~7 a.m. on the working day~~
64  ~~to have the privilege of confinement has been given to~~
65  *Subject to Owner's prior written authorization* Cash for vessel's ordinary disbursements at any port may be advanced as required by the
66  Captain, by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
68  of such advances.

69  6.  That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf/anchorage or place where the Charterers or their Agents
70  direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for vessels to safely~~
71  *lie aground.*

72  7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
73  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
        tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers ~~as far as accommodation allow. Charterers~~

08-OCT-2007  16:22    FROM                                    TO  28772633                    P.03



74  paying Owners.
75  ~~cleared in the consequence, for delay per passage the accommodation for carriage of Passengers, Charterers are at loss-wise at will and expense. However, it is agreed that in case any facts or other expenses are~~
76  8.   That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency, and Charterers are to load, stow, tally and *trim/lash/secure/dunnage* and trim the cargo at their *risk and* expense under the
       supervision of the Captain, *who if required by Charterers* to sign Bills of Lading for
79  cargo as presented, in order conformity with Mate's or Tally Clerk's receipts.
80  9.   That the Charterers shall have reason to be dissatisfied with  the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointment.
82  10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *in port but* between ports or *during*
       *sea passage and see that voyages are prosecuted*
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's *table,* Charterers paying at the
84  rate of $1.00d per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers *and he/Charterers will sign a Letter*
       *of Indemnity prior to its boarding in the usual P and I wording,* or their Agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *See Clause 74.*
86  11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain
87  shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
       sumption of fuel.
89  12.  That the Captain shall use diligence in caring for the ventilation of the cargo.
90
91
92  ~~13.   That the Charterers shall have the option of continuing this charter for a further period of~~
93  ~~as given with respect to to the Owners or their Agents~~
94  14.  That if required by Charterers, time not to commence before *the 22nd August, 2007*
95  not have given written notice by Charterers, time not to commence on or before *the 27th of August, 2007*
96  their Agents to have the option of cancelling this Charter at any time not later than the day of the vessel's readiness. *(Itinerary: 16.1809. August -*
       *Kristiansand; 22-23 August 2007)* ........................................ but not later than 4 p.m. Charterers or
97  15.  That in the event of the loss of time arising from strike of Master/Officers/Crew or sickness/accidents of crew, deficiency or defect
       ~~from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment,~~
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause, *for*
       *which Owners are responsible under the terms of this Charter Party*
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 debt in or breakdown of any part of her hull, machinery or equipment, the time so lost and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted therefrom.
102 16.  That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107 17.  ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men. See Clause 31.~~
110 ~~See contributions.~~
111 18.  That the Owners shall have a lien upon all cargoes, and all sub-freights, freights, demurrages, *hires, sub-hires,* for any amounts due under this
112 Charter, including General Average.
113 deposit to be returned at once, Charterers shall have a lien on the Ship for all monies paid in advance and not carried, and any overpaid hire or excess
       might have priority over the title and interest of the owners in the vessel.

08-OCT-2007  16:22  FROM                    TO  28772633                P.04



19. That all derricks and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of York-Antwerp Rules 1974 or any amendment thereto. Proportion of General Average made necessary by expenses incurred for the ship's and/or crew's benefit shall be credited by the Owners against the hire for the period covered by the off-hire clause.

20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.

22. Owners shall maintain the gear of the ship as fitted, providing gear (for all cranes derricks) capable of handling lifts up to three tons, also providing ropes, falls, slings and blocks. If vessel is fitted with cranes capable of handling heavier lifts, Owners are to provide necessary gear for this same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel electric light as on board night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The Charterers to have the use of any gear on board the vessel.

23. Vessel to work night and day, if required by Charterers, and all cranes winches to be at Charterers' disposal during loading and discharging. The steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, winchmen, etc.

24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained in the U.S. Act of Congress approved on the 13th day of February, 1893, and entitled An Act relating to Navigation of Vessels, etc., in respect of all cargo carried under this charter to or from the United States of America.

U.S.A. Clause Paramount

This bill of lading shall have effect subject to the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities.

Line numbers: 114–159



Both-to-Blame Collision Clause

~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~ ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~ ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~ ~~or liability represents loss of or damage to or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~ ~~carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her~~

25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or discharging. *Vessel not to trade to* (See Clause 73).

26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.

27. A commission of 1.25 3/4% per cent is payable by the Vessel and Owners to *Clarkson Melbourne Pty. Ltd., Melbourne,*
and 1.25% to *Doric Shipbrokers S.A., Greece*
on hire earned and paid under this Charter. _____

28. An address commission of 1 1/2 per cent payable to Charterers.
_____

Clauses 29 to 196 and General Average, General Clause Paramount, New Both to Blame Collision Clause, Arbitration Clause, P & I Bunker Deviation Clause and Conwartime 1993 War Clause and Arbitration (Clause, New Jason Clause, of and incorporated in the Charter Party and all Bill(s) of Lading issued hereunder to incorporate all terms, conditions, liberties and exceptions of the fitre Charter Party and in particular the lien and Arbitration Clause to be fully incorporated in this Charter Party.

CHARTERERS:

OWNERS:

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which cant be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

 

## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 29.**
Charterers are entitled to deduct from last sufficient hire payments estimated Owners disbursements as well as value of estimated bunkers on redelivery, in case of any vessel's delay due to Owners matter vessel to be fully off hire.

Payment is not sufficient to cover value of estimated bunkers on redelivery (See Clause 49 and 72) and estimated amount disbursed for Owners account from penultimate hire payment. Charterers to produce supporting evidence from such deduction as soon as same are available.

**Clause 30.**
At or off port, crew to perform if weather permitting first opening and last closing of hatches where and when required if permitted by local regulations/union/authority, however, crew always to assist in opening and/or closing hatches in case of emergency if permitted by local regulations/union/authority.

**Clause 31.**
That should any dispute arise between Owners and Charterers, the matter in dispute shall be referred to Arbitration in London, in accordance with English Law. This Charter Party shall be governed by and construed in accordance with English Law.

In the event one of the parties serves a notice of appointment of its arbitrator and the other party fails to appoint its arbitrator within 14 days the party that has appointed the arbitrator will serve one final notice to the defaulting party and in the event the defaulting party does not appoint an arbitrator within 7 days then the arbitrator appointed will act as sole arbitrator and as one appointed by mutual consent.

Arbitration shall be conducted in accordance with the rules and procedures of the London Maritime Arbitration Association rules and procedures in force at the time arbitration is declared. Should the claim and counter claim (if any) not exceed US$50,000 (United States Dollars Fifty Thousand) excluding legal fees, tribunal costs and interest, then arbitration shall be conducted in accordance with the simplified rules and procedures of the London Maritime Arbitration Association in force when arbitration is declared.

1

08-OCT-2007   16:24   FROM                    TO   28772633              P.07




## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

**Clause 32.**

Owners to supply valid certificates, for the agreed trading limits and such certificates to be maintained throughout the period of charter. Any consequences due to vessel lacking necessary certificates, or if same should be out dated, to be for Owner's risk and expense to the extent Charterers operations are hindered. Vessel's cargo gear and all other equipment shall comply with the regulations of the countries to which the vessel may trade, and Owners are to ensure that the vessel at all times in possession of valid and up-to-date certificate of efficiency to comply with such regulations. If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owner's Agents to comply with the aforementioned regulations or because vessel is not in possession of such valid and up to date certificates. The vessel to be off hire for the time actually lost. Vessel has lighting apparatus for night work in all holds simultaneously.

**Clause 33.**

Should any damage be caused to the vessel or her fittings by Stevedores, Master has to try to let the Stevedores repair the damage and will try to settle the matter directly with them at the first stage. If the damage is not repaired by the Stevedores, Master has to endeavour to obtain written acknowledgement of the damage and liability from Stevedores otherwise Charterers shall not be responsible for the damage. Master is to notify Charterers or their Agents of such damage within 48 hours of occurrence or on discovery of same, in case of hidden damage. Charterers have the privilege of redelivering the vessel without repairing the Stevedore damage for which the Charterers are responsible, incurred during the currency of this charter as long as the damage does not affect the seaworthiness/cargo worthiness survey report ascertained by independent Lloyds surveyor or joint survey between Charterers representative and Master/Chief Engineer who is to quantify the extent of damage (such cost of damages to be settled by Charterers upon receipt of such survey) but repair time for Charterer's account if such time exceed the time necessary for Owners to carry out their own other works of repair. Stevedore damage affecting seaworthiness and/or cargo worthiness of the vessel shall be repaired without delay to the vessel after each occurrence in the Charterer's time and shall be paid for by the Charterers.

**Clause 34.**

Master shall supervise stowage of cargo as well as instruct one of his Officers to supervise all loading, handling and discharging of the cargo and he is to furnish Charterers with stowage plan as well as other documents customarily used.

2





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 35.**
The Charterers shall not be liable for loss nor personal injury nor arrest or seizure or loss or damage to the vessel or other objects arising from perils covered by the usual policies and conditions of Hull and Marine Insurance at Owner's Underwriters unless caused by Charterers or their servants and/or agents negligence.

**Clause 36.**
In the event of vessel deviating (which expression includes putting back or putting into any port other than to which she is bound under the instructions of Charterers) for any cause or for any purpose which would result in payment of hire being suspended under any provisions of this Charter, no hire shall in any case be payable as from the commencement of such deviation until the time when the vessel is again ready and in an efficient state to resume her service from a position not less favourable to Charterers, than that at which the deviation is commenced.

In the event of the vessel for any cause or for any purpose aforesaid putting into any port other than the port for which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners.

**Clause 37.**
Vessel is currently insured for the full hull and machinery value (including I.V.) but Owners have the right to adjust insured value of hull and machinery from time to time with notice to Charterers of the changes. Owners P and I Club is:

Owners agree that the Charterers will enjoy and are being entitled to same coverage by ship's protection and indemnity club as if vessel were operated by Owners themselves provided rules permit.

**Clause 38.**
Owners guarantee vessel is not black listed by trading countries due to vessel's ownership/operators/age and whatsoever.
Vessel to comply with Australian/New Zealand trading.
Vessel has no relation to ex-Yugoslavia in vessel's flag/ownership/crew/etc.

**Clause 39.**
Charterers agree to instruct their agents to undertake normal ship's husbandry on behalf of Owners without agents fee to Owners. However, this shall not include any extra ordinary business such as crew joining/leaving ship, crew

3

08-OCT-2007  16:25  FROM                    TO  28772633              P.09





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

repatriations and/or hospitalization in which case Owners shall appoint their own agents, or appoint Charterer's agents as Owner's agents.

In any event, Owners have the option to appoint their own husbandry agents if so desired by them.

**Clause 40.**
Any dues and/or taxes on cargoes and/or freight and/or hire due to Charterers trade and domicile to be for Charterer's account, excluding taxes levied by the country of the flag of vessel and Owners.

**Clause 41.**
Deleted.

**Clause 42.**
Owners to supply on delivery and to maintain during the service, valid deratization exemption certificate.

The cost of any fumigation necessary to obtain extension or renewals of deratization exemption certificates to be for Owner's account and time actually lost to be off hire. Hold fumigation due loaded cargo for Charterer's account.

**Clause 43.**
Charterers to be responsible for fines imposed in the event of smuggling by Charterers employees and/or Charterers Agents but Owners to be responsible for any such acts of their own officers and/or crew. Charterers to remain responsible for detention of the due to smuggling committed by Charterers employees and/or Charterers Agents only.

**Clause 44.**
Should the vessel be arrested during the currency of this Charter Party at the suit of any person having or purporting to have a claim against or any interest in the vessel hire under this Charter Party shall not be payable in respect of any time actually lost by Charterers whilst the vessel remains under arrest and remains unemployed as the result of the arrest. Owners shall reimburse the Charterers for any proven expenditure Charterers may incur under the Charter Party in respect of any period during which she is arrested.

This Clause shall be inoperative should the arrest be caused through any fault or omission of Charterers and/or their Servants and/or Agents.

4




### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

**Clause 45.**
If, during the currency of this Charter Party, there is any deviation during the course of the voyage or any loss of time whatsoever caused by sickness of, or accident to crew or any person other than Charterers servants on board the vessel, hire shall not be paid for the time so lost and the cost of extra fuel consumed any extra expenses incurred shall be for the Owners account.

**Clause 46.**
Officers and crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available on board, otherwise any detention and fines resulting from not having these certificates on board to be for Owners account except for the quarantine detention imposed by authorities due to the vessel having traded to country, or port affected by contagious disease/plague under this charter period. Further, the vessel shall be in possession of valid certificate necessary to prepare radio pratique at all port or ports where normal radio pratique is available.

**Clause 47.**
Vessel's holds on delivery to be clean/swept/washed down by fresh water and dried up so as to receive Charterers intended cargoes in all respects, free of salt, loose rust scales and previous cargo residue to the satisfaction of independent surveyor at load port. If vessel fails to pass any hold inspection as above, the vessel should be placed off hire from time of rejection until the vessel passes the same inspection again.

**Clause 48.**
As long as Charterers fulfill their financial obligation to Owners, the Owners undertake to instruct the Master to authorize, in writing, the Charterers or Charterers agents to issue and sign Bills of Lading on Charterers usual form on Owners and Masters behalf for cargo.

Charterers and/or their agents have option to sign Bills of Lading on behalf of Master in accordance with Mate's or Tally's receipts without prejudice to this Charter Party. The entire responsibility for proper delivery of the cargo to the receiver(s) at all discharge ports shall rest at all times with the Charterers.

As long as Charterers have fulfilled their financial obligations, Owners are to allow Charterers to discharge entire cargo without presentation of original Bill(s) of Lading and Charterers provided Letter of Indemnity signed by Charterers only. The L.O.I. to be accompanied with copies of all original Bills of Lading to which it refers.

5

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

Charterers agree to indemnify and hold Owners harmless from any and all claims, cost, expenses and/or liability resulting from or arising out of Charterer's failure to obtain the original Bill(s) of Lading.

It is clearly agreed that no liner Bills of Lading will be issued under this Charter Party unless Owners prior consent is obtained.

Clause 49. Bunker Clause
Vessel to be delivered with about 800/900 metric tons IFO and about 75 metric tons MDO. Bunkers on redelivery to be about same as on delivery.
Same prices at both ends – US$425.00 per metric ton for IFO and US$675.00 per metric ton for MDO.
Bunkers on delivery payable with first hire payment and estimated bunkers on redelivery to be deducted from last sufficient hire payment.

Clause 50. Vessel's Description
MV STENTOR
BC/LOGGER, BUILT JAN 2006 SHIMANAMI SHIPYARD (IMABARI GROUP)
28,445 MT ON 9.78M
BAHAMAS FLAG - NKK CLASS
GT/NT:16960/10493
LOA/BEAM 169.26/27.24M
5 HO/HA
CARGO GEAR:  4 X 30.50T CR
HATCH SIZES: NO.1  13.60 M X 16.00 M NO.2 TO 5   19.20 M X 17.60 M
GRAIN/BALE 37523.01CBM / 35782.45 CBM OR 1325125/1262954CBFT
UNIFORM TANK TOP STRENGTH 15 TNS/SQM
STRENGTHENED FOR OF HEAVY CARGOES, HOLDS NO.2 + NO.4 MAY BE EMPTY
CO2 FITTED/AHL
STEEL PERMANENT AND COLLAPSIBLE STANCHIONS FITTED
SPEED/CONSUMPTION ARE ABOUT, UNDER GOOD WEATHER CONDITION I.E. THE WIND NOT EXCEEDING B4, THE SEA STATE 3 AND NO ADVERSE CURRENT/SWELL/DECK CARGO
ABOUT 13.5 KNOTS ON 22 TONS IFO 180CST
IN PORT: WORKING 4MT IFO, IDLE 2.5MT IFO.
'RME 25' FOR IFO 180 CST AND 'DMB' FOR MDO BOTH ISO 8217/1996 (E).
VESSEL HAS LIBERTY TO USE MDO FOR MANOUVERING IN NARROW WATERS, CANALS, RIVERS, ON ENTERING/LEAVING PORTS AND IN ADVERSE WEATHER.
ADA/WOG

6

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 51.**
Hire to be telegraphically remitted, free of bank charges to Owner's bank:

Eurobank Ergasias SA
Akti Miaouli Branch
Piraeus, Greece
Swift Code: EFGBGRAA
IBAN: GR380 2600 290000 25 1200 268266
Corresponding Bank in New York: Deutsche Bank Trust America New York
Swift Code: BKTRUS33
In favour of: Nalas Marine S.A.
Account Number: 026.029.25.1200268266

Payment of first hire and value of estimated consumable bunkers to be paid within 3 banking days after vessel's delivery and Charterers receipt of faxed invoice in Seoul.

Charterers are entitled to deduct from last sufficient hire payments estimated Owners disbursements as well as value of estimated bunkers on redelivery in case of any vessel's delay due to Owners matter vessel to be fully off hire.

**Clause 52.**
Hull and bunker on-off hire survey to be held.
Time/cost to be shared equally between Owners and Charterers.
Owners option to be represented by Master/Chief Engineer in which case each party to take over the corresponding cost.
Surveys to be arranged and take place in such manner so that vessel not to be off hire.

**Clause 53.**
Deleted.

**Clause 54.**
Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters (as and when received from Underwriters) by reason of the vessel being in port for a minimum period of a calendar month, if on full hire for this period or pro rata for the time actually on hire as far as the rules permit.

7

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 55.**
Basic War Risk Insurance to be for Owner's account. Any additional or extra War Risk Insurance and extra crew war bonus, if any, due to vessel trading in Charterers service to be for Charterer's account.

**Clause 58. Pollution Charter Party Clause**

1. Owners warrant throughout the currency of this Charter they will provide the vessel with the following certificates:
   - (A) Certificates issued pursuant to the Civil Liability Convention 1969 ("C.L.C.")
   - (B) Certificates issued pursuant to Section 311(P) of the U.S. Federal Water Pollution Act, as amended (Title 33, U.S. Code, Section 1321 (P)),
   - (C) Certificates which may be required by U.S. Federal legislation at any time during the currency of this Charter provided always that such legislation incorporates the C.L.C. as amended by the 1984 Protocol thereto or contains provisions equivalent thereto.

2. Notwithstanding anything whether printed or typed herein to the contrary:
   - (A) Save as required for compliance with paragraph 1 hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.
   - (B) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the cost of any delay incurred by the vessel as a result of any failure by Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of the vessel's inability to perform as aforesaid.
   - (C) Owners shall not be liable for any loss, damage, and liability or expense whatsoever and howsoever arising which Charterers and/or the holds of any Bill of Lading issued pursuant to this, Charterers may sustain by reason of the vessel's inability to perform as aforesaid.

3. Charterers warrant that the terms of this Clause will be incorporated effectively into any Bill of Lading issued pursuant to this charter.

8




### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 57.**
Cranemen and stevedores always to be appointed/employed and paid by
Charterers.

It is mutually agreed that the crew of the vessel has to co-operate in rendering
the services as performed and customary on Owner's own vessels according to
the direction of the Charterers respectively their agents. Owners undertake to
instruct ship's command accordingly. Any lashing etc., if and when required will
be done by shore gang or others for Charterer's account. Crew to perform such
work if local regulations/port authorities permit and for such work by Master/Crew
they are servants of the Charterers and work is done at Charterer's time/risk
expense crew remuneration to be agreed with Owners and to be paid to Owners
in the first place.

The vessel's officers and crews to shall perform extra work, if so requested by
the Charterers, such as setting stanchion, lashing, relashing of cargo or
collecting and providing of dunnage and/or lashing materials including catwalks,
cargo marks, painting and etc., provided and subject that shore and labour
union's regulations permit/allow.
Charterers shall pay US$4000 lumpsum per voyage for above extra work directly
to the Owners. Such amount excludes providing necessary material for eventual
catwalk and cargo marks are to be for Charterers account.
Crew to assist in lashing/lashing-always acting as Charterers servants.
When logs loaded on deck, subject to weather conditions, vessel's speed may be
reduced upto half "knot."

1) The crew shall be considered as servants of the Charterers when
   performing this work.
2) The work shall be done at Charterer's time and expense.
3) Trimming is to be performed and completed by Shipper's stevedores to
   the satisfaction of Master, prior to the vessel's Crew commencing lashing
   work.
4) All lashing work is to be performed while the vessel is alongside or in
   anchorage.

**Clause 58.**
When hire is not received by Owners at the due date on account of delays
beyond the Charterer's control Owners to give Charterers 2 banking days notice
in order to rectify the cause for such delay before exercising their rights under
Clause 5 of the charter.

9

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 59.**
Should the vessel be boycotted at any port or place by shore and/or port labour and/or tugboats and/or pilots, or by government authority, by reason of the vessel's manning or ownership or terms and conditions on which members of the Officers/Crew are employed, or by reason of trading of the vessel (except for trading during currency of this Charter), any extra expenses incurred therefrom shall be for Owner's account and the Charterers are entitled to place the vessel off hire any time lost by such reasons. If the boycott shall be caused by Charterers and/or their servants and/or their agents, then this clause shall be inoperative and the vessel shall remain fully on hire.

**Clause 60.**
In lieu of hold cleaning: US$4,500.00 lumpsum including disposal/removal of dunnage/lashing materials/debris/bark.
Intermediate hold cleaning: US$500.00 per hold.

**Clause 61.**
Charterers or Owners are at liberty to cancel this Charter Party in case of war, whether declared or not, between any of the following powers: U.S.A., Great Britain, Japan, Russia and People's Republic of China, South Korea, New Zealand and Liberia.

**Clause 62.**
Deleted.

**Clause 63.**
All negotiations and eventual fixture to be kept private and confidential.

**Clause 64.**
Owners shall have the liberty of using Diesel Oil whilst entering and leaving port and for manoeuvring in shallow water.

**Clause 65.**
General Average, General Clause Paramount, New Both to Blame Collision Clause, New Jason Clause, Arbitration Clause, P & I Bunker Deviation Clause and Conwartime 1993 War Clause and Arbitration Clause are deemed to be a part of and incorporated in the Charter Party and all Bill(s) of Lading issued hereunder. All Bill(s) of Lading to incorporate all terms, conditions, liberties and exceptions of the time Charter Party and in particular the lien and Arbitration Clause as applicable.

10

08-OCT-2007  16:28    FROM                                 TO  28772533        P.16

 

## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

**Clause 66.**
Cargo claims to be settled between Owners and Charterers in accordance with Interclub N.Y.P.E. Agreement as amended May 1984 and any subsequent amendments and/or re-enactments of same. Neither party will involve any time limit as a defense between themselves.

**Clause 67.**
Deleted.

**Clause 68.**
Export and/or import permits for cargo to be at Charterer's risk and expense. Charterers to obtain and to be responsible for all necessary permits to enter and/or trade in/out of all ports during the currency of this charter at their own risk and expense.

**Clause 69.**
Owners have the option to supply bunkers prior to redelivery provided not interfering with Charterer's operations.

Charterers also have the option to supply bunkers prior to redelivery provided not interfering with Owner's operations.

**Clause 70. Bimco Bunker Quality Control Clause Fuel Grade (IFO/MDO):**
Charterers guarantee to supply vessel with bunkers of minimum standards of "RME 25 or RMF 25" for IFO 180 CST and "DMB" for MDO. Bunker specifications to be in accordance with international standards at those set by the ISO 8217/2005 (E) and always in compliance with Marpol Annex VI requirements.
Bimco Fuel Sulphur Content Clause for TCP to apply.

**Clause 71.**
Deleted.

**Clause 72.**
First hire, cables/entertainment/victualling plus bunkers on delivery values to be paid within three banking days after vessel's delivery and receipt of faxed invoice in Seoul.

**Clause 73. Trading Exclusions**
Notwithstanding anything else contained in this Charter Party the Charterers agree that vessel will not trade any area which is now or which may be in the future designated by Lloyds and/or vessel's hull underwriters as a war zone

11




## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

trading always within Institute Warranty Limits and always excluding the following countries:

Israel, Turkish occupied Cyprus, Denmark, Norway, Finland, Sweden, Cuba, Iraq, North Korea, CIS Pacific, Somalia, Liberia, Yemen, Eritrea, Sierra Leone, Mauritania, Alaska, Oregon State and any other place which vessel is from time to time prohibited to call by the national authorities under which the vessel is registered.
Vessel not to trade directly between China and Taiwan.
Conwartime 1993 War Risk Clause to apply.

Vessel not to be ordered to nor bound to enter:

(a) Any places where epidemics are prevalent or to which the Master/crew by law are not bound to follow vessel and in countries/ports where the vessel may be infested by Asian Gypsy Moth i.e. CIS Pacific or Japanese ports which are included in the AGM alert list as per USDA regulations i.e. Chiba, Hachinohe, Hakodate, Hiroshima, Oita, Sakata, Shimizu, Tomakomai.

(b) Any ice-bound port or place or any port or place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice or where there is risk that the vessel will not be able on account of ice to reach the port or place or to depart therefrom after completion loading or discharging. If on account of ice the Master considers it dangerous to remain at the loading or discharging port or place for fear of vessel being frozen in and/or damaged, the Master shall have liberty to sail to a convenient port or place and await Charterer's fresh instructions.

(c) The vessel shall not be obliged to force ice, nor to follow ice breakers. All countries which are not in compliance with International Ship and Port Facility Security (ISPS) Code and therefore lack of effective anti terrorism measures, i.e. following countries are reported by US Coast Guard not in compliance: Albania, Democratic Republic of Congo, Guinea-Bissau, Liberia, Madagascar, Mauritania, Nauru.

(d) No direct call between Taiwan and People's Republic of China is to be permitted.

**Clause 74. Cables, Victualling and Entertainment**
Charterers to pay Owners lumpsum US$1,250 (United States Dollars One Thousand, Two Hundred and Fifty) per month or pro rata for all victualling/cable charges/entertainment/etc.

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 75.**
Deleted.

**Clause 76.**
Subject to vessel's stability/trim and provided deck strength/space permitting Charterers have the option of loading cargo on deck at Charterer's/Shippers entire risk without any liability to Owners/Vessel for whatsoever cause, and Charterers undertake to procure that Bills of Lading to be so claused (See Clause 78 and 79). Charterers undertake to supply on board at their expense all dunnages (if Master considers necessary) and all lashing/securing materials (except for logs and/or lumber and/or wood products for on deck only) and/or any other extra fitting/equipment/materials requisite for safe stowage/carriage and to have such deck cargo dunnaged/stowed/lashed/secured to the satisfaction of Master. Any extra expenses resulting therefrom/incurred thereby and detention through any of above causes to be for Charterer's account.

**Clause 77. Cargo Exclusions**
The vessel shall be employed in carrying lawful merchandise in accordance with the requirements or recommendations of the competent authorities of the country of the vessel's registry and of ports of shipment/discharge and of any intermediate countries or ports through whose waters the vessel must pass.

Charterers warrant that all cargoes to be loaded/stowed/carried and discharged in strict conformity with I.M.O. and local regulations and BC Code. Any extra fittings/equipment/etc. which are required to observe such regulations to be undertaken by Charterers at their time/expense. Charterers will hold Owners harmless against all and any consequences that may arise and will indemnify Owners for all and any damages and/or losses Owners may suffer as a result of any failure in this respect.

None of the cargoes, goods, or substances listed below are to be loaded during the currency of this Charter:
All corrosive, dangerous, explosive and/or combustible, hazardous, inflammable, injurious and toxic substances/cargoes or goods or substances listed in the IMO-IMDG Code 1990 Consolidated Edition and any subsequent new edition thereof or amendments thereto as well as listed on BC Code Appendix B.

Without prejudice to the generality above following cargoes are specifically excluded:

   A. Acids, ammonium nitrate, ammonium nitrate fertilizers except harmless non hazardous type, ammonium nitrates fertilizers Class B, ammonium

08-OCT-2007  16:29  FROM                    TO  29772633          P.19

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

phosphate, ammonium sulphate unless fertilizer grade, alumina, aluminium ashes, aluminum nitrate, aluminium ferrosilicon, aluminium dross, aluminium residues, aluminium silicon powder, aluminium smelting by-products, ammonia, ammunition, andalusite, animals, arms, asbestos, ashes, asphalt and/or its products, ammonium chlorine,

B. Bauxite, barium nitrates, bitumen, black powder, blasting caps and detonator caps, brown coal and brown coal briquettes, boycotted cargoes, bones or bone meal, borax, bombs, bullion

C. Calcined pyrites Class B, calcium nitrates Class B, calcium carbide, calcium chloride, calcium fluoride, calcium hypochlorite, calcium hyperchloride, calcium oxide, calcium oxychloride, carbon black, caustic potash, castor beans, chemical wastes, chrome ore and sand, charcoal, charcoal briquettes, chipped bone, Chilean natural nitrates, Chilean natural potassic mixture, clay, coal, cocoa, coffee, concentrates, copra pellets/products, copra, corrosives, cotton and cotton waste, containers, creosote and creosoted goods, carbite, caustic soda, cottonseed expellers

D. Deck cargoes except logs and timber, dynamite, direct reduced iron in any form, iron swarf, iron oxide, direct reduced iron ore pellets, hot briquetted iron, drugs,

E. Esparto grass, essential oil, explosives

F. Ferrous meal, ferro manganese, ferro silicon, fertilizers except non hazardous and non IMO class, fertilizers to Australia, firearms, fire briquettes, fireworks, fishmeal, fishscrap, ferrous metal, fluorspar,

G. Gaseous coal, gasoline, granite blocks and other stone blocks, gypsum

H. Hypochlorite solutions, hides, HBI

I. Jute

J. Kaolin Clay

K. Ilmenite, Indian coal/coke, iron ore fine or pellets metallized, iron carbide/oxide spent, isotopes,

L. Lead calcined or sulphide or nitrate, lime, livestock, limestone, loaded bombs

M. Magnesia, magnetite, magnesium nitrate, manioc, manioc pellets, metal sulphide, milled rice, Mississippi coal, motor spirit, mineral sands, motor blocks

N. Nefiline syenite, naphtha, nitro glycerin, nigerseed, nitrate of soda, nuclear substances or fuels or cargo or wastes

O. Oil cakes or seeds or palm kernels, oily pieces, oily expellers, organic peroxides, olivine sand

P. Palm kernels, petroleum derivatives and all petroleum products, pig iron, pitch, pitch prill, poultry, pond coal, potassium chloride, potassium/sodium nitrate, potash, petcoke, pesticides, paper products, pollard pellets, pyrites, prefabricated and mobile buildings

14

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14ᵀᴴ AUGUST, 2007

Q.  Quebracho, quicklime
R.  Radioactive substances or wastes of any kind, products or waste, rags, radio isotopes, rape seed expellers, resins, refrigerated cargo, refuse and garbage of any kind, rock salt, rutile san, rice
S.  Salt, saltpetre, metal in any form including motorblocks, turnings and swarf, silicon and silicon manganese, silica sand, silver sand, sludge ore, solvents, sodium nitrate or sulphate, specie, sponge iron, sulphate in bulk, sulphur, sunflower seeds and expellers/pellets and cakes, soda ash, sawdust, seed cakes Class B, sodium and potassium nitrate
T.  Taconite, tankage, tar, tar and all its products, tea, tobacco, TNT, titanium slag, technical urea, toxic waste, turpentine,
U.  Vanadium ore, vermiculite, vehicles
V.  Waste and old paper, wet hides, woodchips and wood pulp pellets both with less than 15 percent moisture
W.  Yachts, yellow phosphorus
X.  Zircon sand, zinc ashes, zinc dross and residue and all it products.

Notwithstanding the above Charterers are allowed to carry with Owners specific prior consent which is not to be unreasonably withheld the following:

Concentrates excluding lead concentrates always provided that carried in accordance with the terms of the Charter party and to be in full conformity with and to be loaded/carried/stowed/discharged in accordance with IMO and/or local authorities regulations/recommendations and certificate of water contents to be within safety margin for water transport as ascertained by IMO Code. Charterers are fully responsible for all time/cost/expenses pertaining to the carriage of concentrates including but not limited to certification/surveys required for carriage of this cargo.

HMS 1 & 2 or shredded scrap, non oily and allow excluding M.B.T. Charterers to observe soft loading clause whereby first layers of scrap to be gently lowered and loaded on vessels tank top forming a cushion prior balance cargo loaded to Master's satisfaction. When scrap loaded, the first load/layer of scrap in each hold to be lowered as/low/close as possible to bottom of the hold to provide a proper flooring and cushion for loading balance of cargo to Master's satisfaction.

In the event that Charterers load IMO and/or IMDG listed cargoes (always in accordance with the Charter Party) then they are to reimburse Owners for any extra expenses incurred by owners as a result including extra fittings and in case IMO/IMDG and/or local and/or national authorities require special documentation for any cargoes covered by IMO/IMDG Codes Charterers to be responsible for obtaining same at their time and expense.

15

08-OCT-2007  16:30   FROM                          TO   28772833              P.21





### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 78.**
Owners guarantee that vessel is fully logs fitted with steel stanchions. Owners guarantee that vessel has sufficient lashing materials and other equipment including certificates for loading full cargoes of log on and under deck.

**Clause 79.**
Master and Owners are not responsible for loss and/or damage to deck cargoes howsoever caused.

**Clause 80.**
Deleted.

**Clause 81.**
Owners and Master to undertake best efforts to co-operate with Charterers for best stowage of cargo and cargo fumigation if necessary at Charterer's time and expense.

**Clause 82.**
If vessel is off hire for a consecutive period of 30 days Charterers have the right to cancel this Charter Party without any further obligation under this contract on the part of the Charter, having first discharged cargo.

**Clause 83.**
In the event of breakdown of crane or cranes, or, winch or winches, by reason of disablement or insufficient power, the hire to be reduced pro rata for the period of such inefficiency, if any loss of time in relation to the number of cranes available. Owners to pay in addition the cost of labour either idle or additionally engaged, but limited to one shift only for each breakdown but Charterers not to order labour against already disabled crane(s). Because of the breakdown Owners to hire shore appliances, if available, if required by Charterers, but maximum daily cost not to exceed daily time charter hire however in such case vessel to remain on full hire unless loss of time should occur.

**Clause 84.**
Gangway watchmen to be from vessel's crew and for the cargo to be for Charterer's account, compulsory shore gangway watchmen, patrol watchmen or watchmen for all purposes to be for Charterer's account.

16





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 85.**
In case Charterers require fumigation of the cargo at discharge port, time and expense of same to be for Charterer's account and Officers/crew are to be provided with suitable hotel/accommodation at Charterer's expense.

**Clause 86.**
Compulsory garbage removal to be for Charterer's account.

**Clause 87.**
The vessel is fitted with hold ladders to current Australian WWF regulations and any dispute on this matter at load ports to be for Owner's responsibility and time lost or expenses incurred thereby to be for Owner's account.

**Clause 88.**
Notice on fixing.

**Clause 89.**
For the purpose of computing hire payments, time for delivery/redelivery shall be adjusted to GMT.

**Clause 90.**
Vessel to be left in seaworthy trim to Master's satisfaction at all times between ports and at sea.

**Clause 91. Hamburg Clause**
Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, Way Bill or other document evidencing a contract of carriage ( whether or not signed on behalf of the Owner or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. The Charterers shall indemnify the Owners against any liability, loss or damage, which may result from any breach of the foregoing provisions of this clause.

**Clause 92.**

The Bill of Lading to be decided by Charterers; tally and measurement and tally to be arranged and paid for by Charterers at both loading and discharging ports if required. But if Owners require tally to protect their own interest which will be for Owners time/account. Master to promptly notify Charterers or their agents of any damage to and/or cargo of which he became aware during the period of this charter.

08-OCT-2007  16:31    FROM    TO  28772633    P.23

 

### ADDITIONAL CLAUSES TO M.V. "STENTOR"
### CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 93.**

Bimco Standard ISM Clause to apply.

From the date of coming into force of the International Safety Management (I.S.M.) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the I.S.M. Code) shall comply with the requirements of the I.S.M. code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (D.O.C.) and Safety Management Certificate (S.M.C.) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by failure on the part of the Owners or "The Company" to comply with the I.S.M. Code shall be for the Owners account.

**Clause 94.**

Bimco Y2K Clause to apply.

**Clause 95. New Both to Blame Collision Clause**

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, following clause to apply:-

"If the vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the Servants of the carrier in the navigation or in the management of the vessel, the Owners of the cargo carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

18

08-OCT-2007  16:32    FROM                              TO  28772633                    P.24





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 96. Intermediate Holds Cleaning**
Any intermediate hold cleaning(s) if required by Charterers shall, in Charterers option, be performed by either the vessels crew or by shore labour at Charterers time/expense. If Charterers request services of crew for intermediate cleaning then this cleaning to be performed whilst vessel is en route to next loading port provided the time of ballast leg is sufficient for the work and the weather suitable, or in port provided shore regulations permit. If this option is declared then Charterers are to pay Owners US$500 per hold for each occasion. All intermediate cleaning, even if effected by crew, are carried out at Charterers risk and in Charterer's time, (crew acting as Charterer's servants) and should vessel's holds be subsequently rejected and any further cleaning etc. be required then these expenses and time used always to be for Charterers account. Any special equipment and/or materials/chemicals etc which may be required for hold cleaning are always to be provided and paid for by Charterers.

**Clause 97.**
Owners to allow transit fumigation as per IMO regulations. If required by Charterers the cargo is to be fumigated en route from the load port(s) to the first discharge port. This fumigation procedure involves the use of the product phosphine. But all loss and damage and expenses to be for Charterer's account.

**Clause 98.**
Owners guarantee that vessel's holds are to be clear of any fittings/superstructures such as car deck, curtain plates, container fittings whatsoever.

**Clause 99.**
Owners guarantee that vessels hatch covers are to be watertight all throughout this charter period and if any hatch cover is found to be defective, same to be rectified at Owner's time and expense to class satisfaction. Charterers also have the right to carryout hose test on all hatches at any time during this charter.

**Clause 100. Safe Stowage and Trimming**
Charterers are to leave the vessel in safe and seaworthy trim and with cargo on board safely stowed, dunnaged and secured to the Master's satisfaction for all shifting between berths and all passages between ports under this Charter in their time and at their expenses.

Separations between cargoes, other than natural, to be for Charterers account/risk and expense.

19

08-OCT-2007  16:33   FROM

TO  28772633

P.25



## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 101. BIMCO U.S.A. Security Clause for Time Charter**

If the vessel calls in the United States including any U.S. territory the following provisions shall apply with respect to any applicable security regulations or measures:

Notwithstanding anything else contained in the Charter party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspection, shall be for the Charterer's account, unless such costs or expenses result solely for the Owners negligence.

**Clause 102. Pre Loading Survey for Steels**

In the event Charterers load finished steel products they will tender notice to Owners prior to such loading in order Owners to arrange for a preloading survey on the cargo to be loaded. The cost of such survey will be shared equally between Owners and Charterers and both parties will receive copies of the pre-loading survey of such cargo.

**Clause 103. Bimco Stowaway clause**

i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to berate of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever, which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers account and the vessel to remain on hire.

iii) Should the vessel be arrested as a result of the Charterers breach of charter according to sub-clause (A) ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure release of the vessel.

B)
i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and however incurred, including fines, shall be for the Owners account and the vessel shall be off-hire.

20





## ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

ii)   Should the vessel be arrested as a result of stowaways having gained access to the vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the vessel is released and at their expense put up bail to secure the release of the vessel.

**Clause 104**

Charterers option to weld padeyes on deck / hatch cover / in holds at Charterer's time/expense and same to be removed prior to redelivery otherwise Charterers option to redeliver vessel without removal padeyes by paying US$10 per each padeye.

No welding of padeyes at places which will adversely affect vessel's epoxy coat, wing tanks or double bottoms or fuel/diesel tanks. Padeyes to be welded to Master's satisfaction which not to be withheld unreasonably.

**Clause 105. Deck Cargo Clause**

Charterers are permitted to load on the vessel's deck and hatch covers always provided that the permissible loads on the deck/hatch covers are not exceeded, that the stability of the vessel permits and that such cargo does not affect the seaworthiness of safe navigability of the vessel in any manner. Any extra fittings required for deck or hatch cargo are to be provided and paid for by the Charterers who are to load, stow, dunnage, lash and secure, unlash, tally such cargo in their time, risk and expense always to the entire satisfaction of the Master.

The vessel is not to be held responsible for any loss of or damage to the cargo carried on deck and Charterers to keep Owners always harmless for all delays/consequences/losses howsoever caused including cost/delays in placing of security/guarantees.

In the event that cargo is shipped on deck during this charter, Charterers are to ensure that separate Bills of Lading are issued covering such cargo that those Bills of Lading are claused as follows:

"Shipped on deck at Charterers/Shippers and Receivers risk, expenses and responsibility, without liability on the part of the vessel, or her Owner for any loss, damage, expenses or delay howsoever caused" or voyages to and from ports in the U.S.A. – "carried on deck at Shippers risks as to perils inherent in such carriage, but in all other respects subject to the provisions of the United States Carriage of Goods by Sea Act 1936."

08-OCT-2007  16:33  FROM                    TO  28772633                    P.27





### ADDITIONAL CLAUSES TO M.V. "STENTOR" CHARTER PARTY DATED 14TH AUGUST, 2007

**Clause 106.**

**A - ISPS CLAUSE FOR TIME CHARTER PARTIES**

(a)(i)  From the date coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company." Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b)(i)  The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO / Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii)  Except as otherwise provided in this Charter Party, loss, damages, expense or delay(excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)  Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the

22

08-OCT-2007  16:34  FROM                                    TO  28772633                · P.29





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

B – Charterers P and I Club: SSM

C – Any shortages established in any other method whatsoever other than draft survey in which the Master participated and agreed/signed will for Charterers account and Charterers place relevant security in order vessel sail without delay.

Charterers undertake to appoint and pay for draft surveys at load and discharge ports. To the extent Charterers fail to do so then the Master will be deemed to have been authorized to perform these surveys on behalf of the Charterers. Such draft surveys will be conclusive evidence of the cargo discharged.

D – Bimco Fuel Sulphur Content Clause for Time Charter Parties
Notwithstanding anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone. The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Clause.
For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

08-OCT-2007  16:35  FROM                    TO  28772633                P.29





## ADDITIONAL CLAUSES TO M.V. "STENTOR"
## CHARTER PARTY DATED 14TH AUGUST, 2007

### P AND I CLUB OIL BUNKERING CLAUSE

The vessel in addition to all other liberties shall have the liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading and discharge named in this Charter Party and may there take oil bunkers in any quantity at the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be adjusted according to York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the cargo, shippers, consignees, or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the cargo.

If a salvage ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the cargo to the carrier before delivery."

### PARAMOUNT CLAUSE

The Hague Rules contained in the International Convention for the unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this contract, when no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactment's are compulsorily applicable, the terms of the said Convention shall apply.

24

**EXHIBIT B**

JUDGE STANTON

542-07/ROSS/PLS

**07 CIV 9544**

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, New York 10005
(212) 425-1900

James L. Ross (JR6411)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------

TRANS PACIFIC CARRIERS CO. LTD.,    07 CV

                            Plaintiff,

   - against -

NAIAS MARINE S.A.,

                            Defendant
--------------------------------------------------

OCT 25 2007
U.S.D.C. S.D.N.Y.
CASHIERS

**VERIFIED COMPLAINT**

Plaintiff, TRANS PACIFIC CARRIERS CO. LTD. (hereinafter "TRANS PACIFIC"), through its attorneys Freehill Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant NAIAS MARINE S.A. (hereinafter 'NAIAS") alleges upon information and belief as follows:

**JURISDICTION**

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract by Defendant NAIAS. The case also falls within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to the New York Convention on the Recognition and Enforcement of Foreign

NYDOCS1/292528.1

Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Arbitration Act, 9 U.S.C. §1 *et seq.* and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

## THE PARTIES

2.    At all times relevant hereto, Plaintiff TRANS PACIFIC was and still is a foreign business entity organized and existing under the laws of a foreign country with an address at 10th floor, Donghwa Bldg., 58-7, Seosomun-Dong, Jung-Gu, Seoul, Korea.

3.    At all times relevant hereto, Defendant NAIAS was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH 96960.

4.    Plaintiff TRANS PACIFIC was the time-charterer of the vessel STENTOR pursuant to a Charter Party ("C/P") dated August 14, 2007. Attached is a copy of the C/P (Exhibit A). This C/P calls for English law and London arbitration (See Clause 31, Exhibit A).

5.    Defendant NAIAS was and is the owner of the vessel STENTOR, who entered into the aforementioned C/P agreement with the Plaintiff.

## FACTS

6.    Pursuant to the C/P (Exhibit A), the Defendant NAIAS agreed to let their vessel STENTOR to the Plaintiff for 2 to 3 voyages over a period of 60 days minimum to a maximum of 100 days (see Line 14 of C/P). The Plaintiff paid charter hire to the Defendant at a daily rate of $34,500 payable 15 days in advance (See Line 52 of C/P).

7.    Pursuant to the C/P (Exhibit A), the STENTOR performed two voyages for the Plaintiff and the Plaintiff exercised its option for a third voyage, as 38 days

remained on the 100 day maximum time period. With respect to this contemplated third voyage, the Plaintiff had entered into an agreement to sub-let the vessel to TPL Shipping Limited for the one voyage. The Plaintiff had the right to sub-let the vessel (See Line 16 of C/P). A copy of the agreed terms and conditions between TRANS PACIFIC and TPL Shipping Ltd. with respect to this third voyage is enclosed as Exhibit B.

8.    In breach of its contractual obligations under the C/P (Exhibit A), the Defendant NAIAS wrongfully withdrew the vessel STENTOR from the services of the Plaintiff prior to it performing the contemplated third voyage.

9.    As a result of the aforementioned C/P breach by the Defendant, the Plaintiff incurred costs, expenses and damages totaling **$1,030,500**, as follows:

(a)    Estimated overpaid daily hire (15 days @$34,500 daily)[1]..........................................$517,500.00

(b)    Plaintiff's losses under the remaining period of the C/P (38 days), including the lost revenue of the voyage charter party with TPL Shipping.............................$513,000.00

### RULE B MARITIME ATTACHMENT

10.    This action is brought in order to obtain security in favor of Plaintiff in respect to Plaintiff's claims against Defendant NAIAS which are subject to arbitration in London pursuant to English law in accordance with the terms of the aforementioned C/P (Exhibit A). This action is further brought to obtain security for any additional sums to cover Plaintiff's anticipated attorney fees and costs in the London arbitration, as well as interest, all of which are recoverable under English law.

---

[1] The Plaintiff paid the daily hire for the use of the vessel and a contemplated a third voyage, 15 days in advance. The Defendant owners accepted these hire payments, but ultimately refused to perform the third voyage.

11.    Upon information and belief, and after investigation, Defendant NAIAS cannot be "found" within this District for purposes of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that the Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, hire, of, belonging to, due or for the benefit of the Defendant (collectively hereinafter "ASSETS"), including but not limited to ASSETS as may be held, received, or transferred for its benefit, at, moving through, or within the possession, custody or control of banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

12.    The amounts of Plaintiff's claim sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by Plaintiff against Defendants is:

    a.  $1,030,500.00 as set forth in paragraph 9 above;

    b.  Interest in the amount of $278,235 calculated on the sum of $1,030,500.00 at the rate of 9% per annum, compounded quarterly, for three years, the estimated time it will take to obtain a final arbitration award, which interest is recoverable in arbitration under English law;

    c.  Estimated costs, including legal fees, of London arbitration, which are recoverable, in the amount of $250,000.00.

For a total claim amount sought to be attached of **$1,558,735.00**.

\

WHEREFORE, PLAINTIFF prays:

a. That process in due form of a law according to the practice of this Court issue against Defendant NAIAS, citing it to appear and answer the foregoing, failing which a default will be taken against it for the principal amount of the claim of $1,030,500.00, plus interest, costs and attorney fees;

b. That Defendant NAIAS be compelled to respond in London arbitration;

c. That if Defendant NAIAS cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of said Defendant, up to and including the claim of **$1,558,735.00** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, of, belonging to, due or being transferred from or for the benefit of Defendant NAIAS (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its own name or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking institutions or even other garnishees who may be served with a copy of the Process of Attachment issued herein.

d. That Plaintiff has such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
October 25, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
TRANS PACIFIC CARRIERS CO. LTD.

By: _____
James L. Ross (JR 6411)
Pamela L. Schultz (PS 8675)
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900
Facsimile: (212) 425-1901

## ATTORNEY VERIFICATION

State of New York  )
                ) ss.:
County of New York )

JAMES L. ROSS, being duly sworn, deposes and says as follows:

1.      I am a member of the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications from our client and documents provided by our client regarding the claims.

3.      The reason this Verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
James L. Ross

Sworn to before me this
25th day October 2007

_____
Notary Public

Lisa M. Morales
Notary Public, State of New York
No. 01MO6162004
Qualified in the Bronx
Commission Expires Feb. 26, 2011

**EXHIBIT C**



To:Trans Pacific Carriers Co.Ltd.("Charterers")
c/o Messrs Ince &Co
38/F,ICBC Tower, Citibank Plazza          Athens, 13 November 2007
3 Garden Road, Central
Hong Kong

## OUR LETTER OF GUARANTEE NO 15401 FOR USD 978.238,00

In consideration of your releasing from arrest and/or refraining from arresting or otherwise detaining the vessel MV STENTOR or any other vessel or property in the same or associated ownership,management, possession or control for the purpose of obtaining security in respect of your claims arising out of or in connection with the alleged unlawful withdrawal of the Vessel under the Charter on or about 25 October 2007 ("the Claims") We HSBC BANK PLC  MESSOGHION 109-111 ATHENS ,GREECE on behalf of Naias Marine S.A.  the Owners of MV STENTOR ("Owners") hereby undertake to pay to you or to your order within7 days of your written demand such sum or sums as may be due to Charterers from Owners in respect of the Claims either as agreed in writing between the parties hereto or as determined by a final arbitration award in London and/or by final judgment of the High Court in London on appeal therefrom and/or by final judgment of any higher appellate Court and/or as determined by an award or certificate of costs made by the arbitrators or the High Court in London, provided always that our total liability hereunder shall not exceed the sum of USD.978.238,00(US Dollars nine hundred seventy eight thousand two hundred thirty eight).

We warrant that we have received irrevocable authority from Owners to give this Guarantee in these terms.

This Guarantee shall be governed by and construed in accordance with the laws of England and any disputes arising therefrom shall be submitted to the High Court of Justice in London.

Yours faithfully,

BOGDANOS N.
A 28104

POLITIS D
A 35369

HSBC Bank plc
109-111, Messoghion Av., GR - 115 26, Athens - Greece
Telephone: 210 6960000, Fax: 210 6928729

022-05/03

# EXHIBIT D

**Nicholas Pantelias**

From:     "Rory Macfarlane" <rory.macfarlane@incelaw.com>
To:       "LEEWARD CONSULTANCY LTD" <nicholas@softway.gr>
Cc:       "Max Cross" <max.cross@incelaw.com>
Sent:     Friday, November 09, 2007 1:42 PM
Attach:   LETTER OF UNDERTAKING #3 - HSBC.DOC; Document.pdf
Subject:  RE: STENTOR

Dear Sirs,

We are pleased that progress appears to be being made on security.  Charterers claim is for US$590,863.41. This comprises US$53,321.79 under the SOA (attached) and US$537,541.62 for damages for wrongful early termination.   Interest at 7.75% over 3 years is a further US$137,375 . Costs of the arbitration are estimated at US$250,000.

The total security sought is therefore US$978,238.41.  The remaining security sought is therefore US$266,632.81.

We attach a revised draft wording (unapproved by our clients due to the time of sending this email) for your consideration.  We have amended the warranty provision regarding the demise charter issue.  Please provide us with your clients warranty on Naias letterhead paper confirming that the vessel was not demise chartered at the material time.

Once we receive the unsigned LOU on HSBC letterhead and the Naias Warranty we will take final instructions from our clients on the wording/security issues and then revert to you.  Until that time, we will proceed as previously indicated.  Which HSBC entity/branch will issue the LOU?  Please confirm so that we can seek the approval of our client on this entity.

Regards

Ince & Co

**EXHIBIT E**

**ORIGINAL**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/14/07

542-07/ROSS/PLS
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, New York 10005
(212) 425-1900
James L. Ross (JR6411)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

TRANS PACIFIC CARRIERS CO. LTD.,            07 CIV 9544 (LLS)

                              Plaintiff,     NOTICE OF DISMISSAL
                                             PURSUANT TO FRCP 41(a)(1 and
          - against -                        VOLUNTARY WITHDRAWAL OF
                                             ATTACHMENT

NAIAS MARINE S.A.,

                              Defendant
--------------------------------------------------------

     The above entitled action is hereby discontinued without prejudice on application of the

Plaintiffs pursuant to Fed. R. Civ. 41(a)(1), the defendant not having appeared, filed an answer

nor filed a motion for summary judgment, and the Process of Maritime Attachment and

Garnishment issued in this action pursuant to Supplemental Rule B is hereby withdrawn and

cancelled, and any funds under attachment are to be released according to the original transfer

instructions.

Dated: New York, New York
       November 14, 2007

                              FREEHILL HOGAN & MAHAR, LLP
                              Attorneys for Plaintiff

                              By: _____
                                 James L. Ross (JR6411)
                                 Pamela L. Schultz (PS 8675)
                                 80 Pine Street
                                 New York, NY 10005
                                 (212) 425-1900
                                 (212) 425-1901 fax

NYDOCS1/293797.1

                              Louis L. Stanton
                              U.S.D.J.
                              11/14/07

# EXHIBIT F

"STENTOR"

**Charterparty dated 14 August 2007**

------------------

**ADVICE**

------------------

1.      By a time charterparty on an amended NYPE form dated 14 August 2007, Naias Marine SA agreed to charter their vessel "STENTOR" ("the vessel") and Trans Pacific carriers Co Ltd agreed to hire the vessel from the time of delivery *"for 2/3 laden legs, minimum 60 to maximum 100 days via safe port(s), safe berth(s), safe anchorage(s), always afloat, always accessible and always within IWL with lawful, harmless cargoes. (Intention first leg: Cement Clinker) within below mentioned trading limits"*.

2.      Clause 4 of the charterparty provided that the redelivery range was to be Penang/Japan and *"Charterers are to give Owners not less than 20/15/10/7/5 days approximate and 3/2/1 day(s) definite notice of vessels expected date of re-delivery."*

3.      The vessel was delivered into the Charterers' service on 23 August at 1530 hours GMT.

4.      By my calculation, the earliest date of redelivery was 22 October (60 days later).

5.      The vessel performed her first laden leg without problem.

6.      On 25 September the vessel completed loading at Nelson, New Zealand, under her second laden voyage and Charterers ordered her to proceed to

1

Shimonoseki, Japan, to discharge.  The Master advised his approximate
ETA Shimonoseki as 12 October.

7.    On 1 October Charterers' brokers sent the following message at 1616
hours Korean time or Melbourne (Australian) time.

> "Following message from Charterers:-
> QTE
> Pls be advised that subj vsl will be redelivered to ownrs at dlosp
> BUSAN, KOREA o/a 20th – 21st OCT 2007, iagw/wp.
> Pls take this msg as chrts' 20 days of redelivery notice
> UNQUOTE"

8.    This message was sent to Owners' brokers (Doric Shipbrokers SA) who
are based in Greece.

9.    According to the documents, at 1937 hours Korean time or Melbourne
(Australian) time the same day (1 October) Charterers' brokers sent a
further message reading:

> "I just had a phone call from the Koreans … a bit hard to follow
> exactly, but he said that his earlier message was an error.
> I will try to clarify but it seems that vessel is NOT going to redeliver
> on 21 Oct.
> Will revert/clarify as soon as possible."

10.    Then at 1947 hours Korean time or Melbourne (Australian) time the same
day (1 October) Charterers' brokers sent a final message reading:

> "Sorry about this.  Apparently the redelivery message was an error –
> "please disregard"!
> They tell me that they will advise in 2 or 3 days.  That's all I can get
> out of them for the moment."

11.     On 1 October 2007 the time difference between Melbourne (Australia) and
        Athens (Greece) was 9 hours. (The time difference between Seoul and
        Athens was 7 hours.)

12.     I believe that the time on the e-mail messages is the time in Melbourne
        where the Charterers' brokers are based.

13.     Accordingly, these events occurred between 0716 hours and 1047 hours
        Greek time on 1 October.

14.     At 1137 hours Greek time on 1 October, Owners brokers went out into the
        market seeking alternative employment for the vessel on the basis she was
        available at Busan on 21 October.

15.     At 1338 Greek time on 1 October Owners' brokers stated their position in
        relation to the events that day. It is worth setting out the message in full:

            "Owners refer to Charterers' redelivery notice and the message
            Owners' brokers appear to have received from Charterers' brokers and
            Owners kindly advise Charterers that the vessel is currently being
            negotiated by the Owners firmly for her next employment on the basis
            of Charterers' redelivery notice. As Charterers can appreciate the
            vessel was fixed to their account in order to perform 2/3 ladden [sic]
            legs at their option.
            Charterers are currently performing their second leg and they have
            already declared their option by tendering redelivery notice that they
            will not perform a third ladden [sic] leg. Owners by circulating vessel
            on the market and having commenced firm negotiations with third
            parties have accepted this redelivery notice and this cannot be now
            retracted by the Charterers."

16.     The only other communication of note is a message dated 4 October sent
        via the brokering chain from Charterers, the material part of which reads:

"We have consulted with our P & I Defence Club and they have advised us that Owners are obliged to perform the 3rd leg and have no right to fix the vessel out to a third party based on a 'redelivery' notice that was retracted shortly after.

Giving an intended redelivery notice is not the same as exercising a legal option: redelivery notices are intended as general guidance only which is very different from making a clear exercise of an option. Charterers having clearly retracted the notice, Owners should have conducted themselves accordingly (and should continue to do so) as though the vessel will be performing a third laden leg ...."

17.   In the event, Owners chartered the vessel out under a new charter (a copy of which I have not seen), Charterers gave voyage instructions for a third laden leg but Owners refused to perform them and employed the vessel under the new charter.

18.   Charterers have sought to accept a repudiatory breach by Owners and have now intimated that they intend to bring a claim and have requested security.

19.   I am asked to advise on liability and quantum.

**Construction of the Charterparty**

20.   The starting point is the true construction of Lines 13 and 14 of the charterparty and Clause 4.

21.   In my view, the contact, properly construed, provided Charterers with the option to employ the vessel on two or three laden voyages provided that the vessel was redelivered between 60 and 100 days after delivery.  In other words, the exercise of the option had to be consistent with redelivery of the vessel within the charter period.

22.   Although I can find no authority on the point, the obligation to give notice in advance of redelivery is probably an innominate term.  A breach of it

sounds in damages. Accordingly, if a charterer purports to redeliver a vessel within the permitted period without giving the required notices, he will be liable for any damages the owner suffers by reason of not having the required forewarning. I do not believe that the absence of the requisite notice renders the purported redelivery ineffective. See, by analogy, redelivery of a damaged ship: *Time Charters* 5th ed. Para 15.11.

23.     Clause 4 requires, inter alia, 20 days "approximate ... notice" of re-delivery. This means, commercially, notice must be given approximately 20 days before re-delivery is reasonably anticipated at the time the notice is given.

### Exercise of contractual options

24.     Often voyage charters will give the charter the option to load or discharge at one or more ports within a given range.

25.     The law is clear in relation to nomination of loading or discharging ports under such voyage charters. In the absence of some special provision a valid nomination once made is irrevocable. As stated in *Voyage Charters* 2nd ed para 5.23, normally a nomination completes the definition of the parties' contractual obligations. The effect of the authorities has been summarised as follows by Judge Diamond QC in *The Jasime B* [1992] 1 Lloyd's Rep 39 at 42:

> "In the absence of any special provision in a charter, the effect of the nomination of a loading or discharging port by the charterer is that the charterparty must thereafter be treated as if the nominated port had originally been written into the charterparty and that the charterer has neither the right nor the obligation to change that nomination."

26.     There is no logical reason why the same considerations should not apply to nomination of a redelivery range/port under a time charter. I have recently been involved as Counsel in an arbitration where this very question arose. Mr Nicholas Hamblem QC, as sole arbitrator, held in an award dated 30

January 2007 that the nomination of a redelivery range under the time charter was irrevocable (as contended for by the undersigned). Mr Hamblem QC said in that case:

> "24. As far as clause 4 as a whole is concerned, the Owners contend that once a redelivery range has been declared it becomes the contractual redelivery range, and they rely by analogy on the law relating to nomination of ports under voyage charters. This was disputed by the Charterers who contend that it is a performance option rather than a contractual option and that its exercise is revocable.

> 25. In my view the option is properly to be construed as a contractual option. It is a matter of importance. Its obvious purpose is to enable the Owners to seek follow on employment in the declared range. Steps to seek such employment are likely to be taken as soon as the option is declared. The Owners need to know where they stand and if the range can at any time be changed then this will not be achievable. Moreover the wording of clause 4 supports the irrevocable nature of the option. Whilst the time of redelivery and the port of redelivery are not required to be made definite until 5 days before delivery, there is no such qualification for the declaration of the redelivery range. The only declaration to be given for redelivery range is the 25 day notice and, in contrast to the other notices, there is nothing to suggest that that notice is not required to be a definite notice.

> 26. If the declaration of the redelivery range is a contractual option it follows that thereafter this was a contract for redelivery in that range. The Charterers were obliged to redeliver in that range and could not choose to do otherwise. ..."

27.    In my view, the same applies in relation to the exercise of a contractual option to perform two laden legs or three laden legs. Precisely the same commercial considerations apply that justify a strict interpretation. Charterers in this case had considerable latitude. Owners needed to know

where they stood and they could not demand more than 20 days notice as to whether the vessel would perform two or three laden legs. The exercise of the option by Charterers was important and should be construed as a contractual option. Owners would need to seek follow on employment. They needed to know where they stood and whether they could commit to such follow on employment. There is no opportunity of revoking the exercise of an option as to do so would be to create a new contract.

28.    The issue therefore arises whether Charterers exercised their option in the instant case. In my view they did.

29.    The matters should be tested as follows. Had Charterers not sought to revoke their 20 day notice of redelivery, but proceeded to give the remaining notices and redelivered the vessel, it is inconceivable that Owners could have argued that Charterers had failed to exercise their option to employ the vessel on just two laden legs rather than three. Any argument to the contrary would be wholly un-commercial and bound to fail. It is necessarily implicit in the giving of the first notice (and subsequent notices) under Clause 4 involving a redelivery at the end of the second laden leg that the Charterers did not intend to employ the vessel for a third laden leg.

30.    Should the result be any different because Charterers sought to revoke their 20 day notice of redelivery? In my view it should not. It remains necessarily implicit in the giving of the notice that Charterers did not intend to employ the vessel for a third laden leg. At that point in time the contractual option was exercised and the contract was one for two laden legs only. If, by revoking the 20 day notice, Charterers were seeking to revoke the exercise of their option then, for the reasons given above, I do not believe this was lawfully open to them.

31.    Although on the facts of this case the construction can be said to produce harsh results, the construction should not be overly influenced by the facts of this case. It is true that Owners did not act to their detriment in the 4

hours or so between the original notice and its purported revocation.
However, one can imagine cases where one, two or three days later a
charterer seeks to revoke the exercise of his option and an owner has acted
to his detriment. I do not consider that the law of estoppel in such cases
should be the only remedy to an owner. If the option is a contractual
option then the contract is made and fixed at the time the option is
exercised.

32.     Finally, the fact that the 20 day notice is not a definite notice of redelivery
but merely approximately 20 days advance notice of redelivery is
irrelevant in my view. By giving the notice Charterers are stating that they
will not be employing the vessel on a third laden leg. This is not
inconsistent with a representation that they believe that the vessel will be
redelivered in about 20 days. If the Charterers intended to employ the
vessel on a third laden leg there could be no justification for giving a 20
day notice. That notice must be a reasonable estimate of when the vessel
is likely to be redelivered. On 1 October Charterers could not have
reasonably believed that the vessel would be redelivered in 20 days if they
intended to employ the vessel on a third laden leg.

33.     Accordingly, I disagree with Charterers in their message of 4 October.
The giving of a 20 day notice necessarily involved an exercise of their
contractual option in lines 13-14.

34.     In the light of my advice it follows that what Charterers said or did after
giving notice at 1616 hours on 1 October is irrelevant.

**Remaining Questions**

35.     Those who instruct me have asked two further questions. I will consider
them even though they do not arise in the light of my advice set out above.

36.     If I am wrong and the giving of the 20 day notice did not amount to an
irrevocable exercise of a contractual option in relation to the number of
laden legs, then Owners would be in repudiatory breach of charter.

8

37.    There is a duty on Charterers to give "approximate" notices of redelivery in good faith. It requires that the Charterers genuinely believe at the time the notice is given that the vessel would be redelivered within approximately 20 days. See, by analogy, the position in relation to duration of time charters "without guarantee": *Time Charters* 5th ed. Para 4.50 and 4.51. In order to have a genuine belief, the assumptions upon which the decision to give notice are based must be reasonable.

38.    However, I do not believe that this duty of good faith is breached if Charterers made a genuine mistake as to whether they had or could fix further employment for the vessel. At present it is simply not known why Charterers made an error.

39.    The only defence I can envisage is one of estoppel. It would be necessary to argue that Charterers are estopped from denying that they intended to redeliver the vessel after only two laden voyages because, induced by Charterers' representations, Owners acted to their detriment. However, given that the notice was withdrawn within 4 hours and prior to Owners putting the vessel out on the market, I cannot see how a case of detrimental reliance can be made out.

40.    As for the measure of damages, if at (or shortly after) the time of wrongful withdrawal or repudiation there is an available market, the normal measure of damages will be the difference between the charter rate of hire and the market rate for chartering in a substitute ship for the balance of the charter period: *Time Charters* 5th ed. Para 16.116 and *The Elena d'Amico* [1980] 1 Lloyd's Rep 75.

41.    The rate at which the Charterers chartered a substitute vessel will be good *evidence* of the prevailing market rate. However, that rate is not necessarily the market rate.

42.   It is not necessary for Charterers to prove that they in fact did have a fixture for a third laden voyage.

### Security wording

43.   The security wording provided by Charterers is for a letter of undertaking and is not suitable for a bank guarantee. Do Owners have P & I cover and, if so, is their P & I Club willing to provide a letter of undertaking in the form requested by Charterers (if necessary backed up by counter-security from Owners)?

44.   The draft letter of undertaking is governed by the laws of Hong Kong S.A.R. This is inappropriate when the underlying dispute is governed by English law. The letter of undertaking should be governed by English law and should contain an exclusive jurisdiction clause providing for English jurisdiction – High Court.

45.   Finally, the amount set out in the letter of undertaking should be <u>inclusive</u> of interest and costs. It would be a mistake to have an open-ended undertaking or guarantee.

### Conclusions

46.   In my view Charterers exercised their contractual option not to employ the vessel on a third laden leg. They did so by serving a 20 day notice of redelivery on 1 October.

47.   The exercise of that contractual option was irrevocable.

48.   Although commercially unattractive, Owners were entitled to hold Charterers to their exercise of their contractual option notwithstanding an attempt to withdraw it four hours later.

49.   Owners do not need to show any detrimental reliance by reason of the giving of the notice and exercise of the option.

50.    Owners should defend any claim pursued by Charterers.

51.    However, if proceedings are commenced and pursued then I would like to revisit my Advice once the parties have pleaded their respective cases.

52.    If those who instruct me have any queries arising out of this Advice, or generally, they should not hesitate to contact me.

TIMOTHY HILL

**STONE CHAMBERS**
4 Field Court
14 November 2007

**EXHIBIT G**



07 CV 10640

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
NAIAS MARINE S.A.
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax:  (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------

NAIAS MARINE S.A.,

                                        Plaintiff,

            v.

TRANS PACIFIC CARRIERS CO. LTD.,

                                        Defendant.
--------------------------------------------------------------X

07 CV _____ (___)

**VERIFIED COMPLAINT**

        Plaintiff NAIAS MARINE S.A., (hereinafter "NAIAS") by its attorneys, Chalos,

O'Connor & Duffy, as and for its Verified Complaint against the Defendant, TRANS

PACIFIC CARRIERS CO. LTD. (hereinafter "TRANS PACIFIC"), alleges upon

information and belief as follows:


                                JURISDICTION

        1.        This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure, and also falls under this Court's admiralty and

maritime jurisdiction pursuant to 28 U.S.C. § 1333.

## THE PARTIES

2.    At all times material hereto, Plaintiff NAIAS was and still is a foreign business entity duly organized and existing pursuant to the laws of a foreign country operating under foreign law with an address at Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH 96960.

3.    The plaintiff NAIAS is the owner of the vessel M/V STENTOR, and the primary business of NAIAS is to charter the M/V STENTOR to others for the carriage of cargo in exchange for payments of hire or freight.

4.    At all times material hereto, defendant TRANS PACIFIC was and still is a foreign business entity duly organized and existing pursuant to the laws of a foreign country by virtue of foreign law with an address at 10th floor, Donghwa Bldg., 58-7, Seosomun-Dong, Jung-Gu, Seoul, Korea.

5.    The defendant TRANS PACIFIC is engaged in the business of transporting cargoes by ocean vessel.

## AS AND FOR A CAUSE OF ACTION
## FOR BREACH OF MARITIME CONTRACT

6.    On August 14, 2007, plaintiff NAIAS, as owner of the ocean-going vessel M/V STENTOR, entered into a charter party contract with defendant TRANS PACIFIC, as charterer, whereby defendant TRANS PACIFIC hired the M/V STENTOR for two (2) to three (3) loaded voyages, a minimum of 60 days and a maximum of 100 days, within agreed upon trading limits.

7.    The charter party contract between plaintiff NAIAS and defendant TRANS PACIFIC is a maritime contract.

2

8.    The maritime contract charter party between the plaintiff NAIAS and defendant TRANS PACIFIC, at clause 31, provides that any disputes arising out of the maritime contract shall be governed by English law and shall be referred to arbitration in London.

9.    Costs, including attorneys' fees, are routinely awarded to the prevailing party in London arbitration because they are recoverable damages in arbitration pursuant to the London Maritime Arbitration Association's rules.

10.    On October 1, 2007, defendant TRANS PACIFIC gave notice that it would not continue the charter for a third laden leg and that, therefore, TRANS PACIFIC would redeliver the M/V STENTOR on or about October 20 or 21, 2007 with the specific statement to "Pls take this msg as chrts' 20 days of redelivery notice."

11.    The plaintiff NAIAS accepted the notice of redelivery and, in reliance on the redelivery notice, NAIAS made arrangements to charter the M/V STENTOR to others.

12.    Later, on October 1, 2007 and thereafter, defendant TRANS PACIFIC began to indicate that it wished to revoke its redelivery notice.

13.    Plaintiff NAIAS, concerned by the hesitancy of defendant TRANS PACIFIC, did not accept defendant TRANS PACIFIC's revocation of the redelivery notice, as it was not required to do so under the terms of the charter party and, consequently, NAIAS accepted redelivery of the M/V STENTOR from TRANS PACIFIC.

14.    On October 25, 2007, the defendant TRANS PACIFIC sued plaintiff NAIAS in the Southern District of New York alleging that NAIAS was in breach of the

3

charter party of August 14, 2007 by wrongfully withdrawing the vessel the M/V

STENTOR from the services of TRANS PACIFIC prior to the performance of the third

laden leg.

15.    The lawsuit initiated by TRANS PACIFIC was initiated for the specific

purpose of employing the Rule B Maritime Attachment Procedure so as to obtain security

for the breach of charter party claim that was to be arbitrated in London.

16.    The lawsuit in the Southern District of New York was entitled Trans

Pacific Carriers Co. Ltd. v. Naias Marine S.A., 07cv9544, and the case was assigned to

Judge Louis L. Stanton.

17.    The lawsuit of October 25, 2007, which was initiated by TRANS

PACIFIC, was dismissed after NAIAS provided security for TRANS PACIFIC's claim in

the form of a Letter of Guarantee from HSBC Bank for $978,238.00.

18.    The security provided by NAIAS was in the amount of $590,863.41 on the

principal claim, and $250,000.00 of which was specifically designated as security for the

estimated costs of London arbitration that TRANS PACIFIC alleged it would incur and

which costs are awardable to the prevailing party in London arbitration.

18.    Pursuant to a request from TRANS PACIFIC under the circumstances of

the posting of security by NAIAS, Judge Stanton signed a Notice of Dismissal on

November 14, 2007, and Judge Stanton ordered that any funds belonging to NAIAS

under attachment be released.

19.    Plaintiff NAIAS, having posted security for the London arbitration,

intends to fully participate in arbitration in London with defendant TRANS PACIFIC

and, more to the point, NAIAS is of the firm belief that it will not only succeed in having

4

the claims of defendant TRANS PACIFIC either dismissed outright or that they will

result in no damages, but the plaintiff NAIAS is of the firm belief that the arbitration

panel will award NAIAS its costs in defending the claim in London arbitration as it is

clear that NAIAS was not in breach of the charter party, pursuant to English law, by

accepting the redelivery notice of TRANS PACIFIC.

 20. Defendant TRANS PACIFIC has already stated in prior pleadings that it

believes the costs of the London arbitration will be on the order of $250,000.00, and the

plaintiff NAIAS agrees that this is a fair estimate of the costs to arbitrate the claim in

London.

 21. Despite due demand, the Defendant TRANS PACIFIC has refused to

provide the Plaintiff NAIAS with security for the costs that will be incurred to defend the

arbitration.

 22. Based on the opinion of an English Barrister, the Plaintiff NAIAS is of

the view that the defendant's exercise of its option not to perform a third loaded voyage

was irrevocable and, as best as can now be estimated, plaintiff NAIAS expects to recover

its estimated costs in London arbitration from defendant TRANS PACIFIC in the amount

of $250,000.00.


PRAYER FOR RELIEF

 23. Notwithstanding the fact that the liability of the defendant is subject to

determination by arbitration in London, there are now, or will be during the pendency of

this action, certain assets, accounts, freights, monies, charter hire, credits, effects,

5

payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or claimed by the defendant within this District and held by various parties, as garnishees.

24.    Plaintiff NAIAS believes that some of these assets, *to wit*: bank accounts; payments from the purchasers of other cargoes; freight and/or hire payments being made to other vessel owners U.S. dollars; freight and hire payments from other charterers or shippers of cargo; and/or Clearing House Interbank Payment System (CHIPS) credits; and/or funds being transferred through intermediary banks are located in this District in the possession of garnishees, namely banks or financial institutions located in New York.

25.    As set forth in the accompanying affidavit of Owen F. Duffy, the defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

26.    Because this Verified Complaint sets forth an *in personam* maritime claim against the defendant and because the defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, the requirements for a Rule B attachment and garnishment are met and Plaintiff seeks the issuance of process of maritime attachment so that it may obtain security for its claims against the defendant and/or *quasi in rem* jurisdiction over the property of the defendant so that an eventual judgment and/or award can be satisfied.

WHEREFORE, Plaintiff prays as follows:

A.      That the defendant be summoned to appear and answer this Verified Complaint;

B.      That the defendant not being found within this District, as set forth in the Affidavit of Owen F. Duffy, then all of its assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to or claimed by the defendant within this District up to the amount sued for herein be attached pursuant to Supplemental Rule B and to pay Plaintiff's damages;

C.      That this Court retain jurisdiction over this matter through the entry of a judgment either by this Court, and/or the London arbitration panel, so that judgment may be entered in favor of Plaintiff for the amount of its claim with costs, *i.e.* US $250,000.00, and that a judgment of condemnation and sale be entered against the property arrested and attached herein in the amount of Plaintiff's claim, plus costs to be paid out of the proceeds thereof; and

D.      That Plaintiff has such other and further relief as the Court may determine to be just and proper under the circumstances.

Dated: Port Washington, New York
       November 27, 2007

                              CHALOS, O'CONNOR & DUFFY, LLP
                              Attorneys for Plaintiff,
                              NAIAS MARINE S.A.

               By:            _____
                              Owen F. Duffy (OD-3144)
                              George E. Murray (GM-4172)
                              366 Main Street
                              Port Washington, New York 11050
                              Tel:  (516) 767-3600
                              Fax:  (516) 767-3605

CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Plaintiff,
NAIAS MARINE S.A.
366 Main Street
Port Washington, New York 11050
Tel:  (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

NAIAS MARINE S.A.,

                    Plaintiff,

        v.

TRANS PACIFIC CARRIERS CO. LTD.,

                    Defendant.
-----------------------------------------------------------------X

07  CV _____ (_____)

**VERIFICATION**

STATE OF NEW YORK    :
                      : ss.
COUNTY OF NASSAU    :

      BEFORE ME, the undersigned authority, personally came and appeared Owen F.

Duffy who, after being duly sworn, did depose and state:

      1.      That he is a partner in the law firm of Chalos, O'Connor & Duffy LLP,

counsel for the Plaintiff, NAIAS MARINE S.A., herein;

      2.      That he has read the foregoing complaint and knows the contents thereof;

      3.      That he believes the matters to be true based on documents and

information obtained from employees and representatives of the Plaintiff through its

agents, underwriters and attorneys; and

4.      That the reason that this verification was made by deponent and not by the

Plaintiff is because Plaintiff is a foreign corporation, whose officers' verification could

not be obtained within the time constraints presented by the circumstances of this case.


Dated: Port Washington, New York
            November 28, 2007

                                    CHALOS, O'CONNOR & DUFFY, LLP
                                    Attorneys for Plaintiff,
                                    NAIAS MARINE S.A.

                  By:        _____

                                    Owen F. Duffy (OD-3144)
                                    366 Main Street
                                    Port Washington, New York 11050
                                    Tel:   (516) 767-3600
                                    Fax:  (516) 767-3605


Subscribed and sworn to before me this
November 28, 2007

_____
Notary Public, State of New York

GEORGE E. MURRAY
Notary Public, State of New York
No. 02MU6108120
Qualified in New York County
Commission Expires April 12, 2008

2

**EXHIBIT H**

JUDGE LEISURE & DUFFY, LLP

NAIAS MARINE S.A.
366 Main Street
Port Washington, New York 11050
Tel: (516) 767-3600
Fax: (516) 767-3605
Owen F. Duffy (OD-3144)
George E. Murray (GM-4172)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NAIAS MARINE S.A.,

                                    Plaintiff,

              v.

TRANS PACIFIC CARRIERS CO. LTD.,

                                    Defendant.
------------------------------------------------------------X

**07 CV 10640**

USDC SDNY.
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/28/2007

07 CV _____ (___)

**ORDER FOR ISSUANCE
OF A PROCESS OF
MARITIME ATTACHMENT**

          Upon reading the Verified Complaint requesting issuance of Process of Maritime

Attachment and Garnishment, and the Affidavit of Owen F. Duffy, Esq. attached thereto,

and the Court finding that the conditions for an attachment under Rule B of the

Supplemental Rules for Certain Admiralty and Maritime Claims Admiralty to the Federal

Rules of Civil Procedure appear to exist, it is this day, by the United States District Court

for the Southern District of New York, hereby

          **ORDERED** that the Clerk shall issue a Process of Maritime Attachment and

Garnishment as prayed for in the Verified Complaint; and it is further

          **ORDERED** that the Process of Attachment issued by the Clerk shall be against

all property, tangible or intangible, including funds, goods, chattels, credits, effects, debts

owned by or owed to the Defendant TRANS PACIFIC CARRIERS CO. LTD. or

monies to be paid to discharge a debt owed to the Defendant, including monies being

electronically transferred by or to TRANS PACIFIC CARRIERS CO. LTD. which are

in the possession or control of, or being transferred through any garnishee within this

District, including, without limitation, property held by or in the possession or control of

the following garnishee(s):

1. American Express Bank Ltd.
   c/o Zeichner Ellman & Krause, LLP
   Legal Counsel for Bank of America
   575 Lexington Avenue, 10th floor
   New York, New York 10022

2. Bank of America, National Association
   c/o Zeichner Ellman & Krause, LLP
   Legal Counsel for Bank of America, N.A.
   575 Lexington Avenue, 10th floor
   New York, New York 10022

3. Bank of New York
   120 Broadway, 19th Floor
   New York, New York

4. Citibank, N.A.
   Legal Service Intake Unit
   1 Court Square, 7th Floor
   Long Island City, NY 11120

5. Deutsche Bank Trust Company Americas
   60 Wall Street
   New York, New York 10005

6. HSBC Bank U.S.A., National Association
   452 Fifth Avenue
   New York, New York

7. JPMorgan Chase Bank, National Association
   One Chase Manhattan Plaza
   New York, New York 10081

8.  Industrial Bank of Korean
    1250 Broadway
    New York, NY 10001-3798

9.  Kookmin Bank
    565 Fifth Avenue, 24th Floor
    New York, NY 10017-2466

10. The Korea Development Bank
    320 Park Avenue, 32nd Floor
    New York, NY 10022-6815

11. Shinhan Bank
    800 Third Avenue, 32nd Floor
    New York, NY 10022-7604

12. Standard Chartered Bank
    One Madison Avenue
    New York, NY 10010

13. UBS AG
    299 Park Avenue
    New York, New York, 10017

14. Wachovia Bank, National Association
    11 Penn Plaza
    New York, New York 10001

or any of their affiliates and any other garnishee(s) within this district upon whom a copy of the Process of Maritime Attachment and Garnishment herein may be served, in an amount up to the amount sued for, *i.e.*, $250,000.00, it is further

**ORDERED** that any person claiming an interest in the property attached or garnished pursuant to said Order shall, upon application to the Court, be entitled to a prompt hearing at which the plaintiff shall be required to show why the attachment and garnishment should not be vacated or other relief granted, and it is further

**ORDERED** that a copy of this Order be attached to and served with the said Process of Maritime Attachment and Garnishment, and it is further

**ORDERED** that pursuant to Fed. R. Civ. P., Supplemental Rules for Certain Admiralty and Maritime Claims, Rule B(1)(d)(ii)(C), the Writ of Attachment may be served by any person, who is not less than 18 years old, and who is not a party to this action, and it is further

**ORDERED** that service on any garnishee(s) (i.e. any original garnishee or any garnishee herein) is deemed to be effective and continuous service throughout the remainder of the day upon which such service is made commencing from the time of such service through the opening of the garnishee's business the next business day, and it is further

**ORDERED** that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D), that following initial service upon any garnishee by the United States Marshal or any other person designated by Order to make service in this action, supplemental service of the Process of Maritime Attachment and Garnishment shall thereafter be made by way of service of a copy of the Process of Maritime Attachment and Garnishment via facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee so personally served, and it is further

**ORDERED** that supplemental process enforcing this Order may be issued by the Clerk and served without further Order of the Court.

Dated:  New York, New York
        November 28 2007

SO ORDERED:

_____
U. S. D. J.

A CERTIFIED COPY
J. MICHAEL McMAHON,                CLERK

BY _____
        DEPUTY CLERK

4

**EXHIBIT I**

# 07 CV 10640

JUDGE LEISURE PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT

## THE PRESIDENT OF THE UNITED STATES OF AMERICA

To:    The United States MARSHAL for the SOUTHERN DISTRICT OF NEW YORK

**GREETING:**

WHEREAS, a Verified Complaint has been filed in the United States District Court for the Southern District of New York on the 28th day of November, 2007 styled as follows:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
NAIAS MARINE S.A.,

                         Plaintiff,

                                                    07 CV _____ (___)

          v.

TRANS PACIFIC CARRIERS CO. LTD.,

                         Defendant.
-------------------------------------------------------------X

in a certain action to recover damages due and owing the said Plaintiff amounting to $250,000.00, and praying that a Writ of Attachment and Garnishment be issued against the Defendants pursuant to Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims, and

WHEREAS, this process is issued pursuant to such prayer and requires that the garnishee shall serve his answer, together with answers to interrogatories served with the Verified Complaint, within 20 days after service of process upon him and requires that Defendant shall serve an answer within 30 days after process has been executed, whether by attachment of property or service on the garnishee,

NOW, THEREFORE, we do hereby command you that if said Defendant cannot be found within the District, you attach the following up to the amount sued for:

All property, tangible or intangible, including: assets, accounts, freights, hire payments, monies, charter hire, credits, debts owed to the Defendant, effects, CHIPS credits, electronic fund transfers, payments for bunkers, cargo, goods or services, bills of lading, cargo and the like belonging to or claimed by the Defendant within this District to the amount sued for herein be attached pursuant to Supplemental Rule B and the same be

attached to pay Plaintiff's damages which are found in the possession of garnishees or which are found in the possession or control of specific garnishees, to wit:

1.  American Express Bank Ltd.
    c/o Zeichner Ellman & Krause, LLP
    Legal Counsel for Bank of America
    575 Lexington Avenue, 10th floor
    New York, New York 10022

2.  Bank of America, National Association
    c/o Zeichner Ellman & Krause, LLP
    Legal Counsel for Bank of America, N.A.
    575 Lexington Avenue, 10th floor
    New York, New York 10022

3.  Bank of New York
    120 Broadway, 19th Floor
    New York, New York

4.  Citibank, N.A.
    Legal Service Intake Unit
    1 Court Square, 7th Floor
    Long Island City, NY 11120

5.  Deutsche Bank Trust Company Americas
    60 Wall Street
    New York, New York 10005

6.  HSBC Bank U.S.A., National Association
    452 Fifth Avenue
    New York, New York

7.  JPMorgan Chase Bank, National Association
    One Chase Manhattan Plaza
    New York, New York 10081

8.  Industrial Bank of Korean
    1250 Broadway
    New York, NY 10001-3798

9.  Kookmin Bank
    565 Fifth Avenue, 24th Floor
    New York, NY 10017-2466

2

10. The Korea Development Bank
    320 Park Avenue, 32nd Floor
    New York, NY 10022-6815

11. Shinhan Bank
    800 Third Avenue, 32nd Floor
    New York, NY 10022-7604

12. Standard Chartered Bank
    One Madison Avenue
    New York, NY 10010

13. UBS AG
    299 Park Avenue
    New York, New York, 10017

14. Wachovia Bank, National Association
    11 Penn Plaza
    New York, New York 10001

or any other garnishee within this district.

**WITNESS**, the Honorable Judge *Peter K Leisure*, Judge of said Court, this 21st day of November, 2007.

By: *J. Michael McMahon.*

Clerk

By: *Paul Robett*

Deputy Clerk

**NOTE:** This is issued pursuant to Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

CERTIFIED COPY

J. MICHAEL McMAHON,      CLERK

BY *Paul Robett*

DEPUTY CLERK

3

**EXHIBIT J**

# CHALOS, O'CONNOR & DUFFY

## ATTORNEYS AT LAW

Michael G. Chalos
Eugene J. O'Connor
George M. Chalos
Owen F. Duffy
Leroy S. Corsa
Timothy Semenoro*
Brian T. McCarthy
George E. Murray

*Admitted in NY & NJ

366 MAIN STREET
PORT WASHINGTON, NEW YORK 11050-3120

TELEPHONE (516) 767-3600
TELECOPIER (516) 767-3605 & 3925
WEBSITE: WWW.CODUS-LAW.COM

Owen F. Duffy
Partner
ofd@codus-law.com

November 30, 2007

Trans Pacific Carriers Co. Ltd.
10th Floor
Donghwa Bldg., 58-7                    *Via DHL*
Seosomun-Dong
Jung-Gu
Seoul, Korea

Re:    Naias Marine S.A. v. Trans Pacific Carriers Co. Ltd.
       S.D.N.Y. Index No. 07 CV 10640 (PKL)
       Our ref.: 500390.003

## *Notice of Lawsuit and Maritime Attachment*

Dear Sirs:

We are New York attorneys, who represent Naias Marine S.A. in the above-referenced matter.

The purpose of this letter is to provide you with Notice of a Lawsuit that has been commenced by Naias Marine S.A. against Trans Pacific Carriers Co. Ltd. in the U.S. District Court for the Southern District of New York. Additionally, the purpose of this letter is to provide you with Notice, in accordance with Fed. R. Civ. P. Supplemental Rule B(2), that property belonging to Trans Pacific Carriers Co. Ltd. is being restrained pursuant to Process of Maritime Attachment issued by the U.S. District Court for the Southern District of New York. The property, *i.e.* money, has been restrained, and will be held pursuant to the Court's Order, to secure the claim asserted by Naias Marine S.A. against Trans Pacific Carriers Co. Ltd. for security in Naias Marine S.A.'s dispute with Trans Pacific Carriers Co. Ltd. regarding the charter party of August 14, 2007.

CHALOS, O'CONNOR & DUFFY LLP

In order to protect our client's rights in this matter, we have initiated a lawsuit against Trans Pacific Carriers Co. Ltd. in the U.S. District Court for the Southern District of New York. Briefly stated, the lawsuit in New York was initiated to make use of the Supplemental Rules for Admiralty and Maritime Claims, which provide for a Maritime Attachment procedure whereby a defendant's assets can be attached to obtain security or satisfy an award that arises out of another legal proceeding such as arbitration in London.

The purpose of this letter is to provide you with formal Notice of the Lawsuit and Notice of the Attachment as required by Rule B(2) of the Supplemental Rules for Admiralty and Maritime Claims.

Accordingly, **PLEASE TAKE NOTICE** that the lawsuit filed by Naias Marine S.A. against Trans Pacific Carriers Co. Ltd. in New York is as follows:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
NAIAS MARINE S.A.,

                          Plaintiff,

                                                    07  CV  10640 (PKL)

          v.

TRANS PACIFIC CARRIERS CO. LTD.,

                          Defendant.
--------------------------------------------------------------X

Copies of the relevant pleadings that were filed in the case to obtain Process of Maritime Attachment and the Court's Orders are attached herewith for your guidance. These enclosed documents are the following:

1.     Verified Complaint, with Request for Issuance of Maritime Attachment and Garnishment, filed November 28, 2007;

CHALOS, O'CONNOR & DUFFY LLP                                        2

2.    Order for Issuance of Process of Maritime Attachment, dated November 28, 2007; and

3.    Process of Maritime Attachment, dated November 28, 2007.

Also attached is an original Summons for you to serve upon the Plaintiff's attorney an Answer in this action within thirty (30) days after receiving this letter, exclusive of the day of receipt. If you fail to serve an Answer upon the Plaintiff's attorney, judgment by default will be taken against you for the relief demanded in the Verified Complaint. You must also file your Answer with the Clerk of this Court within a reasonable period of time after service.

**PLEASE TAKE FURTHER NOTICE** that the Process of Maritime Attachment has been executed in that the Process of Maritime Attachment was served, among others, on the Bank of America. This garnishee-bank has confirmed that it is holding funds belonging to Trans Pacific Carriers Co. Ltd. in accordance with the Process of Maritime Attachment. The money that has been attached was a payment being remitted by Trans Pacific Carriers Co. Ltd. in the amount of $316,305.62 of which $250,000.00 was restrained pursuant to the Process of Maritime Attachment in this matter.

The total amount that is presently being restrained, $250,000.00, is sufficient to fully secure Naias Marine S.A.'s claim. As such no other restraints are being sought in this matter.

As set forth in Supplemental Rule E (4)(f), any person claiming an interest in such property is entitled to a prompt hearing at which the plaintiff shall be required to show why the attachment should not be vacated or other relief granted consistent with the rules. We are, however, of the firm view that there are no grounds for the attachment to be vacated.

Alternatively, whenever Process of Maritime Attachment and Garnishment is issued, the execution of such process shall be stayed, or the property released, on the giving of security, to be approved by the court or clerk, or by the stipulation of the parties, conditioned to answer the judgment of the court or any appellate court. The parties may stipulate the amount and nature of such security.

CHALOS, O'CONNOR & DUFFY LLP                                         3

Under the circumstances, if you are interested in providing alternate security so as to release the attachment over its funds being held by the garnishee-bank, then I ask that you or your legal counsel contact the undersigned. If we fail to hear from you, we will eventually proceed to execute on such funds.

I thank you for your attention to this matter, and I look forward to hearing from you.

Very truly yours,

CHALOS, O'CONNOR & DUFFY, LLP

Owen F. Duffy

Encl.****
OFD:gem

**Via Email**
cc:     rory.mcfarlane@incelaw.com
        max.cross@incelaw.com

**Via Fax**
Ince & Co.
44 20 7481 4968